# 24-2734(L)

**To Be Argued By:**
**ALLEGRA GLASHAUSSER**

United States Court of Appeals
For the second Circuit

Docket Nos. 24-2734(L) & 24-3299(Con)

UNITED STATES OF AMERICA,

Appellee,

-against-

MAURICIO RENE GARCIA QUIMBAYO, AKA TONY, AKA MAURICE, CLAUDIA ISABEL MERCADO SCALZO, AKA LA FLACA, TATIANA ANDREA VARGAS BULLA, AKA TATI, AKA TONIA, AKA TONYA, OSCAR GOMEZ ROMERO, AKA COMPA,

Defendants,

JEY JAMES ROLDAN CARDENAS, AKA SEALED DEFENDANT 1, AKA MILLER DE JESUS GUTIERREZ DURAN, JOSE ALFREDO AGUAS OVIEDO,

Defendants-Appellants.

APPEAL FROM A FINAL JUDGMENT
OF THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

BRIEF FOR DEFENDANT-APPELLANT JEY JAMES ROLDAN CARDENAS

Federal Defenders of New York, Inc.
Appeals Bureau
52 Duane Street, 10th Floor
New York, New York 10007
Tel. No.: (212) 417-8742

Attorney for Defendant-Appellant
**JEY JAMES ROLDAN CARDENAS**

**ALLEGRA GLASHAUSSER**,
Of Counsel

## TABLE OF CONTENTS

Statement of Jurisdiction ................................................................... 1

Questions Presented ........................................................................... 2

Statement of the Case ........................................................................ 2

Statement of Facts .............................................................................. 3

The court excludes evidence that Aguas – Mr. Roldan's police co-worker
and alleged coconspirator – had helped seize drugs for police .................................... 4

Trial ................................................................................................... 7

Mr. Roldan's police co-worker Aguas tipped off the DEA that a plane
with drugs would be leaving the Cartagena airport ........................................ 7

A paid DEA informant, the informant's assistant, and a cooperating
government witness discussed transporting drugs from the Cartagena airport .......... 8

The paid DEA informant met Aguas (the police officer who later told
the DEA that a plane would be leaving Cartagena with drugs). Aguas
claimed he would transport drugs from the Cartagena airport by plane. ................... 9

Aguas introduces Mr. Roldan to the paid DEA informant, who immediately
recognizes that Mr. Roldan was not a police major, and was only wearing
a bad costume. ................................................................................ 10

The DEA had paid the informant about three million dollars and
provided paperwork for him to live in the United States after being
deported, despite the informant's history of grave misconduct .................................. 13

The cooperating government witness continued to try to arrange the drug transaction, including meeting another confidential informant. ................ 14

At a second and last meeting with the paid DEA informant, Mr. Roldan was again vague. ......................................................................................... 14

The paid DEA informant continued to discuss the drug transaction with Aguas, the police officer who had told the DEA that a plane would be leaving the Cartagena airport with drugs. ...................................................... 15

The paid DEA informant spoke to Mr. Roldan by phone only once; Mr. Roldan was again vague. ........................................................................ 16

The cooperating government witness admitted that "maybe [Mr. Roldan and Aguas] were truly secretly investigat[ing]." ...................................... 17

The government introduces records related to a lack of undercover work to claim that Aguas – who the government knew had helped seize drugs for police – and Mr. Roldan weren't seizing drugs for police. ................ 18

The court's exclusion of the defense exhibits .............................................. 18

Defense Case ....................................................................................................... 21

Mr. Roldan testified that he thought he and Aguas were helping police seize drugs. ........................................................................................... 21

Summations .......................................................................................................... 29

Charge conference and jury instructions ......................................................... 29

Sentencing ........................................................................................................... 31

Summary of Argument .................................................................... 37

Argument ........................................................................................ 38

Point I

Mr. Roldan testified that he thought he was helping Aguas, his police coworker, seize drugs for the police, and this was his defense at trial. The court made evidentiary errors that improperly hampered this defense by, *inter alia*, excluding evidence that Aguas had helped seize drugs for police twice during the same time as the charged conspiracy .......................................... 38

    A.    Evidence about Aguas's help with police drug seizures should have been admitted under Rule 404(b). ........................................... 39

    B.    The court should have allowed the defense to admit photos supporting Mr. Roldan's testimony. .................................................. 44

Point II

The defense requested a legally correct charge: that the reason government informants couldn't be part of any conspiracy was because they lacked the intent to join one. The court committed error in refusing to provide this charge, which went to the heart of the defense theory that Mr. Roldan also lacked the intent to join any conspiracy because he thought – just like the other informants – that he was part of a police operation ............................... 49

    A.    Standard of review ............................................................ 50

    B.    Counsel's requested charge that government informants couldn't be conspirators because they lacked intent was legally correct and should have been provided. ......................................................... 51

Point III

The court erred in failing to rule on the defense objections to the guideline range before sentencing Mr. Roldan. .................................................................. 55

Conclusion ........................................................................................................ 59

# TABLE OF AUTHORITIES

Cases

*Chambers v. Mississippi*,
410 U.S. 284 (1973) ................................................................ 39

*Dowling v. United States*,
493 U.S. 342 (1990) ................................................................ 39

*Gall v. United States*,
552 U.S. 38 (2007) ............................................................. 54, 56

*Molina-Martinez v. United States*,
578 U.S. 189 (2016) ........................................................... 54, 55

*Old Chief v. United States*,
519 U.S. 172 (1997) ................................................................ 45

*Peugh v. United States*,
569 U.S. 530 (2013) ........................................................... 54, 55

*Rosales-Mireles v. United States*,
585 U.S. 129 (2018) ........................................................... 54, 55

*United States v. Aboumoussallem*,
726 F.2d 906 (2d Cir. 1984) ........................................... 39, 40, 41

*United States v. Al Kassar*,
660 F.3d 108 (2d Cir. 2011) .................................................... 42

*United States v. Al-Moayad*,
545 F.3d 139 (2d Cir. 2008) .................................................... 45

*United States v. Amuso*,
21 F.3d 1251 (2d Cir. 1994) .................................................... 41

v

*United States v. Anderson,*
   747 F.3d 51 (2d Cir. 2014) ...................................................... 52, 53

*United States v. Angelilli,*
   660 F.2d 23 (2d Cir. 1981) .......................................................... 43

*United States v. Bautista,*
   252 F.3d 141 (2d Cir. 2001) ........................................................ 53

*United States v. Blum,*
   62 F.3d 63 (2d Cir. 1995) ........................................................... 40

*United States v. Booker,*
   543 U.S. 220 (2005) ............................................................ 54, 55

*United States v. Botti,*
   711 F.3d 299 (2d Cir. 2013) ........................................................ 50

*United States v. Capers,*
   20 F. 4th 105 (2d Cir. 2021) ....................................................... 50

*United States v. Carlton,*
   442 F.3d 802 (2d Cir. 2006) ........................................................ 50

*United States v. Cavera,*
   550 F.3d 180 (2d Cir. 2008) ........................................................ 54

*United States v. Dawkins,*
   999 F.3d 767 (2d Cir. 2021) ........................................................ 42

*United States v. Desimone,*
   119 F.3d 217 (2d Cir. 1997) ........................................................ 51

*United States v. Desposito,*
   704 F.3d 221 (2d Cir. 2013) ........................................................ 39

*United States v. Doyle,*
    130 F.3d 523 (2d Cir. 1997) ................................................................. 51

*United States v. Feldman,*
    647 F.3d 450 (2d Cir. 2011) ................................................................. 57

*United States v. Genao,*
    869 F.3d 136 (2d Cir. 2017) ..........................................................54, 55

*United States v. Jamil,*
    707 F.2d 638 (2d Cir. 1983) ................................................................. 45

*United States v. Labbe,*
    588 F.3d 139 (2d Cir. 2009) ................................................................. 58

*United States v. LaFlam,*
    369 F.3d 153 (2d Cir. 2004) ................................................................. 39

*United States v. Mahaffy,*
    693 F.3d 113 (2d Cir. 2012) ................................................................. 50

*United States v. Mustafa,*
    753 F. App'x 22 (2d Cir. 2018) ........................................................... 40

*United States v. O'Connor,*
    580 F.2d 38 (2d Cir. 1978) ................................................................... 42

*United States v. Olmeda,*
    894 F.3d 89 (2d Cir. 2018) ................................................................... 57

*United States v. Poindexter,*
    942 F.2d 354 (6th Cir. 1991) ............................................................... 53

*United States v. Polouizzi,*
    564 F.3d 142 (2d Cir. 2009) ................................................................. 46

*United States v. Prawl,*
168 F.3d 622 (2d Cir. 1999) ............................................................. 50

*United States v. Rosenblatt,*
554 F.2d 36 (2d Cir. 1977) ............................................................. 50

*United States v. Scarpa,*
897 F.2d 63 (2d Cir. 1990) ............................................................. 42

*United States v. Seabrook,*
968 F.3d 224 (2d Cir. 2020) ........................................................... 57

*United States v. Silver,*
864 F.3d 102 (2d Cir. 2017) ........................................................... 50

*United States v. Vazquez,*
113 F.3d 383 (2d Cir. 1997) ........................................................... 51

*United States v. Weiss,*
930 F.2d 185 (2d Cir. 1991) ........................................................... 39

*United States v. White,*
692 F.3d 235 (2d Cir. 2012) ........................................................... 48

*Wray v. Johnson,*
202 F.3d 515 (2d Cir. 2000) ........................................................... 48

Statutes

18 U.S.C. § 3231 ................................................................................ 1

18 U.S.C. § 3742(a) .......................................................................... 1

21 U.S.C. § 963 ................................................................................. 2

21 U.S.C. § 960(b) ............................................................................ 2

28 U.S.C. § 1291 ............................................................................... 1

United States Sentencing Guidelines

U.S.S.G. §3C1.1 ........................................................................... 31

U.S.S.G. § 3B1.2 .......................................................................... 58

U.S.S.G. § 3B1.3 ........................................................................... 31

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

_____

Docket Nos.  24-2734(L) &24-3299(Con)
_____

UNITED STATES OF AMERICA,

Appellee,

-against-

Mauricio Rene Garcia Quimbayo, AKA Tony, AKA Maurice, Claudia Isabel Mercado Scalzo, AKA La Flaca, Tatiana Andrea Vargas Bulla, AKA Tati, AKA Tonia, AKA Tonya, Oscar Gomez Romero, AKA Compa,

Defendants,

Jey James Roldan Cardenas, AKA Sealed Defendant 1, AKA Miller de Jesus Gutierrez Duran, Jose Alfredo Aguas Oviedo,

Defendants-Appellants.

_____

APPEAL FROM A JUDGMENT
OF THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

_____

BRIEF FOR APPELLANT JEY JAMES ROLDAN CARDENAS

_____

## Statement of Jurisdiction

The district court had jurisdiction pursuant to 18 U.S.C. § 3231. The judgment was rendered on September 26, 2025, and a notice of appeal was timely filed on September 30, 2024. This Court has jurisdiction pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a).

1

## Questions Presented

1. Mr. Roldan testified that he thought he was helping Aguas, his police co-worker, seize drugs for the police, and this was his defense at trial. Did the court make evidentiary errors that improperly hampered this defense by, *inter alia*, excluding evidence that Aguas had helped seize drugs for police twice during the same time as the charged conspiracy?

2. The defense requested a legally correct charge: that the reason government informants couldn't be part of any conspiracy was because they lacked the intent to join one. Did the court commit error by refusing to provide this charge, which went to the heart of the defense theory that Mr. Roldan also lacked the intent to join any conspiracy because he thought – just like the other informants – that he was part of a police operation?

3. Did the court err in failing to rule on the defense objections to the guideline range before sentencing Mr. Roldan?

## Statement of the Case

Jey James Roldan Cardenas was convicted after a jury trial of conspiracy to import cocaine, in violation of 21 U.S.C. §§ 963 & 960(b)1)(B), in the Southern District of New York (Hon. Lewis A. Kaplan). The court sentenced him to 165 months of incarceration and five years of supervised release. Mr. Roldan is currently incarcerated.

This Court continued the appointment of the Federal Defenders of New York as counsel on appeal under the Criminal Justice Act.

2

## Statement of Facts

Jey James Roldan Cardenas was a poor Colombian police officer who patrolled rural areas on horseback, protecting livestock and plants. He was charged with a conspiracy to import cocaine from Cartagena to the United States based largely on two videos of him in May and June 2021 talking to Isidro Vargas, who turned out to be a paid DEA informant, about assisting Vargas in flying cocaine out of Cartagena. In meeting Vargas, Mr. Roldan pretended to be a high-ranking police major, but wore such an obviously fake costume, that the paid DEA informant started calling him "Mayor Falso," or the Fake Major.

Mr. Roldan's defense at trial was all about his intent: he testified that a new police co-worker, Jose Aguas Oviedo, told Mr. Roldan that he worked with the anti-narcotics police seizing drugs; Mr. Roldan met the paid DEA informant only as part of a seizure plan. In support, the defense highlighted evidence from the government's case that, in June 2021, Aguas told superiors in the anti-narcotics unit that he had a tip that a plane would leave Cartagena with drugs – the very same type of conduct that the government argued Aguas and Mr. Roldan were arranging criminally.

In fact, Aguas had other experience helping police seize drugs: twice during the same time period, in May and June 2021, Aguas helped police make substantial drug seizures. But the jury never heard that evidence, which the court excluded. Aguas also had experience taking money related to drug seizures; he had skimmed from rewards

3

that were given to police informants before, just as Mr. Roldan believed he would do to pay Mr. Roldan. The court excluded this evidence too. The court also prevented the defense from introducing pictures of Mr. Roldan at his job, showing that, for him, police work involved shoveling manure, sleeping on a cot, and working in a bleak field, not making drug money or controlling airport security.

At the jury charge conference, the defense requested that the court tell the jury that the government informants involved in this fake plan couldn't be part of any conspiracy because they lacked the criminal intent to join one. Although this charge was directly relevant to Mr. Roldan's defense, which relied on the exact same theory that Mr. Roldan intended to seize the drugs, not traffic them, the court refused to give it. Mr. Roldan was convicted. Before sentencing, a juror wrote to the court saying that he understood that Mr. Roldan's intent didn't matter.

The court sentenced Mr. Roldan to 165 months of incarceration.

<u>The court excludes evidence that Aguas – Mr. Roldan's police co-worker and alleged coconspirator – had helped seize drugs for police.</u>

Pretrial, the government moved *in limine* to prohibit the defense from introducing evidence that Aguas had arranged two cocaine seizures while working with the Colombian police anti-narcotics unit. Dkt. 171 at 30-31.[1] The government

---

[1] Numbers preceded by "A" refer to pages of the appendix. Numbers preceded by "T" refer to pages of the trial transcript. All citations to the docket ("Dkt") are to ECF case number 21-cr-359.

argued that this would be "pure propensity evidence" barred by Federal Rule of Evidence 404 because the defense would be asking the jury to infer that Aguas was "acting in conformity with his prior lawful police activities (and therefore his apparent acceptance of a bribe on video was really a secret sting operation)." *Id.* The government also argued that the defense shouldn't be allowed to introduce evidence of prior instances where Colombian police officers took cuts of civilian informants' monetary rewards. Dkt. 171 at 31-32.

In response, the defense argued that evidence that Aguas had participated in two substantial drug seizures in May and June 2021 and had "worked with an antinarcotics unit…that skimmed money from civilian informants' monetary rewards" was relevant because it showed he had the "capability to work with an anti-narcotics unit to set up large cocaine seizures," and that Aguas had a "plan and a financial motive to" set up a drug seizure with Mr. Roldan. Dkt. 181 at 12-16.

The defense also moved to introduce statements from Major Victor Alfonso Torres Valero[2] about Aguas's drug seizure work. Dkt. 176 at 3-4; A. 27. Torres said that Aguas "had previously given information to" two superintendents in the police department "regarding two cocaine seizures that had occurred." A. 37. This statement

---

[2] The defense repeatedly requested to conduct a Rule 15 deposition of Major Torres, who was in Colombia. *E.g.,* Dkt. 147; 176. Initially, the court said the defense should simply call him to testify, Dkt. 157, but after the government spoke to his police department, he was prevented from traveling. Dkt. 176. The defense argued that the government made Torres unavailable, and the parties entered a stipulation at trial with respect to other statements by Torres.

"corroborate[d]" what Aguas "told Mr. Roldan" because "it show[ed] that he ha[d] the capability" to seize drugs. A. 38-39. The defense argued that this evidence was relevant to motive, opportunity, intent, preparation and plan under Rule 404(b). Dkt. 176 at 5.

At oral argument, the government responded that Aguas's drug seizures were different from the charged crime because they were at the "seaport," not the airport, and they "us[ed] an informant," instead of being a "sting operation." A. 32-33, 41. The court initially said Torres's statement should be excluded on hearsay grounds, A. 39, but counsel replied that that the government hadn't "actually raised [a] hearsay objection" with respect to Aguas's seizures because the "government knows that Aguas was involved in those prior seizures," which were documented in reports and by a DEA agent. A. 40. Additionally, Torres had "firsthand" information about them. A. 44.

The government agreed, saying that it had a hearsay objection only with respect to the "specific sentence" from Torres that Aguas "knew to reach out to the Major because [he] had previously given information to" the police department "regarding two cocaine seizures." A. 40. It had a "relevance" objection to the information about the seizures more generally. A. 40. The government said that the evidence would only show that Aguas "was a good cop." A. 41. The defense responded that it wouldn't use

the seizures to show Aguas was a good officer, but to show that he "knew how to setup a large seizure." A. 44.

In a written decision, the court granted the government's request to exclude the evidence of Aguas's drug seizures and skimming of money from confidential informants. SPA 4. The only explanation it provided was that it was "largely for the reasons stated in the government's motion." SPA 4.

Trial

Mr. Roldan's police co-worker Aguas tipped off the DEA that a plane with drugs would be leaving the Cartagena airport.

The parties entered a stipulation that Major Torres, the chief of a Colombian police anti-narcotics unit, would have testified that in mid-June 2021, Aguas said that he had a civilian informant with information about a plane departing from Cartagena to Central America with drugs. A. 197. Torres told Aguas he could either "formally register" as an undercover agent or that Torres could bring the information to the DEA for Aguas. A. 197. Being an undercover agent would have required working with the prosecutor's office and Aguas decided to have Torres bring the information to the DEA instead. A. 197-99.

Aguas still served as the "handler" for the source, which is someone who is a "law enforcement official that manages a confidential source by providing them guidance." A. 205. Torres, Aguas, and Aguas's informant met with a DEA Special

7

Agent on June 29, 2021. A. 198, 203. The informant would have been paid if the DEA decided to work with him, but the DEA decided not to because the DEA agent wasn't able to get information from him. A. 198, 204, 207. Aguas was told not to do anything on his own. A. 198.

> **A paid DEA informant, the informant's assistant, and a cooperating government witness discussed transporting drugs from the Cartagena airport.**

In 2021, Isidro Vargas, a paid DEA informant, pretended to be a drug trafficker trying to transport drugs by plane from Cartagena to New York. A. 211-12. Vargas paid an assistant a "commission" to help, explaining that "he was helping with a law enforcement investigation." A. 235-36. Unlike Vargas, his assistant was not a "confidential source" and didn't "report directly to the DEA." A. 235. His assistant only reported to Vargas. A. 235.

Vargas's assistant introduced him to Claudia Isabel Mercado Scalzo, who testified for the government as a cooperator, and eventually pleaded guilty to two counts of conspiracy to import cocaine into the United States. A. 162, 235-36. In February 2021, Vargas talked to Scalzo about bringing 1,000 kilos of cocaine by plane from Cartagena to the United States. A. 81, 85-87. Scalzo was "in charge of getting in touch with [ ] people who could facilitate" this plan. A. 81.

In May 2021, an "investor" introduced Scalzo to Aguas – the police officer who later tipped off the DEA about a plane leaving Cartagena with drugs. A. 89-94.

8

The investor said that he had "worked [with Aguas] before" and that Aguas "had a setup in the air, on land, and on the water." A. 89-90. Aguas told Scalzo he had worked in anti-narcotics, which she understood meant that he had "knowledge of the security protocols for detecting cocaine in the airport." A. 94. She told Aguas about the plan to manufacture cocaine and ship it from the Cartagena airport. A. 91, 94.

> The paid DEA informant met Aguas (the police officer who later told the DEA that a plane would be leaving Cartagena with drugs). Aguas claimed he would transport drugs from the Cartagena airport by plane.

On May 7, 2021, Scalzo introduced Vargas to Aguas. A. 95, 234. According to Vargas, Scalzo had told him that the purpose of this meeting was to discuss cocaine trafficking with a "colonel in the drug enforcement division of the Colombian National Police." A. 236. Vargas "insist[ed] on meeting with the colonel" because he "wanted" a "high-ranking member" involved to "get rid of corrupt people." A. 103, 240-41. GX 701A-T, F-T. However, no colonel came to this meeting. On the contrary, Scalzo could "tell that [Aguas] was a patrolman," A. 139, the lowest rank in the Colombian National Police. A. 357.

Aguas told Vargas that he "worked in a group…[his] own group." A. 103. He said that he would "handle all the logistics and security" of the cocaine deal. A. 103, GX 701F-T. Aguas described the kind of plane he would use, the type of flight plan, and that he would use explosive-sniffing dogs instead of drug-sniffing dogs to check the plane. A. 136, 237-38, 241. Vargas discussed that the plane would go "to the

9

Dominican Republic," to Puerto Rico, before eventually arriving in New York. A. 116-17; DXC0-T at 18, 52, 64, 66.

Aguas later sent Vargas photos showing an inspection of a private plane and helicopter, stating that the pictures showed "the way we work." A. 249, 252. Vargas thought these pictures were of a drug inspection at the Cartagena airport, A. 272, but the pictures actually were from somewhere else. A. 326. Aguas didn't really work at the airport or in Cartagena, A. 359-60, he was making that up.

Aguas texted Vargas later, saying that Aguas's "boss" was "asking for $50,000." A. 247. Scalzo "thought that this was [Aguas] trying to pull a fast one." A. 180.

> Aguas introduces Mr. Roldan to the paid DEA informant, who immediately recognizes that Mr. Roldan was not a police major, and was only wearing a bad costume.

On May 26, 2021, Aguas introduced Scalzo to Mr. Roldan and said that Mr. Roldan was his boss. A. 122-23. This was made up. Mr. Roldan was not Aguas's boss, but was just a horse-mounted "carabinero" police officer, who patrolled rural areas, protecting livestock and plants. A. 358-59. Like Aguas, he did not work at any airport and didn't work in Cartagena. A. 358-59.

They went into a hotel conference room and met Vargas, who noticed immediately that Mr. Roldan's police uniform was "frayed" and in "very bad condition." A. 124, 253, 255. Mr. Roldan was "missing some insignia on the collar of

10

his shirt, [ ] he wasn't wearing a badge," but, inconsistently, his "major insignia were completely new." A. 256. A "fabric" "name plate" said "Miller Major." A. 256.

Vargas asked Mr. Roldan, "are you [Aguas's] boss," and Mr. Roldan said, "Yes, Major Gutierrez." A. 127. Vargas concluded that Mr. Roldan "wasn't a major, [and] something wrong was going on there." A. 256. He emphasized that, Mr. Roldan "didn't seem to me to be a real major." A. 300. Indeed, he "never believed Mr. Roldan was a real major" and explained that to his DEA handler the same day he met Mr. Roldan. A. 315.

Just like Vargas, Scalzo also doubted Mr. Roldan was a major. She initially testified that Mr. Roldan was Aguas's boss, who "managed the logistics and security" at the Cartagena airport, calling him Aguas's "right-hand man" and saying that Aguas and Mr. Roldan "were to be in charge of transportation." A. 82, 88-89. However, later she explained that she only "wanted him to be a major" and "was expecting him to be one," but then Mr. Roldan was "wearing an old wrinkled uniform." A. 181. This made her "ask[ ] all sorts of questions and wonder[ ] about things." A. 182-83. She told a friend that she "doubted that…Mr. Roldan was a major," but was "reassured" to "[not] worry, they're police officers." A. 181. She also told someone that "it looked like Aguas was really the one in charge." A. 183.

To Vargas, Aguas also "appeared to be in charge ..." A. 321. During the meeting, which was recorded by Vargas, Vargas placed $6,000 on the table in front of

11

Mr. Roldan; Mr. Roldan picked it up and handed it immediately to Aguas. A. 143-44; GX 602B. Scalzo "thought" that it was "unlikely that a police major would hand the money to his underling." A. 182. Throughout, Mr. Roldan generally provided vague comments about his role, which Aguas frequently had to correct. Mr. Roldan said, for example, "We involve the whole airport…everybody…they're our people." GX 702C-T at 2. After this, Vargas asked, "not all the fucking staff is aware of [the drug transaction], are they?" DX B0-T at 13. And, Aguas clarified, saying "No, No." *Id.*

Mr. Roldan also vaguely described what he would do: he would "say my General, my Colonel, look we are going to work. This is what we are going to do and so on and so forth." A. 261-62. Mr. Roldan said that, "we pick up the product, and we take it to a warehouse we have over there." A. 263. Mr. Roldan also claimed he was "in charge of everything …related to the personnel, of everything that is related to the police end of things and all that, [he would] handle it." A. 128. He repeated this later, saying that they would handle "everything," adding "that's how we work," "we cover everything." GX 702H-T. Aguas mentioned the "forklifts, the supervisor [ ], the airport camera system, and most importantly the control tower," and Mr. Roldan said, "[t]hey are my people." A. 129.

Aguas provided some details, saying that he had "done some small departures…in suitcases" from the Cartagena airport before. A. 265. He again described that they would use explosive-sniffing dogs instead of drug-sniffing dogs. A.

12

134-36. Vargas asked if they would be paid in dollars or pesos and Mr. Roldan said, "either way." 702G-T. Aguas then said in "dollars," and Mr. Roldan echoed Aguas, saying, "In dollars." GX 702G-T. Aguas said that they would charge about $2,300 per unit of cocaine. A. 140.

After this meeting, Vargas started referring to Mr. Roldan as the "Mayor Falso." A. 300. At some point, Vargas – the paid DEA informant – told Scalzo that if Mr. Roldan wasn't a real major that Aguas "had better return the $6,000." A. 323. He "threatened to go looking for Aguas." A. 324.

After this May meeting, Scalzo never saw Mr. Roldan again. A. 167.

<u>The DEA had paid the informant about three million dollars and provided paperwork for him to live in the United States after being deported, despite the informant's history of grave misconduct.</u>

Vargas's career as a paid informant was decades long and twice interrupted by misconduct. He first worked with the FBI in 1989, but had to leave after an "incident with one of the FBI agents." A. 215-16. He then started working with the DEA, but, in 2008, he was "involved in a robbery of [ ] drugs…and money." A. 218. Vargas and a DEA detective would set up drug deals and then steal from the drug dealers. A. 331. After Vargas was arrested, he cooperated with the government. A. 219. Because of this, instead of receiving a 10-year mandatory minimum sentence, he served only 10 months in prison. A. 332. Although he was deported from the United States, he continued to work for the DEA and was allowed to return to the United States in

13

2011. A. 220. The DEA renewed his documents to stay in the United States yearly. A. 220. If he stopped working with the DEA, they would "very likely" stop renewing his papers to live in the United States. A. 333. Vargas was also paid $2,950,000 by the DEA. A. 214.

He was paid $80,000 for his work on Mr. Roldan's case alone. A. 215.

Even though Vargas didn't think Mr. Roldan was a major, at trial, Vargas claimed to "believe" Mr. Roldan was "100 percent" "capable of performing the [drug] deal " "because of the way he talked," "the codes that were used." A. 236, 301, 335-36. He didn't elaborate on any "codes" that Mr. Roldan used.

The cooperating government witness continued to try to arrange the drug transaction, including meeting another confidential informant.

On June 16, Scalzo introduced Vargas to a person who was to "make the arrangements to get a laboratory" "where the cocaine was going to be produced," and a person who turned out to be yet another confidential source. A. 82, 149, 275. The confidential source went to an "active cocaine processing lab," and sent Vargas photos of it. A. 277-78. Vargas sent the photos to the phone number Aguas had given him for "Mayor Falso." A. 280; GX 401B & 403B.

At a second and last meeting with the paid DEA informant, Mr. Roldan was again vague.

Vargas met Mr. Roldan for the second and last time on June 18, 2021. A. 281. Mr. Roldan was dressed in civilian clothes and Vargas asked him, "Didn't you bring

14

your costume today?" DX C0-T at 3. Other people at the meeting laughed. DX C0-T at 3.

At this meeting, Aguas again took the lead on details, explaining, for example, how much advance notice and money they needed. DX CO-T, at 11-13. There were lengthy portions of the meeting during which Mr. Roldan said nothing. *See e.g.,* DX CO-T at 24-37 & 39-44. When he did talk, he was vague: he described the lab as "all good." A. 286. And he said, "you just have to send us the money. You just have to say, it's for…such-and-such date. And then we'll arrange everything." A. 291.

In fact, at least according to Scalzo, there actually were no "labs," explaining that "they're not like amphetamine labs. They don't exist. So the laboratory is a place where they make, they manufacture, the drugs. There's no owner of the cocaine, as such. It's an empty place. There's no coke waiting for you there…" A. 189.

Vargas did not meet Mr. Roldan again.

<u>The paid DEA informant continued to discuss the drug transaction with Aguas, the police officer who had told the DEA that a plane would be leaving the Cartagena airport with drugs.</u>

In August 31, 2021, Vargas met with Aguas without Mr. Roldan. A. 293-95. Beforehand, Aguas texted Vargas and said that he couldn't meet at the hotel because it was "frequented by the DEA" and that he "got reprimanded" for going there. A. 294. Aguas knew that the DEA went to that hotel because he had met with the DEA himself there in June. A. 203.

15

At this August meeting, Vargas told Aguas that he knew that Mr. Roldan was "not a major." A. 297-98. Aguas responded rhetorically, saying "I work with someone who is not a policeman"? and suggested that Vargas could "go over there, where we work." A. 298. Vargas didn't take him up on this offer. A. 298. At some point, Vargas asked Aguas to give him a tour of the Cartagena airport, but Aguas said no. A. 325.

Scalzo also continued to meet Vargas into September without Mr. Roldan A. 153. Vargas asked her for three kilograms of cocaine as a sample from the "same lab" "where the kilos were going to be produced," which she provided. A. 155-57. [3] Vargas paid her, and she never saw him again A. 158.

Vargas sent photos of this cocaine sample to Aguas, saying that he had ordered 1000 kilograms. A. 306-08.

### The paid DEA informant spoke to Mr. Roldan by phone only once; Mr. Roldan was again vague.

In September 2021, the investor sent Vargas a new number for the "major." A. 308-09. Vargas sent this new number the same pictures of cocaine that he had sent Aguas. A. 310. Vargas received a text message that the person could "take" Vargas's "call now." GX 403C. Afterward, Mr. Roldan spoke to Vargas, who said "did you talk with [Aguas] about everything already?" A. 312. Mr. Roldan said, "Yes, of course, he is keeping me up to speed." A. 312. Vargas asked Mr. Roldan if he could "really trust

---

[3] A fourth confidential informant, Marco, was also at this meeting. A. 302.

[him] 100 percent." GX 501-T. Vargas said, "there is some mistrust about whether you were or were not, but I'm going to trust you…" GX 501-T.  He asked Mr. Roldan where he wanted to receive the money and Mr. Roldan said, "Boss, wherever you tell me. You tell me what's more convenient for you." GX 501-T. Vargas recorded this phone call under the file name, "Recording Fake Major." A. 321.

<u>The cooperating government witness admitted that "maybe [Mr. Roldan and Aguas] were truly secretly investigat[ing]."</u>

Scalzo initially claimed that she "knew everybody's intent, everybody who was at that meeting. It was drug trafficking, of course." A. 168-69. She then admitted, however, that she thought that "at the time," but later realized that wasn't true, because – at the least – Vargas and his assistant didn't intend to do a drug transaction. A. 169. Despite that, she was "sure" Aguas could move drugs through the Cartagena airport because "[h]e was a cop" and "I know my country, and I know the way things work better than anybody, and…any police officer might have a lot contacts." A. 179.

Later, however, she said that, "I knew they were police officers. Now, what kind? Well, either corrupt ones or – I mean, maybe corrupt police officers or maybe they were truly secretly investigating. That's a possibility. Just like Isidro Vargas…" A. 191. At the time she thought Vargas "was what [he] said [he] [was]" as he "knew a lot about drug trafficking…" A. 192.

Scalzo also admitted that during her conversations with Vargas, she said "a lot of things…that weren't true." A. 160.

<u>The government introduces records related to a lack of undercover work to claim that Aguas – who the government knew had helped seize drugs for police – and Mr. Roldan weren't seizing drugs for police.</u>

<u>Juan Ayala</u>, who worked at the Office of the Attorney General of Colombia, requested records from eight agencies about Mr. Roldan and Aguas and did not find any records about them doing official undercover work. A. 340, 345-36. Only "judicial police" were allowed to conduct undercover investigations and there were policies for such investigations, including that any money would have to be reported. A. 347-52. It was not explained why Aguas's meeting with the DEA in June 2021 didn't appear in these records.

<u>The court's exclusion of the defense exhibits</u>

After the government's case concluded, the government moved to exclude photographs the defense planned to introduce in its case. Dkt. 191. The defense argued it should be permitted to provide "evidentiary richness" to their case, and that precluding the exhibits mid-trial, even though the government had them since a week before opening statements, was prejudicial as the defense's opening statement included telling the jury that Mr. Roldan's police duties included "literally cleaning out stables and shoveling horse manure." Dkt. 193, citing A. 65. The excluded pictures showed that Mr. Roldan didn't have the ability to take drugs through the airport,

18

didn't "have the income of a corrupt police officer involved in narcotrafficking," and "establish[ed] his motive to earn reward money." Dkt. 193.

The photos showed Mr. Roldan at work, Dkt. 193, including cleaning horses' stables:



Building a fence to contain the police horses:



19

The horses he took care of in their pasture:



And his work sleeping area:



Dkt. 191 and 193.

The defense also argued that these pictures were particularly important as it had

been hindered in obtaining supportive evidence from Colombia. For example, two

Colombian police officers who were scheduled to testify about Mr. Roldan's police

20

duties backed out after the government's witnesses "made inquiries of their superiors." Dkt. 193. The photographs were the best corroborating evidence Mr. Roldan could access. *Id.*

The court agreed with the defense that the photographs "illustrat[ed] a day in the life of a lowly and poorly paid rural police officer – a person perhaps not likely to be in a position to direct airport security and other airport personnel and not likely to be party to an illegal cocaine exporting operation." SPA 64-65. But, the court said that the "circumstances of his daily life are equally consistent with his intent being to facilitate a law enforcement seizure or facilitate trafficking cocaine," so the "photographs add not[h]ing [ ] relevant [to a] dispute in this case." SPA 65. "[T]here is no denying that they are likely to engender sympathy for a poor man performing mundane duties and living in unattractive circumstances in a remote part of a poor and troubled country." SPA 65. The "risk of unfair prejudice to the government's case substantially outweighs any probative value of those exhibits." SPA 65. It excluded all but three photos. SPA 65.

Defense Case

> Mr. Roldan testified that he thought he and Aguas were helping police seize drugs.

Mr. Roldan was 35 years old and had never been convicted of any crime. A. 368-69. Being a police officer was his "childhood dream," and he applied to the police force when he was 20 years old. A. 369. He became a patrolman and had never had

any other rank. A. 370. On his first assignment, he had to travel, working for 60 days straight at a time. A. 371. After five years, he switched assignments, as it was too hard to be away from his family. A. 371. Shortly after getting his new position patrolling in one spot, however, he was ordered to join the carabineros group. A. 371.

As a carabinero, he was taught to work with horses. A. 372. He took care of the horses, cleaned their stables, tended to injuries, and rode them. A. 372. He patrolled for environmental crime in a rural area. A. 372.



Mr. Roldan at work; DX F-1 (excerpt).

22

He was sent to the "Banana Zone" in 2021, so-named because it had many banana trees. A. 377, 379. There he addressed crimes like theft of fruit and theft of tools. A. 379. He was never assigned to Cartagena and had never worked in an airport. A. 376. He had no training on airport operations, security, or air traffic control. A. 376. His police records confirmed this information. DX A1.

In the Banana Zone, he was paired with Aguas on April 9, 2021. A. 386-87. They shared one motorcycle, which they would ride together. A. 387. Aguas appeared "better off financially" than Mr. Roldan and the rest of the patrolmen, as he was the only one who arrived by car, owned his own weapon, and had better quality work items. A. 388.

Mr. Roldan was poor. A. 388. His salary was about $500 per month and he had no other income. A. 388. He had no car and lived in his parents' house. A. 389. Aguas told Mr. Roldan he had extra money because he worked at the anti-narcotics base and had a source who provided drug information that Aguas provided to his bosses. A. 389. Aguas explained that his source was registered with the police and that the source would receive a reward for good information and give a percentage to Aguas. A. 389-90. Mr. Roldan knew that the monetary reward system for tips was something used within the police force. A. 390.

Aguas told Mr. Roldan that he was working on information from a source that a Mexican wanted to move drugs through the Cartagena airport. A. 391. The plan was

23

for the Mexican to place the drugs at a warehouse that Aguas's bosses knew about, and to seize them. A. 392. Aguas told Mr. Roldan that he had already met this Mexican and that he needed Mr. Roldan to "pretend to be Aguas's boss and tell the Mexican that [he] was authorizing Aguas to do whatever was needed." A. 392. The "goal was that the Mexican trust Aguas, place the drugs at a warehouse, so they could be seized." A. 393. Aguas told Mr. Roldan that Mr. Roldan would get a cut of the reward, up to $7,000. A. 393. The "Mexican" was Vargas, the paid DEA informant.

To pretend to be a major, Mr. Roldan's brother made him a fake ID. A. 395-96. Mr. Roldan attached a major insignia to the uniform using his mother's sewing machine. A. 400. Aguas helped Mr. Roldan find a major's hat. A. 397-98. While they were looking for the hat, Aguas stopped with Mr. Roldan at the anti-narcotics base, to which he had a key. A. 398-99. That Aguas had access to the anti-narcotics base, confirmed to Mr. Roldan that he was telling the truth about his experience.

At the first meeting with Vargas, Mr. Roldan told Vargas that he had worked with Aguas for seven years, which wasn't true. A. 408. He said they worked together at the airport, which wasn't true. A. 408. Mr. Roldan had no way to help put drugs on a plane. A. 394. Neither did Aguas, as far as he knew. A. 394. His intention was to help seize the drugs involved and earn tip money. A. 394.

Aguas called him the day before the second meeting and said he needed Mr. Roldan again. A. 414. He gave Mr. Roldan money to buy civilian clothes, and gave

24

him a cell phone and a watch. A. 415-16. The phone had only one contact in it, "Mexi." A. 417. Right before the meeting started, Mr. Roldan received photos on the phone. A. 418. After the meeting, Mr. Roldan gave the phone back to Aguas. A. 420.

Mr. Roldan's cell phone number, which he had for about five years, ended in 3087 A. 383. DX A3T. Mr. Roldan had that phone on him at the time of his arrest. A. 384. The phone referenced in the government's case was not this phone.

When Mr. Roldan didn't hear anything else, he thought that the Mexican had backed out. A. 428. But in September 2021, Aguas called him and said the Mexican wanted to talk to Mr. Roldan and that Mr. Roldan should take the call. A. 428-29. Aguas said to tell the person who turned out to be the paid DEA informant that Aguas had kept Mr. Roldan up to date and that they could take him to the anti-narcotics unit if he wanted. A. 429. Because Mr. Roldan only had his personal phone, Aguas told him to uninstall what's app on his phone and reinstall it with a code from Aguas. A. 430. This activated the "major's" phone number on his phone. A. 430. Mr. Roldan texted that he would call. A. 431. After this call, he never talked to the paid DEA informant again. A. 433.

Mr. Roldan last spoke to Aguas on February 18, 2022, the day before he was arrested. A. 435. On cross, the government introduced a notation that Aguas had "turned on disappearing messages" on February 18, 2022. GX 404. Mr. Roldan said

he didn't remember how the disappearing message feature worked and also he

couldn't read English, which was the language the message appeared in. A. 468.

Summations

In closing argument, the government highlighted testimony that there was no

record of Mr. Roldan or Aguas working as undercover agents, saying that the official

"scoured the relevant agencies' records for any shred of evidence that [Mr. Roldan] or

[ ] Aguas were working in an undercover capacity between May and August of 2021.

What did he find? Absolutely nothing." A. 514. The "acceptance of the $6,000…the

failure to report it…all of that is devastating proof." A. 531. In contrast, Vargas

explained "all the steps that actually happened in a real undercover investigation." A.

513.

Later, the government continued at length on this theme, explaining that Mr.

Roldan knew the rules and didn't follow them. A. 535-39. It said: "there are

procedures that exist for an undercover operation in Colombia, and that not just any

police officer in Colombia is authorized to carry out undercover operation. You have

to be a special type of police officer, a judicial police officer." A. 536. It asserted that

"every police officer in Colombia knows [the procedures and rules] just from his or

her most basic training." A. 536. There were "multiple layers of authorizations that are

needed to carry out an undercover operation…a lot of paperwork is generated…" A.

536. "Real undercover officers don't keep money they seize from purported drug

traffickers. They file it in evidence. They file reports on it. But none of that occurred here. Because there was no undercover operation. The defendant made it all up." A. 536. It also asserted that "any person would know that an authorized undercover sting operation would not require you to go home and sew your own undercover costume…" A. 535.

The government also asserted that "you know, from all the evidence in this case, that the defendant and [ ] Aguas…had the means to smuggle cocaine out of the airport into the United States on a private charter flight," because "Aguas worked for an anti-narcotics unit," so he had "many different police contacts." A. 523.

In its rebuttal argument, the government said that the defense theory was that Mr. Roldan had the "bad luck of not filing a single police report. He had the bad luck of [ ] Aguas not filing a single police report either. He had the really bad luck of Jose Aguas not actually being an undercover registered officer," it concluded by asserting, "Ladies and gentlemen, nobody's that unlucky." A. 579-80.

The government also confused the issue of whether an informant could be part of a conspiratorial agreement, saying that there was "no serious dispute that there was an agreement to smuggle" cocaine to the United States because "Scalzo" "agreed to traffic drugs with [ ] Vargas, the DEA informant." A. 516-17. And it stated, incorrectly, that "[j]ust [Mr. Roldan's] mere presence at the May 26th meeting is evidence of intent." A. 525.

27

In response, the defense argued that Mr. Roldan believed he was helping Aguas with a drug seizure, just as Vargas's assistant was helping Vargas. Counsel explained, "it makes sense that [ ] Aguas would tell Mr. Roldan that Aguas would give a portion of the reward money to Mr. Roldan just like [ ] Vargas gave a portion of his reward money to" his assistant. A. 547. Just as Vargas's assistant didn't make reports, neither did Mr. Roldan. A. 548. The defense also focused on the fact that in mid-June Aguas told his boss, the head of anti-narcotics…, that Aguas had information about a plane leaving the Cartagena airport with drugs…Aguas reported the plane." A. 545.

The defense also tried to point the jury to the lack of evidence in the government's case, but was interrupted repeatedly by sustained objections. Counsel said: "[T]he government is missing a lot of evidence that they really ought to have if Mr. Roldan were guilty." A. 560. An unspecified objection was sustained. A. 560. Counsel continued, saying "[t]here is no evidence that Mr. Roldan has even visited the Cartagena airport, let alone that he worked there or had connections there. The DEA or perhaps its partners in the Colombian National Police could easily have surveilled Mr. Roldan to see if he had those connections." A. 561. An unspecified objection was sustained. A. 561. Counsel said, "I don't understand the objection," and the court said, "Go on, and adhere to the rulings." A. 561. Counsel continued, saying "[w]hy didn't the DEA do literally any investigation into Mr. Roldan before it decided to

28

charge and extradite him?" A. 561. Another unspecified objection was sustained and the court instructed the jury that:

> the government does not have to prove its case by any particular means, nor does the government have to place before you all of the information at its disposal, whatever that is or isn't. The question is whether the proof you have heard in this case satisfies you beyond a reasonable doubt of the defendant's guilt or not. A. 561-62.

<u>Charge conference and jury instructions</u>

During the charge conference, the defense asked for an instruction explaining that the government informants weren't part of any conspiracy because they "lack[ed] the intent" to be conspirators. A. 493. *See also* Dkt. 168 at 8. Counsel explained that the "same reason those individuals are not bona fide conspirators is why [under the defense theory] [Mr. Roldan] is not a bona fide coconspirator." A. 493. The court said that it was "not sure [the reason why government informants couldn't be conspirators was] because they don't share the intent." A. 490. Counsel cited *United States v. Al Kassar*, 660 F.3d 108 (2d Cir. 2011), saying "[b]ecause a conspiracy requires the participation of at least two culpable co-conspirators, it follows that a person who enters into such a conspiratorial agreement while acting as an agent of the government, either directly or as a confidential informant, lacks the criminal intent necessary to render him a bona fide co-conspirator." A. 490-91. Counsel added that it was "about the intent," and that was their "theory of defense." A. 491-92. The court asked, "the reason why you think that's necessary is what?" A. 493. And counsel

29

reiterated that their theory of defense was that the "same reason those [government informants] are not [ ] conspirators is why our client is not a [ ] coconspirator." A. 493.

The court overruled this request, saying "[t]hat may be, but I'm going to deal with your client…separately." A. 493. The court added, "Your client is certainly capable of being one of the conspirators." A. 493-94. Counsel said that, "so are the government agents if they harbored the intent to actually do the deal." A. 494. The court said counsel was "nitpicking." A. 494.

The jury instruction didn't explain why government informants can't be conspirators. Instead, the court said only: "there is one category of persons who cannot be considered in deciding whether two or more people reached an agreement or understanding. No one who is acting at the direction of the government may be considered …as one of the two persons who initially formed the conspiracy." A. 584. The only time the court mentioned intent with respect to the element about whether a conspiracy existed was to describe what "intent to distribute" meant, an issue that wasn't in dispute. A. 590.

With respect to Mr. Roldan's intent, the court said that the government had to prove he "[k]nowingly and intentionally entered into the charged conspiracy with a criminal intent, that is, with a purpose to violate the law…" A. 592. The court explained that an act was done "knowingly and intentionally if its done deliberately

30

and purposefully; that is, the defendants acts must have been the product of the defendant's conscious objective rather than the product of a mistake or an accident or negligence or some other reason." A. 592.

The jury convicted Mr. Roldan. A. 619. Before sentencing, one of the jurors wrote to the court stating that he "went into deliberations thinking that the defendant was innocent, or at least that the government hadn't proven to me beyond a reasonable doubt that he had the means or the intent to actually aid in getting cocaine over the US border." Dkt. 237, at 27. The juror said, however, that he "realized" "that intent or means didn't matter here." *Id.* The letter continued, saying, "Yes, Mr. [Roldan] was involved in a conspiracy, and that is all that needed to be true to convict, but his role was never quite proven to me to be more than a man stumbling oafishly through a bad situation and looking for some cash from people who were even more corrupt than he was." *Id.*

Sentencing

Probation calculated the total offense level as 43, using a base offense level of 38 because of the weight of the drugs and adding two points each for enhancements for possessing a weapon, under U.S.S.G. § 2D1.1(b)(1), abusing a position of trust, under U.S.S.G. § 3B1.3, and providing "false testimony at trial," under U.S.S.G. §3C1.1. PSR 11-12. Although Mr. Roldan's criminal history category was I, his guideline range was life imprisonment. PSR 12, 16.

The defense objected to the guidelines calculation, arguing that the correct range was 63 to 78 months. A. 628. The defense argued, *inter alia*, that Mr. Roldan should receive a mitigating role adjustment as he was the "least culpable person involved," and was "a prop used by Jose Aguas to bolster Jose Aguas' credibility." A. 629. Mr. Roldan "showed up with a uniform he sewed himself," "stumbling officially through the situation." A. 670. He was "the most peripheral" person, who went to only two meetings and had one call; he had no connections to the airport and was just pretending to be a major. A. 631. The government responded that Mr. Roldan was "not a drug courier," that he "understood the full scale of the operation," and "stood to benefit" from the transaction. A. 633-34. The court denied the defense request without explanation. A. 634.

The defense also objected to the abuse of trust enhancement, arguing that Mr. Roldan didn't use his own position as a police officer, but pretended to be a major, which he wasn't. PSR. 26; A. 634. The court did not rule on this issue but said, "We may come back to this." A. 636.

Counsel also argued that Mr. Roldan 'testified truthfully at the trial, and the fact that he was convicted does not mean that he lied." A. 637. This was especially true based on the juror's letter explaining that he "didn't think Mr. Roldan did have the intent, he just didn't think that was necessary to convict." A. 637. The court also didn't rule on this objection, saying "Let's come back to that, too." A. 638.

32

Instead of ruling on those two objections, the court said that the "recommendation from probation is 180 months" and to "get down to the point where that [would be] a guidelines sentence, [would take] adjustments totaling nine points. You haven't persuaded me of that, and I don't think any of these points we've discussed is material in light of that." A. 641. Counsel said, "they're material," as the "guidelines are" an initial point and "an anchor." A. 641. The court said that counsel's arguments "even if they all went your way [ ] don't get you" to the probation recommendation being a guideline sentence. A. 642. "[A]ll or substantially all of the arguments made by the defense for a different adjusted offense level would be immaterial if I imposed the recommended sentence." A. 642. The court then said, "as a matter of good order, I adopt the guideline range as set forth in the PSR." A. 642. Counsel reiterated that the guidelines are an "initial anchor," that the rulings on the guidelines weren't "immaterial," and that "correct calculation of the guidelines is [ ] important." A. 642-43.

The court reiterated its counter-position, saying that, "if the guideline computation yielded an offense level as high as 36, the guideline range would be over 180 months." A. 643. Counsel replied that, "if the guidelines were lower, the recommendation might also be lower." A. 643. The court said, "I guess we probably have a different view of that, but it's for another day" and directed counsel to move on to the 3553 factors. A. 643.

33

Counsel explained that he had traveled to Colombia, seen Mr. Roldan's "humble home," and met his coworkers and family, who all think he is a "wonderful person." A. 644. Counsel believed that too. A. 644. Mr. Roldan lived with his grandmother, father, mother, partner and child; the house bathroom didn't even have a door. A. 645. Mr. Roldan's colleagues and his boss, "were discouraged from coming [to trial because] it would hurt their careers." A. 644. As they wrote to the court, they were "[s]hocked by his arrest" and that they had "no doubt that he was not involved in drug trafficking, in part because that's his character, in part because he was broke." A. 645. Mr. Roldan "could not have truthfully allocated" because he wasn't guilty. A. 646-47.

The court asked if counsel was "really asking [ ] to sentence him on the basis that he didn't do the crime of which he has been convicted." A. 647. Counsel said, "He didn't do the crime that he has been convicted of." A. 647. Counsel continued, saying "I believe he is innocent, and this has been a very difficult case for counsel and especially for Mr. Roldan and his family." A. 649.

The government asked for 196 months of incarceration, which was a sentence "modestly higher than" Aguas's sentence because Mr. Roldan "lied." A. 650.

The court sentenced him to 165 months of imprisonment and five years of supervised release. A. 651. The court said it was a "substantial variance from the guideline provision, which call[ed] for a life sentence" and noted that it was "more

34

favorable" than what probation recommended. A. 652. The court was "enormously sympathetic to quite a lot of indication that, with the exception of this conspiracy, he is a good family member, a good friend, a good man." A. 652. The court said, "we can't overdo enhancing sentences because somebody goes to trial, tells an exculpatory story that is not believed, and gets convicted[,] on a theory of perjury." A. 653. "We have to be very cautious, lest that become a penalty for going to trial and whatever analysis is given to the uncertainty that our discussion this morning revealed about the guideline computation." A. 653.

The court added, "I did not enhance the guideline calculation for perjury, but that isn't to say that I believed the story that Mr. Roldan told on the stand." A. 653. It continued, "as confident as one can be of these things, I'm quite persuaded that he was all-in on this conspiracy and falsely denied it, but …[i]t didn't affect the guideline calculation, nor did it affect the extent of my downward variance." A. 653. The court told Mr. Roldan that he could appeal and thanked counsel, explaining that it was clear their "heartstrings were involved in this case from the beginning." A. 654.

After this, the government asked to "clarify a couple ministerial items." A. 655. It said, "the Court just said that the Court did not consider the defendant's perjury or alleged perjury in any way to enhance his sentence." A. 655. The court said, "I did not give you the obstruction of justice adjustment to the guideline calculation. [ ] [T]he fact that his testimony was rejected by the jury and that I personally didn't credit it

35

may have had some influence on the sentence, but…well the sentence speaks for itself." A. 655.

The government asked, "With respect to the abuse of trust enhancement, did the Court intend to include that enhancement or not…?" A. 656. The court said, "not included." A. 656. The government then said, "for clarity of the record…the rejection of those two enhancements reduces the defendant's offense level to a total of 40…and that yields an advisory guideline of 292 to 365 months." A. 656. The government added that, "just to clarify, your Honor, or rather to confirm that revised guideline range does not in any way affect the sentence the Court intended to impose." S. 33. The Court said, "Yes. Thank you for the clarification." A. 656.

The government continued, saying, "the Court adopted the full – well, just to confirm, did the Court adopt the entire PSR subject to the revisions of the guidelines range and paragraph 74 that we discussed…including, most importantly, the reasons for the special conditions set forth in the PSR?" The Court said, "Yes." A. 656.

## Summary of Argument

In May and June 2021, numerous people met and discussed trafficking cocaine by plane from the Cartagena airport. However, at least four of them didn't really intend to do so, but were working for the government or police in some capacity. Mr. Roldan testified that, just like the other four people, he also didn't intend to traffic cocaine, but thought he was working with Aguas and the police to seize drugs. His testimony made sense. Aguas told the DEA he had an informant with a tip about a plane leaving Cartagena with drugs in June 2021. And, Mr. Roldan had no knowledge or means to traffic drugs. He was a poor police officer, whose job was to take care of police horses. Moreover, Aguas knew how to help seize drugs for the police; he had done so twice in May and June 2021. The jury, however, didn't hear that evidence and other evidence that supported Mr. Roldan's defense.

The jury charge also did not adequately explain how intent worked in this case and that the reason the government informants weren't part of the conspiracy was because they lacked a criminal intent. For the evidentiary errors and the jury charge error, his conviction should be reversed.

In the alternative, the court should vacate Mr. Roldan's sentence because the court didn't rule on two defense guideline errors before sentencing.

## Argument

### Point I

**Mr. Roldan testified that he thought he was helping Aguas, his police coworker, seize drugs for the police, and this was his defense at trial. The court made evidentiary errors that improperly hampered this defense by, inter alia, excluding evidence that Aguas had helped seize drugs for police twice during the same time as the charged conspiracy.**

Mr. Roldan's defense was that he thought he and Aguas were working on a drug seizure for the police. This was logical: the government's own proof established that Aguas had told a chief in the antinarcotics unit that he had information about a plane with drugs leaving Cartagena in the same month as the alleged conspiracy. But the court improperly excluded other evidence that further supported the defense theory. Most crucially, it excluded evidence that Aguas successfully helped police seize drugs twice during the exact same time that the government said he was conspiring to traffic drugs.

The court also excluded evidence that Aguas skimmed money from drug informants, which was relevant because Mr. Roldan testified that he expected Aguas to do the same to pay Mr. Roldan.

In this close case, and combined with the court's exclusion of defense exhibits that persuasively illustrated Mr. Roldan's low-level police work, these were not just

ordinary evidentiary errors,[4] but deprived him of his constitutional right to a fair trial. *See Chambers v. Mississippi*, 410 U.S. 284 (1973). *See also Dowling v. United States*, 493 U.S. 342, 352 (1990) (due process test asks whether introduction of the type of evidence is "so extremely unfair that its admission violates 'fundamental conceptions of justice'").

A.    <u>Evidence about Aguas's help with police drug seizures should have been admitted under Rule 404(b).</u>

Rule 404 of the Federal Rules of Evidence provides that evidence of any "other crime, wrong, or act is not admissible to prove a person's character," but "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404. The Second Circuit has an "inclusionary approach to other act evidence under Rule 404(b), which allows such evidence to be admitted for any purpose other than to demonstrate criminal propensity." *United States v. LaFlam*, 369 F.3d 153, 156 (2d Cir. 2004).

Here, evidence about Aguas's drug seizures and skimming of money should have been admitted to show Aguas's intent, motive, and plan. *United States v. Aboumoussallem*, 726 F.2d 906, 911–12 (2d Cir. 1984) (explaining that on "numerous

---

[4] <u>Standard of Review</u>: This Court reviews the district court's evidentiary rulings for abuse of discretion. *E.g. United States v. Desposito*, 704 F.3d 221, 233 (2d Cir. 2013); *United States v. Weiss*, 930 F.2d 185, 198 (2d Cir. 1991) ("When the district court has performed this balancing [under Rule 403], we will not overturn the decision unless the district court abused its discretion or acted arbitrarily and irrationally"). An incorrect legal ruling is an abuse of discretion.

39

occasions federal and state courts have admitted similar acts evidence offered for defensive purposes"). It has long been the rule that the defense is allowed to use third-party 404(b) evidence. *United States v. Blum*, 62 F.3d 63, 68 (2d Cir. 1995) (describing *Aboumoussallem* as holding that "Rule 404(b) mandates admission of evidence of similar acts probative of third party's intent, motive, common scheme or plan for the purpose of proving defendant's lack thereof"). *See also United States v. Mustafa*, 753 F. App'x 22, 36 (2d Cir. 2018). Indeed, the "risks of prejudice are normally absent when the defendant offers similar acts evidence of a third party to prove some fact pertinent to the defense." *Aboumoussallem*, 726 F.2d at 911–12 (explaining that "[i]n such cases the only issue arising under Rule 404(b) is whether the evidence is relevant to the existence or non-existence of some fact pertinent to the defense."). Thus, the "standard of admissibility when a criminal defendant offers similar acts evidence as a shield need not be as restrictive as when a prosecutor uses such evidence as a sword." *Id.*

Moreover, this evidence was also admissible to show Mr. Roldan's intent, motive, and plan. Mr. Roldan testified that he believed that he would be seizing drugs with Aguas. That Aguas had worked on two drug seizures during the exact same time the government charged he was trafficking drugs and that he taken some of the reward money for the seizures was relevant to whether he convinced Mr. Roldan that was the plan here too.

40

*Aboumoussallem* is instructive. In that case, this Court found that evidence that the alleged coconspirators had previously duped people into acting as drug couriers was relevant to the defendant's knowledge and should have been admitted as third-party Rule 404(b) evidence. 726 F.2d at 911. The same is true here. The excluded evidence was relevant to Mr. Roldan's intent, not to Aguas's character. *Cf. United States v. Amuso*, 21 F.3d 1251, 1262 (2d Cir. 1994) (noting that unlike in *Aboumoussallem*, the defense was not trying to disprove an element of the offense, but to show that a third party "had lied on a prior occasion" and "thus was lying now.").

The government didn't dispute the fact that Aguas had made these two drug seizures in May and June 2021. Instead, the government argued this evidence wasn't relevant because the seizures were done at the seaport rather than the airport. A. 32-33. This argument made little sense. Just as it was relevant that Aguas told police supervisors that he had a tip about a plane leaving Cartagena with drugs in June 2021, it was relevant that Aguas was helping seize drugs for police during the same two months the government argued he was conspiring to traffic drugs. That Aguas had made these seizures made it more likely that he intended to seize drugs with Mr. Roldan, or, at least, that Mr. Roldan believed that Aguas intended to do so. That Aguas's other seizures were by sea rather than air was splitting hairs. The point was that Aguas had experience helping police seize drugs, exactly what Mr. Roldan testified Aguas told him they were doing.

41

The government also argued that the defense was really planning to use this evidence to show Aguas was a "good cop." A. 41. This argument fails too. There is no indication that the defense planned to argue that Aguas was a good police officer, or was actually working a registered, formal investigation. On the contrary, that Aguas skimmed money and effectuated drug seizures without following the Colombian police formal rules was traditional bad act evidence.

The cases cited by the government and, presumably, relied on by the district court, each involve situations where, unlike here, the defense sought to introduce prior good act evidence to show the defendant's good character. Dkt. 171, citing *United States v. Dawkins*, 999 F.3d 767 (2d Cir. 2021); *United States v. Al Kassar*, 660 F.3d 108 (2d Cir. 2011); *United States v. Scarpa*, 897 F.2d 63 (2d Cir. 1990); and *United States v. O'Connor*, 580 F.2d 38 (2d Cir. 1978). In *Dawkins*, the defense sought to introduce the defendant's relationship with people "whom he did not bribe" to show his good "character." 999 F.3d at 792. *See also Al Kassar*, 660 F.3d at 124 (upholding exclusion of prior good act evidence that "related to wholly different events that took place many years earlier"); *Scarpa*, 897 F.2d at 70 ("A defendant may not seek to establish his innocence…through proof of the absence of criminal acts on specific occasions."); *O'Connor*, 580 F.2d at 43 ("counsel sought to ask a defense witness…about O'Connor's specific good acts" in not taking bribes from some people). These cases are inapposite. Here, in contrast, the defense didn't seek to

42

introduce anything about Mr. Roldan's or Aguas's character. Instead, evidence that Aguas was helping seize drugs at the same time as the charged conspiracy was relevant to Aguas and Mr. Roldan's intent, motive, and plan in meeting Vargas.

The other case cited by the government, *United States v. Angelilli*, 660 F.2d 23 (2d Cir. 1981), is also dissimilar. In *Angelilli*, the court upheld the introduction of a custom and practice of law enforcement skimming money, but explained that it couldn't be used to "prove that the individual defendants acted in conformity with the custom and practice." *Id.* at 40. Here, the defense didn't seek to introduce general custom or practice evidence, but traditional 404(b) evidence. That Aguas had skimmed money from police rewards was prior bad act evidence admissible under 404(b) as relevant to his intent and plan with Mr. Roldan.

In the absence of any evidence that Aguas helped with two substantial drug seizures during the same months as the charged conspiracy, the government was permitted to strongly – and incorrectly – imply that Aguas had <u>no</u> experience seizing drugs for the police department, through testimony that Colombian officials had conducted an extensive records search and found no information about his work as an undercover. A. 345-46. The government relied on this evidence in its opening argument, saying that there would be testimony that Aguas had not doing "any kind" of "lawful undercover work," A. 62, and it discussed this testimony extensively in closing argument, A. 537-39, arguing it proved Mr. Roldan's guilt. The government

43

also told jurors that they "kn[e]w, from all the evidence in this case, that the defendant and [ ] Aguas, in fact, had the means to smuggle cocaine out of the airport into the United States on a private charter flight" because "Aguas worked for an anti-narcotics unit," so he had "many different police contacts." A. 523. This argument that Aguas's work with the anti-narcotics unit supported that he was trafficking drugs was disingenuous. It would have been persuasively undermined had the evidence that he was actually <u>helping</u> the anti-narcotics unit seize drugs, not traffic them, been introduced.

The court, which provided no reasoning of its own for its decision other than a passing reference to the government's papers, erred in excluding this evidence. SPA 4.

B.    <u>The court should have allowed the defense to admit photos supporting Mr. Roldan's testimony.</u>

Mr. Roldan's duties as a police officer were indisputably relevant to the defense. In their opening statement, they explained that Mr. Roldan had no intent or means to traffic drugs from the airport, as his police job involved literally shoveling manure and cleaning out stables. A. 65. To support these statements, the defense planned to introduce pictures of Mr. Roldan doing exactly what he said he did. These photos showed that Mr. Roldan's police job was exceedingly low-level and had nothing at all to do with controlling the airport. The district court, however, excluded these photos under Rule 403, stating that they were more prejudicial than probative.

44

Fed. R. Evid. R. 403 ("The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."). This too was error.

The district court "must make a conscientious assessment of whether unfair prejudice substantially outweighs probative value." *United States v. Al-Moayad*, 545 F.3d 139, 160 (2d Cir. 2008) (cleaned up). Because "the trial judge is granted such a powerful tool by Rule 403, he must take special care to use it sparingly." *United States v. Jamil*, 707 F.2d 638, 642 (2d Cir. 1983) (citing 1 J. Weinstein and M. Berger, Weinstein's Evidence ¶ 403[01], at 403–7 (1982)). And the defense should have been permitted to present their case with "evidentiary richness." Dkt. 193. *Old Chief v. United States*, 519 U.S. 172, 183 (1997) (explaining that a judge needs to make a Rule 403 "calculations with an appreciation of the offering party's need for evidentiary richness and narrative integrity in presenting a case").

Here, the excluded pictures were crucial. Other Colombian police officers who planned to testify for the defense were prevented from traveling to the United States after a government witness spoke to their supervisors. Similarly, the defense repeatedly sought to secure Major Torres's in-person testimony or a deposition, but he too was prevented from traveling, requiring the defense to rely only on a written stipulation about the key evidence that Aguas told police about a plane leaving

45

Cartagena with drugs. The photos remained as the only evidence the defense had to add "evidentiary richness," *id.*, to Mr. Roldan's testimony.

Essentially admitting these photos were relevant, the court described them as "illustrat[ing] a day in the life of a lowly and poorly paid rural police officer" who "perhaps [was] not likely to be in a position to direct airport security …and not likely to be party to an illegal cocaine exporting operation." SPA 64-54. The court, however, excluded them under Rule 403 because of a "risk of unfair prejudice to the government's case" by "engender[ing] sympathy" for Mr. Roldan. SPA 64-54. This was error. The government did not dispute Mr. Roldan's impoverishment or lowly occupational duties, and there was nothing prejudicial to the government about these photos, except in the sense that they supported Mr. Roldan's testimony that he was innocent. That is not an "unfair" prejudice, but a fair one. *See e.g., United States v. Polouizzi*, 564 F.3d 142, 152-53 (2d Cir. 2009) (no Rule 403 violation where government showed images of child pornography to the jury even though defendant did not contest that he had received and possessed child pornography).

\*     \*     \*

These errors cannot be considered harmless because the evidence of Mr. Roldan's guilt was weak. Mr. Roldan testified compellingly that he didn't intend to do a drug deal, and thought he and Aguas were going to seize the drugs. In the only two meetings and one call involving Mr. Roldan, he was vague, parroted what Aguas said,

46

and exhibited no knowledge of drug deals. When Vargas gave him money, he handed it directly to Aguas, showing that he was simply doing what Aguas instructed him. It was undisputed that he wasn't a police major and had never worked at the airport. Nobody believed he was a major when he showed up in his sad costume.

That Mr. Roldan thought he would be paid on the side by Aguas to help seize drugs also made sense with the other evidence. Aguas had a relationship with the anti-narcotics police. And, Mr. Roldan's conception of his role with Aguas appeared very similar to that of Vargas's assistant, who had no formal relationship with the DEA, but was paid on the side by Vargas, who was a registered DEA informant.

This was also an unusual case where four people involved in the key meetings were only pretending to be drug dealers. In other words, many people in this case said things they didn't actually mean. Even Scalzo, who was one of the few people not working for the government at the time of the conspiracy, admitted lying to Vargas, and provided confusing and contradictory testimony about whether there ever was any drug lab. Scalzo also admitted that she didn't know if Mr. Roldan was actually seizing drugs for police, testifying that "maybe [Mr. Roldan and Aguas] were truly secretly investigating. That's a possibility." A. 191. And Vargas had a substantial motive to exaggerate his testimony: his career and immigration status depended on his work for the DEA. He had made almost three million dollars working for the DEA.

And if the DEA stopped taking care of his immigration status, he would be deported from the United States where he had lived for many years.

In this context, the evidentiary rulings, which would have bolstered Mr. Roldan's testimony that he too didn't mean what he said to Vargas, were harmful because they were related to the critical dispute in this case, Mr. Roldan's intent. *See e.g., United States v. White*, 692 F.3d 235, 251–52 (2d Cir. 2012) (evidentiary error that "spoke directly to a critical element of the Government's case" was not harmless); *Wray v. Johnson*, 202 F.3d 515, 526 (2d Cir. 2000) ("In assessing the wrongly admitted testimony's importance, we consider such factors as whether the testimony bore on an issue that is plainly critical to the jury's decision") (internal quotation marks omitted).

This Court should, therefore, reverse Mr. Roldan's conviction and order a new trial.

### Point II

**The defense requested a legally correct charge: that the reason government informants couldn't be part of any conspiracy was because they lacked the intent to join one. The court committed error in refusing to provide this charge, which went to the heart of the defense theory that Mr. Roldan also lacked the intent to join any conspiracy because he thought – just like the other informants – that he was part of a police operation**

The most important government witness, and three other people mentioned during the government's case, were government informants. Vargas had been paid millions of dollars working for the DEA; Vargas's assistant was working for Vargas; and two others were working for the Colombian police. These people were pretending to be involved in a drug conspiracy, but they weren't actually involved in the drug conspiracy at all because they lacked any criminal intent. Mr. Roldan's testimony and defense was based on this exact same legal concept. His theory was that he wasn't a conspirator for the same reason that the numerous government informants weren't conspirators: he lacked the criminal intent.

The defense asked the court to provide a legally correct jury charge that would have explained this concept – that intent is the reason government informants can't be conspirators. The court refused, calling this "nitpicking" and saying it would "deal with" Mr. Roldan "separately." A. 493-94. The jury charge, however, failed to adequately explain that an element of conspiracy is intent and that the conspirators

must share a criminal intent. This element was the key disputed element at the trial, and the failure to explain it was error.

For the reason too, Mr. Roldan's conviction should be reversed.

A.    Standard of review

This Court reviews "de novo a properly preserved challenge to a jury instruction, reversing where the charge, viewed as a whole, either failed to inform the jury adequately of the law or misled the jury about the correct legal rule." *United States v. Capers*, 20 F.4th 105, 116 (2d Cir. 2021) (citation omitted). "Under this standard of review, a conviction will be affirmed only 'if it is clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error.'" *United States v. Botti*, 711 F.3d 299, 308 (2d Cir. 2013) (quoting *United States v. Mahaffy,* 693 F.3d 113, 136 (2d Cir. 2012)). This Court "will vacate a conviction on account of a missing requested instruction if (1) the requested instruction was legally correct; (2) it represents a theory of defense with basis in the record that would lead to acquittal; and (3) the theory is not effectively presented elsewhere in the charge." *United States v. Prawl*, 168 F.3d 622, 626 (2d Cir. 1999). The government bears the burden of proving harmlessness. *United States v. Silver*, 864 F.3d 102, 119 (2d Cir. 2017).

B.   Counsel's requested charge that government informants couldn't be conspirators because they lacked intent was legally correct and should have been provided.

A conspiracy is an "agreement among the conspirators," requiring a "meeting of minds." *United States v. Rosenblatt*, 554 F.2d 36, 38 (2d Cir. 1977). The reason government informants can't be conspirators is because they lack the required criminal intent, so there is no "meeting of the minds." *Al Kassar*, 660 F.3d at 128. *See also United States v. Carlton*, 442 F.3d 802, 811 (2d Cir. 2006) ("The agreement to conspire requires that at least two culpable co-conspirators agree, and 'a person who enters into such an agreement while acting as an agent of the government, either directly or as a confidential informant, lacks the criminal intent necessary to render him a bona fide co-conspirator.'"), citing *United States v. Vazquez*, 113 F.3d 383, 387 (2d Cir. 1997). *See also United States v. Desimone*, 119 F.3d 217, 223 (2d Cir. 1997) (same). The charge requested by defense counsel accurately conveyed this concept. It should have been provided. *See United States v. Doyle*, 130 F.3d 523, 535 (2d Cir. 1997) (error if "charge either fails to adequately inform the jury of the law, or misleads the jury as to a correct legal standard").

The court, on the other hand, appeared to misunderstand this concept. When counsel first requested this charge, the court seemingly disbelieved this black letter law, saying that it was "not sure [the reason why government informants couldn't be conspirators was] because they don't share the intent." A. 490. It is unclear in the

51

record whether the court came to accept counsel's legally accurate description of the law supporting the charge: while the court eventually conceded that counsel "may be" correct, it then rejected counsel's request as "nitpicking." A. 493-94. If the court was confused about the law (i.e., why informants can't be conspirators), it is extremely likely that the jury was confused too.

The charge the court did provide did nothing to explain why government informants couldn't be conspirators. Instead, it simply said that those people could not "be considered" as conspirators. A. 584. This charge incorrectly implied that there was a strict rule the jury had to blindly follow about informants that couldn't apply to Mr. Roldan and had nothing to do with the informants' intent. A. 584. The rest of the charge also didn't adequately convey this concept. Instead, it was unclear from the charge that Mr. Roldan couldn't be part of the conspiracy if he – like the other government informants – intended to be uncovering drug trafficking instead of participating in it.

Indeed, intent wasn't mentioned with respect to the element of whether the conspiracy existed, except in describing the "intent to distribute" drugs. That the alleged conspiracy involved an intent to distribute drugs, however, wasn't disputed. What was disputed was whether Mr. Roldan had any criminal intent at all. It was error for the court to fail to explain intent with respect to the forming of a conspiracy.

52

The harm from this error was compounded by the government's summation, which further confused this issue: the government told the jury that "Scalzo" "agreed to traffic drugs with Isidro Vargas, the DEA informant" and that there was "no serious dispute that there was an agreement." A. 516-17. This was incorrect as Vargas agreed in words with Scalzo, but not in his intent – thus, there was no meeting of the minds and no shared conspiracy because Vargas had no criminal intent. The government also told the jury – incorrectly – that "Just [Mr. Roldan's] mere presence at the May 26th meeting is evidence of intent." A. 525. *E.g., United States v. Anderson*, 747 F.3d 51, 61 (2d Cir. 2014) ("We have often observed [ ] that a defendant's mere presence at the scene of a crime…[is] not… sufficient to prove the defendant's criminal liability for conspiracy."). At least one juror didn't understand that intent mattered to Mr. Roldan's guilt. Dkt. 237, at 27.

*   *   *

This charging error should also be considered in context with an instructional error during the defense summation, when the court strongly implied to the jury that any lack of government evidence couldn't be considered. Specifically, it told the jury that "the government does not have to prove its case by any particular means, nor does the government have to place before you all of the information at its disposal, whatever that is or isn't. The question is whether the proof you have heard in this case satisfies you beyond a reasonable doubt of the defendant's guilt or not." A. 561. It

53

concluded by telling counsel that his arguments about the lack of evidence were "not appropriate, and it's ended." A. 562. [5]

This instruction was wrong. "The absence of evidence in a criminal case is a valid basis for reasonable doubt." *United States v. Bautista*, 252 F.3d 141, 145 (2d Cir. 2001), citing *United States v. Poindexter*, 942 F.2d 354, 360 (6th Cir. 1991) ("In every criminal case, the mosaic of evidence that comprises the record before a jury includes both the evidence and the lack of evidence on material matters."). That the court shut down counsel's summation about the absence of evidence and then told the jury that they couldn't consider it was harmful. The lack of evidence of Mr. Roldan's guilt was an important part of his defense because there was much evidence lacking that one would expect if he was guilty. There was no evidence Mr. Roldan controlled "everybody" at the airport, or anyone; there was no evidence that his "people" were at the airport; there was no evidence he had any knowledge or expertise to aid a drug trafficking deal.

In this close case, these errors allowed the jury to avoid a careful analysis of the weakness in the government's proof that Mr. Roldan intended to join the conspiracy. *See* Point I, *supra*. Accordingly, this Court should reverse Mr. Roldan's conviction and order a new trial.

---

[5] That the jury could consider the "lack of evidence" wasn't mentioned at all in the court's initial instructions and mentioned only once in the final instructions. A. 582.

### Point III

### The court erred in failing to rule on the defense objections to the guideline range before sentencing Mr. Roldan

The guidelines are the "starting point and the initial benchmark" for sentencing, *Gall v. United States*, 552 U.S. 38, 49 (2007), that provide a "framework" and an "anchor" for sentencing. *Molina-Martinez v. United States*, 578 U.S. 189, 198–99 (2016) (cleaned up). A court commits procedural error when it fails to calculate or consider the guidelines range. *See, e.g., United States v. Cavera*, 550 F.3d 180, 190 (2d Cir. 2008) (*en banc. See also United States v. Booker*, 543 U.S. 220, 261 (2005) (Remedial Op., Breyer, J.) (appellate court reviews sentences for "unreasonableness" which "amounts to review for abuse of discretion"). It is "important for the district court to follow the rules for application of the Guidelines strictly and correctly." *United States v. Genao*, 869 F.3d 136, 147 (2d Cir. 2017). The court "has the ultimate responsibility to ensure that the Guidelines range it considers is correct, and the failure to calculate the correct Guidelines range constitutes procedural error." *Rosales-Mireles v. United States*, 585 U.S. 129, 134 (2018) (cleaned up) (citing *Peugh v. United States*, 569 U.S. 530, 537 (2013)).

Here, the court failed to calculate the guideline range before pronouncing the sentence, as it refused to rule on the defense objections to abuse of trust and obstruction enhancements. A. 636, 638. Instead of ruling, the court told counsel that the court might "come back" to the objections. A. 636, 638. But, it didn't come back

to them before pronouncing sentencing. Instead, the court declared that ruling on those enhancements wasn't "material" because probation had recommended a sentence that was lower than the guideline range would have been if the court granted the objections. A. 642. Counsel objected to this approach, accurately explaining that the guidelines are an "anchor," that the "correct calculation is [ ] important," and noting that probation's sentence recommendation might also change if the guideline range changed. A. 642-43. The court disagreed, and directed counsel to move on to the 3553(a) factors. A. 643.

In addition to refusing to rule on the objections before pronouncing the sentence, the court also made contradictory comments about what guideline range it relied on. Initially the court said that it had adopted the range in the PSR, which included both enhancements. A. 642. Afterward, however, the court reiterated that it wasn't deciding whether the abuse of trust and obstruction enhancements applied. A. 642. During its explanation of the sentence, it said that it "did not enhance the guideline calculation for perjury." A. 653. And, then, after sentencing had concluded, the court said that it had "not included" either enhancement. A. 656. The court's failure to calculate the guideline range <u>before</u> sentencing Mr. Roldan was a procedural error and his sentence should be vacated.

The government's post-hoc attempt to fix the court's error in not calculating the guidelines range didn't solve it. Only <u>after</u> sentencing had concluded did the

government attempt to correct the error, pushing the court to issue a ruling on both the obstruction of justice and abuse of trust enhancements. A. 655-56. When the court said that neither of those enhancements were "included," the government recalculated the guidelines range and stated that the range was "292 to 365 months." A. 656. The guidelines are meant to be the "starting point and the initial benchmark" for sentencing. *Gall*, 552 U.S. at 49. Calculating the range after sentencing has concluded defeats the purpose of calculating the guideline range.

Similarly, the government's comment that it was "confirm[ing] that [the] revised guideline range [didn't] in any way affect the sentence the Court intended to impose" and the court's response of "yes," A. 656, does not cure this error. A sentencing court's legal duty to correctly calculate and consider the guidelines means that a "district court cannot insulate its sentence from [appellate] review by commenting that the Guidelines range made no difference to its determination." *United States v. Seabrook*, 968 F.3d 224, 233-34 (2d Cir. 2020); *see also United States v. Feldman*, 647 F.3d 450, 460 (2d Cir. 2011) (opining that "incantation" that sentencing court would "impose the same sentence regardless of any errors calculating the applicable Guidelines range" shouldn't "exempt[ ]" sentence from procedural review); *United States v. Olmeda*, 894 F.3d 89, 94 (2d Cir. 2018).

Additionally, the court failed to explain why it denied Mr. Roldan a minimal or minor role adjustment, saying only that this request was denied, without further

explanation. A. 634. The court's reasoning was not obvious. Instead, Mr. Roldan's role in the conspiracy was substantially less than the others: he had no "decision-making authority" and the "nature and extent" of his participation was minimal. U.S.S.G. § 3B1.2, note 3C (listing factors to consider). He participated in only two meetings and a brief phone call. It was apparent from the videos of the meetings that he was just following Aguas's lead and he had no experience or expertise in airport security or drug trafficking. He didn't bring anyone else into the conspiracy, didn't participate in any exchanges of drugs, and didn't visit the drug lab. "[A]lthough [this Court's] review is deferential, a sentencing court is required to make findings sufficient to permit appellate review." *United States v. Labbe*, 588 F.3d 139, 144 (2d Cir. 2009) (citation omitted) (remanding for explanation related to the denial of role adjustment). Here, the court's failure to provide an explanation for its denial of the role adjustment was also error.

Accordingly, this Court should vacate Mr. Roldan's sentence and remand for a resentencing.

## Conclusion

For the reasons set forth above, the Court should reverse Mr. Roldan's

conviction or vacate his sentence.


Dated:      New York, New York
             March 3, 2025

                              Respectfully submitted,

                              FEDERAL DEFENDERS OF NEW YORK
                              APPEALS BUREAU

                              *Allegra Glashausser*
                              **ALLEGRA GLASHAUSSER**
                              Assistant Federal Defender
                              52 Duane Street, 10th Floor
                              New York, New York 10007
                              Tel.: (212) 417-8739

## CERTIFICATE OF SERVICE

I certify that a copy of this appendix been served by **ACMS** electronic filing on the United States Attorney/S.D.N.Y.; Attention: **JACOB R. FIDDELMAN, ESQ.**, Assistant United States Attorney, 26 Federal Plaza, New York, New York 10286.

Dated:   New York, New York
         March 3, 2025

              *Allegra Glashausser*
              **ALLEGRA GLASHAUSSER**

## CERTIFICATE OF COMPLIANCE WITH RULE 32 (a)

1. This Brief complies with the type-volume limitations of Fed. R. App. P. 32(a)
   (7) (B) because:

   this Brief contains 13,929 words, excluding the parts of the Brief exempted by
   Fed. R. P. 32(a) (7) (B) (iii); and

2. This Brief complies with the typeface requirements of Fed. R. App. P. 32(a) (5)
   and type style requirements of Fed. R. App. P. 32(a) (6) because:

   This Brief has been prepared in a monospaced typeface using **Microsoft Word**
   with **14 characters per inch in Garamond** type style.


Dated:  March 3, 2025
        New York, New York




*Allegra Glashausser*
**ALLEGRA GLASHAUSSER**
Federal Defenders of New York