# 24-2734

*To Be Argued By:*
ALEXANDER LI

## United States Court of Appeals

### FOR THE SECOND CIRCUIT
### DOCKET NO. 24-2734

UNITED STATES OF AMERICA,

*Appellee,*

*v.*

MAURICIO RENE GARCIA QUIMBAYO, also known
as Tony, also known as Maurice, CLAUDIA ISABEL
MERCADO SCALZO, also known as La Flaca,

*(For Continuation of Caption See Inside Cover)*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR THE
## UNITED STATES OF AMERICA

JAY CLAYTON,
*United States Attorney for the
Southern District of New York,
Attorney for the United States
of America*
26 Federal Plaza, 37th Floor
New York, New York 10278
(212) 637-2200

ALEXANDER LI,
SARAH L. KUSHNER,
OLGA I. ZVEROVICH,
*Assistant United States Attorneys,
  Of Counsel.*

TATIANA ANDREA VARGAS BULLA, also known as
Tati, also known as Tonia, also known as Tonya,
OSCAR GOMEZ ROMERO, also known as Compa,
JOSE ALFREDO AGUAS OVIEDO,

*Defendants,*

JEY JAMES ROLDAN CARDENAS,
also known as Miller de Jesus Gutierrez Duran,

*Defendant-Appellant.*

## TABLE OF CONTENTS

PAGE

Preliminary Statement . . . . . . . . . . . . . . . . . . . . . . . .  1

Statement of Facts . . . . . . . . . . . . . . . . . . . . . . . . . .  2

    A.   The Government's Case . . . . . . . . . . . . . . . .  2

        1.   May 2021: Roldan and Aguas Introduce Themselves as Corrupt Police Officers and Accept a Bribe on Video . . . . . . . . .  5

        2.   June 16–18, 2021: Roldan and Aguas Inspect Photographs of a Cocaine Laboratory . . . . . . . . . . . . . . . . . . . . . . .  6

        3.   June 29, 2021: Aguas Meets with the DEA in His Police Capacity . . . . . . . . .  7

        4.   August 2021: Aguas Warns Vargas and Mercado About the DEA . . . . . . . . . . .  8

        5.   September 2021: Mercado and Garcia Sell a Three-Kilogram Cocaine Sample to Vargas, and Roldan Confirms He Is "Up to Speed" . . . . . . . . . . . . . . . . . . . . . . .  8

    B.   The Defense Case and Verdict . . . . . . . . . . .  9

    C.   The Sentencing . . . . . . . . . . . . . . . . . . . . . .  10

ARGUMENT:

POINT I—The District Court's Evidentiary Rulings Were Not an Abuse of Discretion . . . . . . . . . . .  11

    A.   Applicable Law . . . . . . . . . . . . . . . . . . . . . .  11

ii

PAGE

1. Other-Acts Evidence . . . . . . . . . . . . . . 11

2. Standard of Review . . . . . . . . . . . . . . 12

B. Discussion . . . . . . . . . . . . . . . . . . . . . . . . . 14

1. The District Court Did Not Abuse Its
   Discretion by Excluding Evidence of the
   Prior Drug Seizures . . . . . . . . . . . . . . . 14

   a. Relevant Facts. . . . . . . . . . . . . . . 14

   b. Discussion . . . . . . . . . . . . . . . . . 17

2. The District Court Did Not Abuse Its
   Discretion by Excluding Evidence that
   Other CNP Officers Skimmed Money
   from Informants . . . . . . . . . . . . . . . . . 23

3. The District Court Did Not Abuse Its
   Discretion by Excluding Photographs of
   Roldan's Poor Living and Work
   Conditions. . . . . . . . . . . . . . . . . . . . . . . 25

4. Any Evidentiary Errors Were
   Harmless . . . . . . . . . . . . . . . . . . . . . . . 28

POINT II—The District Court Properly Instructed the
Jury on Intent . . . . . . . . . . . . . . . . . . . . . . . . . . 31

A. Relevant Facts . . . . . . . . . . . . . . . . . . . . . 32

B. Applicable Law . . . . . . . . . . . . . . . . . . . . . 35

C. Discussion . . . . . . . . . . . . . . . . . . . . . . . . . 36

iii

PAGE

POINT III—The District Court Did Not Procedurally
   Err at Sentencing . . . . . . . . . . . . . . . . . . . . . . .   43

   A.   Relevant Facts . . . . . . . . . . . . . . . . . . . . . .   44

   B.   Applicable Law . . . . . . . . . . . . . . . . . . . . . .   47

   C.   Discussion . . . . . . . . . . . . . . . . . . . . . . . .   50

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . .   58

**TABLE OF AUTHORITIES**

*Cases*:

*Molina-Martinez v. United States,*
   578 U.S. 189 (2016). . . . . . . . . . . . . . . . . . . . . 49, 53

*Neder v. United States,*
   527 U.S. 1 (1999). . . . . . . . . . . . . . . . . . . . . . 36, 43

*Puckett v. United States,*
   556 U.S. 129 (2009). . . . . . . . . . . . . . . . . . . . . . . 49

*Tanner v. United States,*
   483 U.S. 107 (1987). . . . . . . . . . . . . . . . . . . . . . . 41

*United States v. Aboumoussallem,*
   726 F.2d 906 (2d Cir. 1984) . . . . . . . . . . . . . . 20, 22

*United States v. Afjehei,*
   869 F.2d 670 (2d Cir. 1989) . . . . . . . . . . . . . . . . . 21

*United States v. Al Kassar,*
   660 F.3d 108 (2d Cir. 2011) . . . . . . .   13, 19, 36, 38

iv

PAGE

*United States v. Allah,*
130 F.3d 33 (2d Cir. 1997) . . . . . . . . . . . . . . . . . . 38

*United States v. Alvarado,*
720 F.3d 153 (2d Cir. 2013) . . . . . . . . . . . . . . . . 49

*United States v. Angelilli,*
660 F.2d 23 (2d Cir. 1981) . . . . . . . . . . . . . . . . . 24

*United States v. Applins,*
637 F.3d 59 (2d Cir. 2011) . . . . . . . . . . . . . . . . . 35

*United States v. Araujo,*
539 F.2d 287 (2d Cir. 1976) . . . . . . . . . . . . . . . . 40

*United States v. Awadallah,*
436 F.3d 125 (2d Cir. 2006) . . . . . . . . . . . . . . . . 26

*United States v. Barret,*
848 F.3d 524 (2d Cir. 2017) . . . . . . . . . . . . . . . . 13

*United States v. Borrego,*
388 F.3d 66 (2d Cir. 2004) . . . . . . . . . . . . . . 48, 51

*United States v. Cadet,*
664 F.3d 27 (2d Cir. 2011) . . . . . . . . . . . . . . . . . 12

*United States v. Cavera,*
550 F.3d 180 (2d Cir. 2008) . . . . . . . . . . . . . 47, 50

*United States v. Certified Env't Servs., Inc.,*
753 F.3d 72 (2d Cir. 2014) . . . . . . . . . . . . . . . . . 48

*United States v. Chambers,*
800 F. App'x 43 (2d Cir. 2020) . . . . . . . . . . . 12, 19

*United States v. Chavez,*
549 F.3d 119 (2d Cir. 2008) . . . . . . . . . . . . . . . . 40

v

PAGE

*United States v. Cheung Kin Ping,*
    555 F.2d 1069 (2d Cir. 1977) . . . . . . . . . . . . . . . . 42

*United States v. Coppola,*
    671 F.3d 220 (2d Cir. 2012) . . . . . . . . . . . . . . 13, 26

*United States v. Crosby,*
    397 F.3d 103 (2d Cir. 2005) . . . . . . . . . .  47, 48, 51

*United States v. Curley,*
    639 F.3d 50 (2d Cir. 2011) . . . . . . . . . . . . . . 12, 28

*United States v. Darrah,*
    132 F.4th 643 (2d Cir. 2025) . . . . . . . . . . . . . 54, 55

*United States v. Davis,*
    278 F. App'x 73 (2d Cir. 2008) . . . . . . . . . . . . . . 41

*United States v. Dawkins,*
    999 F.3d 767 (2d Cir. 2021) . . . . . . . . . . . . . *passim*

*United States v. DeMizio,*
    741 F.3d 373 (2d Cir. 2014) . . . . . . . . . . . . . . 36, 43

*United States v. Dhafir,*
    577 F.3d 411 (2d Cir. 2009) . . . . . . . . . . . . . . . . 48

*United States v. Dussard,*
    967 F.3d 149 (2d Cir. 2020) . . . . . . . . . . . . . . . . 49

*United States v. Feldman,*
    647 F.3d 450 (2d Cir. 2011) . . . . . . . . . . . . . . . . 55

*United States v. Gansman,*
    657 F.3d 85 (2d Cir. 2011) . . . . . . . . . . . . . . 35, 36

*United States v. George,*
    266 F.3d 52 (2d Cir. 2001) . . . . . . . . . . . . . . . . 27

vi

PAGE

*United States v. Ghailani*,
   733 F.3d 29 (2d Cir. 2013) . . . . . . . . . . . . . . . . . . 39

*United States v. Gramins*,
   939 F.3d 429 (2d Cir. 2019) . . . . . . . . . . . . . . . . . 13

*United States v. Green*,
   595 F.3d 432 (2d Cir. 2010) . . . . . . . . . . . . . . 22, 28

*United States v. Gupta*,
   747 F.3d 111 (2d Cir. 2014) . . . . . . . . . . . . . . . . . 31

*United States v. Han*,
   230 F.3d 560 (2d Cir. 2000) . . . . . . . . . . . . . . . . . 39

*United States v. Hernandez*,
   521 F. App'x 14 (2d Cir. 2013) . . . . . . . . . . . . . . . 51

*United States v. Hotaling*,
   No. 24-434, 2025 WL 2416346
   (2d Cir. Aug. 21, 2025) . . . . . . . . . . . . . . . . . . 56, 57

*United States v. Jass*,
   569 F.3d 47 (2d Cir. 2009) . . . . . . . . . . .  49, 53, 54

*United States v. Kaplan*,
   836 F.3d 1199 (9th Cir. 2016) . . . . . . . . . . . . . . . 39

*United States v. Lacey*,
   699 F.3d 710 (2d Cir. 2012) . . . . . . . . . . . . . . . . . 48

*United States v. Luna-Acosta*,
   715 F.3d 860 (10th Cir. 2013) . . . . . . . . . . . . . . . 52

*United States v. McPartland*,
   81 F.4th 101 (2d Cir. 2023) . . . . . . . . . . . . . . 12, 13

vii

PAGE

*United States v. Melvin,*
 105 F.4th 620 (4th Cir. 2024). . . . . . . . . . . . . 51, 52

*United States v. Mercado,*
 573 F.3d 138 (2d Cir. 2009) . . . . . . . . . .  12, 13, 30

*United States v. Meza,*
 620 F.3d 505 (5th Cir. 2010) . . . . . . . . . . . . . . . 52

*United States v. Miller,*
 626 F.3d 682 (2d Cir. 2010) . . . . . . . . . . . . . . . 28

*United States v. Morgan,*
 385 F.3d 196 (2d Cir. 2004) . . . . . . . . . . . . . . . 37

*United States v. Ngono,*
 801 F. App'x 19 (2d Cir. 2020) . . . . . . . . . . . . . 42

*United States v. O'Connor,*
 580 F.2d 38 (2d Cir. 1978) . . . . . . . . . . . . . . . . 17

*United States v. Paccione,*
 949 F.2d 1183 (2d Cir. 1991) . . . . . . . . . . . . . . 27

*United States v. Rainford,*
 110 F.4th 455 (2d Cir. 2024) . . . . . . . . . . . . 55, 56

*United States v. Ramos,*
 979 F.3d 994 (2d Cir. 2020) . . . . . . . . . . . . . . . 47

*United States v. Romero-Padilla,*
 583 F.3d 126 (2d Cir. 2009) . . . . . . . . . . . . . . . 38

*United States v. Roy,*
 783 F.3d 418 (2d Cir. 2015) . . . . . . . . . . . . . . . 35

*United States v. Saldarriaga,*
 204 F.3d 50 (2d Cir. 2000) . . . . . . . . . . . . . . . . 42

viii

PAGE

*United States v. Santiago,*
    739 F. App'x 693 (2d Cir. 2018) . . . . . . . . . . . . . . 53

*United States v. Scarpa,*
    897 F.2d 63 (2d Cir. 1990) . . . . . . . . . . . . . . . 11, 17

*United States v. Seabrook,*
    968 F.3d 224 (2d Cir. 2020) . . . . . . . . . . . . . . 54, 55

*United States v. Siddiqui,*
    699 F.3d 690 (2d Cir. 2012) . . . . . . . . . . . . . . . . 31

*United States v. Thavaraja,*
    740 F.3d 253 (2d Cir. 2014) . . . . . . . . . . . . . . . . 47

*United States v. Torres,*
    738 F. App'x 36 (2d Cir. 2018) . . . . . . . . . . . . . . 55

*United States v. Umeh,*
    527 F. App'x 57 (2d Cir. 2013) . . . . . . . . . . . 36, 37

*United States v. Villafuerte,*
    502 F.3d 204 (2d Cir. 2007) . . . . . . . . . . . . . . 49, 55

*United States v. Walker,*
    191 F.3d 326 (2d Cir. 1999) . . . . . . . . . . . . . . 12, 19

*United States v. Williams,*
    205 F.3d 23 (2d Cir. 2000) . . . . . . . . . . . . . . . . 19

*United States v. Williams,*
    943 F.3d 606 (2d Cir. 2019) . . . . . . . . . . . . . . . . 42

*United States v. Yates,*
    No. 22-3003-CR, 2024 WL 1338762
    (2d Cir. Mar. 29, 2024) . . . . . . . . . . . . . . . . . . . 48

ix

PAGE

*United States v. Zayac,*
  765 F.3d 112 (2d Cir. 2014) . . . . . . . . . . . . . . . . . 31

*Statutes, Rules & Other Authorities*:

18 U.S.C. § 3553(a) . . . . . . . . . . . . . . . . . . . . . . . . . . 45

18 U.S.C. § 3553(f) . . . . . . . . . . . . . . . . . . . . . . . . . . 44

21 U.S.C. § 952(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

21 U.S.C. § 959(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

21 U.S.C. § 960(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . 37

21 U.S.C. § 960(a)(3) . . . . . . . . . . . . . . . . . . . . . . . . 37

21 U.S.C. § 963 . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 36

Fed. R. Crim. P. 52(a) . . . . . . . . . . . . . . . . . . . . 36, 43

Fed. R. Evid. 104(a) . . . . . . . . . . . . . . . . . . . . . . . . . 22

Fed. R. Evid. 403 . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Fed. R. Evid. 404(b)(1) . . . . . . . . . . . . . . . . . . . . . . 11

Fed. R. Evid. 404(b)(2) . . . . . . . . . . . . . . . . . . . . . . 12

Fed. R. Evid. 606(b) . . . . . . . . . . . . . . . . . . . . . . . . . 41

U.S.S.G. § 2D1.1(a)(5) . . . . . . . . . . . . . . . . . . . . . . 44

U.S.S.G. § 2D1.1(b)(1) . . . . . . . . . . . . . . . . . . . . . . 44

U.S.S.G. § 2D1.1(b)(18) . . . . . . . . . . . . . . . . . . . . . 44

U.S.S.G. § 3B1.2(a) . . . . . . . . . . . . . . . . . . . . . . . . . 44

U.S.S.G. § 3B1.3 . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

x

PAGE

U.S.S.G. § 3C1.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

U.S.S.G. § 4C1.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

# United States Court of Appeals

## FOR THE SECOND CIRCUIT
## Docket No. 24-2734

―――――――

UNITED STATES OF AMERICA,

*Appellee,*

―v.―

MAURICIO RENE GARCIA QUIMBAYO, also known as
Tony, also known as Maurice, CLAUDIA ISABEL
MERCADO SCALZO, also known as La Flaca, TATIANA
ANDREA VARGAS BULLA, also known as Tati, also
known as Tonia, also known as Tonya, OSCAR GOMEZ
ROMERO, also known as Compa,
JOSE ALFREDO AGUAS OVIEDO,

*Defendants,*

JEY JAMES ROLDAN CARDENAS, also known as Miller
de Jesus Gutierrez Duran,

*Defendant-Appellant.*

―――――――

## BRIEF FOR THE UNITED STATES OF AMERICA

―――――――

### Preliminary Statement

Jey James Roldan Cardenas ("Roldan") appeals
from a judgment of conviction entered on October 10,
2024, in the United States District Court for the

2

Southern District of New York, following a one-week trial before the Honorable Lewis A. Kaplan, United States District Judge, and a jury.

Superseding Indictment S6 21 Cr. 359 (LAK) (the "Indictment") was filed on September 30, 2021, in one count, charging Roldan with conspiring to import at least five kilograms of cocaine into the United States, in violation of 21 U.S.C. § 963.

Trial commenced on May 7, 2024, and ended on May 14, 2024, when the jury found Roldan guilty.

On September 26, 2024, Judge Kaplan sentenced Roldan principally to 165 months' imprisonment, to be followed by five years' supervised release.

Roldan is serving his sentence.

## Statement of Facts

### A.  The Government's Case

The Government's proof at trial, the sufficiency of which is not challenged on appeal, established that, in 2021, Roldan—a police officer with the Colombian National Police ("CNP")—conspired with others to procure and smuggle one thousand kilograms of cocaine from Colombia to the United States. Roldan and his co-conspirators agreed to do this for Isidro Vargas, a man who claimed to be an international drug trafficker but who was in fact a confidential source acting at the direction of the Drug Enforcement Administration ("DEA").

One of Roldan's co-conspirators was Jose Alfredo Aguas Oviedo ("Aguas"), another police officer and

3

Roldan's partner in the CNP. Roldan and Aguas agreed to exploit their positions and contacts as police officers to provide temporary storage for the cocaine (*see, e.g.*, A. 259-60); transport the cocaine through the Cartagena airport and onto a private charter plane (*see, e.g.*, A. 263-64); and secure air-traffic authorization for the drug-laden plane to leave the airport (*see, e.g.*, A. 260-61).[1] Roldan, Aguas, and other co-conspirators repeatedly met and communicated with Vargas to discuss the cocaine shipment and the logistics for smuggling it through the Cartagena airport. (A. 225).

At trial, the Government called four witnesses, including Vargas, who testified about his meetings and communications with Roldan and his co-conspirators (A. 211-337), and Claudia Isabel Mercado Scalzo ("Mercado"), a co-conspirator who introduced Aguas to Vargas and who testified as a cooperating witness (A. 70-195). Based on Roldan's anticipated defense that he believed he was participating in an undercover

-----

[1]   "Br." refers to Roldan's brief on appeal; "A." refers to the appendix with that brief; "SPA" refers to the special appendix with that brief; "GX" refers to a government exhibit at trial; "DX" refers to a defense exhibit at trial; "PSR" refers to the Presentence Report prepared by the Probation Office in connection with Roldan's sentencing; and "Dkt." refers to an entry on the District Court's docket for this case. Unless otherwise noted, case and record text quotations omit internal quotation marks, citations, and previous alterations.

4

operation, not an illegal drug smuggling conspiracy (*see* A. 64, 69), the Government also called Juan Ayala, an investigator from the Attorney General's Office of Colombia who testified that (i) undercover operations in Colombia require extensive approvals and documentation, including a resolution from a prosecutor's office (A. 348-53); (ii) Ayala had requested records from eight Colombian agencies to determine whether Roldan or Aguas had ever performed undercover work (A. 342-46), and (iii) Ayala found no records reflecting any such undercover work (A. 346).

The Government also introduced 138 exhibits in evidence. These exhibits included Vargas's recordings, along with corresponding transcripts, of his meetings and communications with Roldan and his co-conspirators, which captured the conspirators' explicit plans to procure and smuggle a thousand kilograms of cocaine from Cartagena to New York. (*See* GX 401A to 404, 501, 501-T, 601 to 607D, 701A to 707B, 701A-T to 707B-T). In addition, the Government introduced a three-kilogram sample of cocaine that two of Roldan's co-conspirators provided Vargas as proof of their capabilities. (A. 301-05; GX 1002).

5

### 1. May 2021: Roldan and Aguas Introduce Themselves as Corrupt Police Officers and Accept a Bribe on Video

On May 7, 2021, Vargas met with Aguas and Mercado in Cartagena. (A. 95).[2] Vargas claimed to be an international drug trafficker who wanted to buy a thousand kilograms of cocaine and fly it out of the Cartagena airport. (A. 102-04). Aguas introduced himself as a CNP officer who could work with his boss, a CNP colonel, to facilitate the movement of Vargas's drugs through the Cartagena airport, including by managing the airport's security cameras and control tower. (A. 103-04, 108, 119).

After the May 7 meeting, Aguas texted Vargas that Aguas's boss was demanding an upfront payment of $50,000. (A. 247). Vargas refused to pay that sum, but Aguas nevertheless agreed to bring his boss to a meeting at a hotel in Cartagena ("Hotel-1"). (A. 247, 253-54). In advance of the meeting, the DEA provided Vargas with $6,000 in cash. (A. 267).

On May 26, 2021, Roldan, Aguas, and Mercado met with Vargas at Hotel-1. (A. 120-21, 124, 253-54). Just before the meeting, Aguas privately warned Roldan and Mercado that they could all "die if [Vargas] ends up being a DEA agent." (A. 123). During the meeting, Roldan and Aguas wore CNP uniforms—with Roldan wearing the insignia of a major—and carried

––––––––––

[2] Another informant (Franco Montoya) attended this meeting, as well as subsequent ones, with Vargas. (A. 96, 124, 281).

6

sidearms. (A. 126-27, 256). The parties discussed the plan to send cocaine by plane from Cartagena to Puerto Rico and ultimately to New York, and Roldan and Aguas explained that they would charge $2,300 per kilogram of cocaine to facilitate the flight from the Cartagena airport. (A. 128, 138-143, 286-87). Roldan explained that he had people "at the airport" who were going to assist with this drug smuggling operation. (GX 702J-T).

At the end of the meeting, Vargas paid Roldan and Aguas the $6,000 provided by the DEA as an initial bribe. (A. 143-44, 267-70). Roldan and Aguas accepted the payment and gave $200 to Mercado after they left. (A. 144).

### 2. June 16–18, 2021: Roldan and Aguas Inspect Photographs of a Cocaine Laboratory

On June 16, 2021, Mercado introduced Vargas to Mauricio Rene Garcia Quimbayo ("Garcia"), a cocaine supplier. (A. 148-49). Garcia advised that he had access to a laboratory that could produce a thousand kilograms of cocaine and agreed to an inspection of the laboratory. (A. 149, 276). Later that day, another DEA confidential source, El Viejo, who purported to be Vargas's worker, toured the laboratory at the direction of law enforcement. (A. 82, 149-50, 275-78). El Viejo sent photographs of the laboratory to Vargas, who passed on the photographs to Roldan and Aguas. (A. 278).

On June 18, 2021, Roldan and Aguas, now joined by another co-conspirator, Oscar Gomez Romero ("Gomez"), met again with Vargas at Hotel-1. (A. 281).

7

At the meeting, Vargas informed the group that he had agreed to start with a thousand kilograms of cocaine from Garcia's laboratory. (A. 286). Roldan and Aguas inspected the photographs of Garcia's cocaine laboratory and agreed that the equipment looked capable. (A. 283-86). Roldan and Aguas reiterated that they would charge $2,300 per kilogram, plus a $300,000 flat fee, to facilitate the air transport of the drug load. (A. 286-87; *see also* A. 139-40).

### 3. June 29, 2021: Aguas Meets with the DEA in His Police Capacity

In mid-June 2021, Aguas told CNP Major Victor Alfonso Torres Valero ("Torres"), who led an anti-narcotics unit, that Aguas had an informant who provided information about a plane that would be departing from Cartagena to Central America with narcotics inside. (A. 197). Aguas did not reveal that he had been meeting with drug traffickers or that he was having clandestine meetings, and he told Major Torres that he was not interested in becoming an undercover officer. (A. 197-98). Aguas said nothing about Roldan. (A. 198). With Aguas's agreement, Major Torres contacted the DEA to see if it was interested in meeting Aguas's informant. (A. 197-98).

On June 29, 2021, Major Torres, Aguas, and Aguas's informant met with DEA agents stationed in Cartagena, including Special Agent Larry Rosales, who testified at trial. (A. 199, 205-06). The meeting, which was held at Hotel-1, went poorly, with Aguas's informant refusing to even provide his name. (A. 204-07). The DEA declined to work with Aguas's informant

8

and learned nothing substantive from the meeting. (A. 198, 207-08). After the meeting, Major Torres never met or spoke with Aguas again. (A. 198).

### 4. August 2021: Aguas Warns Vargas and Mercado About the DEA

On August 25, 2021, Aguas and Vargas discussed meeting again to advance the drug transaction. (A. 293). Aguas texted Vargas that their next meeting should be held at a different location because "[w]here we last saw each other"—*i.e.*, Hotel-1—"is a place very frequented by the DEA." (A. 293-94). Around the same time, Mercado texted Vargas that they had to be "[c]areful with the meetings in hotels," and that Aguas was "beside himself" because "three days after [Vargas] gave [Aguas] the money at [Hotel-1], there was a meeting of the three letters," *i.e.*, the DEA. (A. 151-52). On August 31, 2021, because of Aguas's concerns, Vargas met with Aguas at an office space in Cartagena, and not at Hotel-1. (A. 295).

### 5. September 2021: Mercado and Garcia Sell a Three-Kilogram Cocaine Sample to Vargas, and Roldan Confirms He Is "Up to Speed"

On September 2, 2021, Vargas, El Viejo, and a Colombian undercover officer met with Mercado and Garcia in Cartagena. (A. 156-57, 301-02). At the meeting, Vargas purchased a three-kilogram sample of cocaine from Mercado and Garcia for $6,000. (A. 301-05). Vargas told Mercado and Garcia that the purpose of the sample was to confirm the quality of the cocaine for Vargas's associates in New York. (A. 301).

9

On September 9, 2021, Vargas texted photographs of the three-kilogram sample of cocaine to Roldan, explaining that Vargas had bought the sample from Mercado, shipped it to New York, and placed a full order for a thousand kilograms. (A. 310). Roldan confirmed that Aguas had told him about the sale. (A. 309-11). That same day, Roldan and Vargas spoke by telephone to discuss the drug deal. (A. 311-13). Roldan confirmed that Aguas had been "keeping me up to speed." (A. 312). Vargas told Roldan that the three-kilogram sample had arrived in New York, and Roldan advised that he wanted to be paid for his participation in the cocaine transaction in U.S. dollars rather than Colombian pesos. (A. 312-13).

## B. The Defense Case and Verdict

Roldan testified in his own defense. Roldan testified that he did not "intend to send 1,000 kilograms of cocaine to the United States" but instead intended "[t]o seize the drugs." (A. 369). Roldan testified that Aguas, his partner in the CNP, claimed to be working with the DEA and a CNP anti-narcotics unit to seize Vargas's cocaine shipment. (A. 389-92). On Roldan's telling, Aguas asked Roldan to help with this purported undercover operation by pretending to be Aguas's "boss" at a meeting with Vargas. (A. 391-93).

On cross-examination, Roldan admitted that he never met with anyone from Aguas's anti-narcotics unit in advance of the purported undercover operation (A. 456); did not record his two meetings with Vargas (A. 460-61); did not report the $6,000 payment he received from Vargas (A. 461); and did not write any

10

reports on his purported undercover operation (A. 457). Roldan acknowledged that one "aspect[] of the 1,000-kilogram drug deal" was the laboratory where the cocaine would be manufactured, and that Vargas showed Roldan photographs of such a laboratory. (A. 451-52). Roldan acknowledged that a cocaine laboratory is illegal, and that these photographs "would be good evidence if [Roldan] were carrying out an undercover sting operation," but admitted that he did not file any report about those photographs either. (A. 452). The Government also introduced a WhatsApp text message exchange between Roldan and Aguas showing that on February 18, 2022—one day before their arrests in this case—Aguas enabled a "disappearing messages" feature for their thread, which Roldan could have disabled but did not, and that approximately three minutes later Roldan called Aguas. (A. 466-69; GX 404).

Roldan also called a defense investigator, who testified that she had visited Roldan's residence, workplace, and horse farm, as well as the airport in Cartagena, and reviewed with the jury photographs of the horse farm and airport. (A. 476-82; DX F1, H).

On May 14, 2024, in the span of an afternoon and without any notes, the jury found Roldan guilty of the charge in the Indictment. (A. 618-21).

## C. The Sentencing

On September 26, 2024, Judge Kaplan sentenced Roldan to 165 months' imprisonment, to be followed by five years' supervised release, and imposed a $100 mandatory special assessment. (A. 651).

11

# **A R G U M E N T**

## **POINT I**

### **The District Court's Evidentiary Rulings Were Not an Abuse of Discretion**

Roldan challenges three of the District Court's evidentiary rulings: (i) its exclusion of evidence that Aguas—Roldan's CNP partner and co-conspirator, who pleaded guilty before Roldan's trial—had previously facilitated two lawful drug seizures using a civilian informant; (ii) its exclusion of evidence that other CNP officers had a practice of taking, or had taken, a cut from rewards payments made to informants; and (iii) its exclusion of some (but not all) of the photographs that Roldan sought to introduce to show his poor living and work conditions in rural Colombia. (Br. 39-48). The District Court acted well within its discretion in excluding this evidence, and any error was harmless in any event.

### **A. Applicable Law**

#### **1. Other-Acts Evidence**

"Evidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1). In particular, "[a] defendant may not seek to establish his innocence . . . through proof of the absence of criminal acts on specific occasions." *United States v. Scarpa*, 897 F.2d 63, 70 (2d Cir. 1990). "The reasoning behind this rule is straightforward: A single

12

occurrence of lawful conduct is 'simply irrelevant' to other occurrences of unlawful conduct." *United States v. Chambers*, 800 F. App'x 43, 46 (2d Cir. 2020) (quoting *United States v. Walker*, 191 F.3d 326, 336 (2d Cir. 1999)). However, evidence of other acts "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(2). "When 'other act' evidence is offered to show knowledge or intent in particular, . . . such evidence must be sufficiently similar to the conduct at issue to permit the jury to draw a reasonable inference of knowledge or intent from the other act." *United States v. Cadet*, 664 F.3d 27, 32 (2d Cir. 2011).

Even if proffered evidence is offered for a proper purpose and is relevant to a disputed issue, it may be excluded "if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403; *see United States v. Curley*, 639 F.3d 50, 56-57 (2d Cir. 2011).

### 2.   Standard of Review

This Court reviews "a district court's evidentiary rulings for abuse of discretion and will disturb an evidentiary ruling only where the decision to admit or exclude evidence was manifestly erroneous." *United States v. McPartland*, 81 F.4th 101, 114 (2d Cir. 2023). Under this standard, a district court's decision will be affirmed unless it was "arbitrary and irrational." *United States v. Mercado*, 573 F.3d 138, 141 (2d Cir.

13

2009). "A district court has abused its discretion if its ruling is based on an erroneous view of the law or on a clearly erroneous assessment of the evidence, or if its decision cannot be located within the range of permissible decisions." *United States v. Barret*, 848 F.3d 524, 531 (2d Cir. 2017). This Court "accord[s] great deference to a district court in ruling as to the relevancy and unfair prejudice of proffered evidence, mindful that it sees the witnesses, the parties, the jurors, and the attorneys, and is thus in a superior position to evaluate the likely impact of the evidence." *McPartland*, 81 F.4th at 114; *see also United States v. Dawkins*, 999 F.3d 767, 788 (2d Cir. 2021) ("[W]e will afford the district court the customary wide latitude to exclude irrelevant, repetitive, or cumulative evidence."); *United States v. Coppola*, 671 F.3d 220, 244 (2d Cir. 2012); *United States v. Al Kassar*, 660 F.3d 108, 123 (2d Cir. 2011).

"[E]videntiary rulings are subject to harmless error analysis," meaning that even a manifestly erroneous evidentiary ruling will not merit a new trial "if the appellate court can conclude with fair assurance that the evidence did not substantially influence the jury." *Mercado*, 573 F.3d at 141. In assessing harmlessness, this Court considers: "(1) the overall strength of the prosecutor's case; (2) the prosecutor's conduct with respect to the improperly admitted evidence; (3) the importance of the wrongly admitted testimony; and (4) whether such evidence was cumulative of other properly admitted evidence." *United States v. Gramins*, 939 F.3d 429, 454 (2d Cir. 2019).

14

### B. Discussion

#### 1. The District Court Did Not Abuse Its Discretion by Excluding Evidence of the Prior Drug Seizures

##### a. Relevant Facts

Before trial, Roldan moved *in limine* to admit three categories of testimony by CNP Major Torres: (1) "that Aguas previously had worked with the Colombian anti-narcotics unit to effectuate two substantial cocaine seizures" in May and June 2021; (2) "that Aguas told Major Torres . . . in or about June 2021 that he had information of a plane planned to leave the Cartagena airport with narcotics on it"; and (3) "that a subsequent meeting of Aguas and his alleged source with the DEA was arranged." (SPA 5; *see also* A. 27). Roldan argued that this evidence was "relevant and favorable to the defense," as it tended to show that Aguas "had the capacity to assist with antinarcotics seizures and that Aguas reported the very plot at issue in the present case—a June 2021 plan to load a plane with drugs at Cartagena airport—to the head of an antinarcotics unit." (Dkt. 176 at 4).[3]

-----------

[3] This page number, and the page numbers in other citations to filings in the District Court, refer to the CM/ECF-generated page numbers at the top of the page (as opposed to the page numbers listed at the bottom of the page).

15

The Government opposed Roldan's motion and cross-moved to preclude Major Torres's statements. (Dkt. 171 at 33-37; Dkt. 178 at 2-3; A. 29, 32, 40-41). The Government objected to the latter two categories principally on hearsay grounds and argued that the first category, relating to Aguas's facilitation of two prior drug seizures, was "prior good act evidence" inadmissible under Federal Rule of Evidence 404(b). (Dkt. 171 at 35-37; *see also* Dkt. 178 at 3; A. 29, 32, 40-41). At oral argument, the Government explained that the prior seizures were different in kind from the charged conduct and thus irrelevant for any purpose other than to improperly show Aguas's propensity for good police work:

> In the prior situation, that was involving a lawful operation using an informant. In the case that [is] charged, the defendant and Aguas Oviedo purport to be doing some sort of sting operation. . . . Without pointing to any sort of commonality, really the only inference that this evidence is going to put in front of the jury is that Aguas Oviedo was a good cop. And that's exactly the kind of propensity evidence that Rule 404 is designed to prohibit.

(A. 41; *see also* A. 32-33; Dkt. 178 at 3).[4] The Government further argued, in its opposition to Roldan's

---

[4] Roldan thus mischaracterizes the record when he portrays the Government's position below as "splitting hairs" by arguing that the prior seizures were not

16

motion, argued that "[e]ven if these statements were admissible and had some marginal probative value (and they do not), that value would be far outweighed by the risks of misleading and confusing the jury, and are therefore properly excluded under Federal Rule of Evidence 403," particularly because the jury would be unaware that Aguas had "actually pleaded guilty." (Dkt. 178 at 2-4).

The District Court precluded the first category of testimony, relating to Aguas's facilitation of two prior drug seizures, "largely for the reasons stated in the government's motion." (SPA 4 (citing Dkt. 171 at 36-41)). However, the District Court agreed to admit the latter two categories of testimony over the Government's hearsay objection, finding that "[t]he fact that Aguas reported to Major Torres of the anti-narcotics unit information about a drug-laden plane expected to leave the Cartagena airport in June 2021—the same airport and the same or a similar time period as the alleged events in question—[was] probative of whether Aguas told defendant that his intention was to facilitate a seizure rather than an illegal shipment," which in turn was relevant, albeit in an "attenuated" way, to the defendant's intent. (SPA 5-6).

––––––––––

"relevant because the seizures were done at the seaport rather than the airport." (Br. 41 (citing A. 32-33)).

17

At trial, the Government introduced a testimonial stipulation for Major Torres consistent with the District Court's ruling. (A. 196-99; GX 1005).[5]

### b. Discussion

The District Court properly excluded evidence of Aguas's facilitation of two prior drug seizures as classic propensity evidence prohibited by Rule 404(b)(1). It is black-letter law that prior acts are irrelevant to show that a person "acted in conformity with those prior . . . acts," because that is "the exact propensity inference Rule 404(b)(1) is designed to prohibit." *Dawkins*, 999 F.3d at 792. Thus, "[a] defendant may not seek to establish his innocence . . . through proof of the absence of criminal acts on [other] specific occasions." *Scarpa*, 897 F.2d at 70; *see also United States v. O'Connor*, 580 F.2d 38, 43 (2d Cir. 1978) (same). That rule applies straightforwardly here: Roldan was charged

---

[5] Roldan's suggestion that the Government caused Major Torres's unavailability at trial (*see* Br. 5 n.2) is incorrect and overlooks the facts described in the Government's sealed correspondence to the District Court on this issue, which the Government will provide to this Court upon request. (*See* Dkt. 178 at 1-2). In any event, Roldan's accusation is irrelevant to any issue on appeal, as the Government agreed below to stipulate to any portion of Major Torres's testimony that the District Court deemed admissible, and Roldan agreed that a stipulation was "practical and a good proposal." (A. 25-26; *see also* A. 42). Roldan does not challenge that approach on appeal.

18

with unlawfully conspiring with Aguas (and others) to import cocaine, and Roldan could not establish his innocence by pointing to other occasions on which Aguas had lawfully seized drugs in the course of his police work.[6]

Indeed, this Court has routinely rejected similar efforts to introduce evidence of legal or honest conduct on other occasions to establish that the defendant did not commit the charged crimes. For example, in *Dawkins*, this Court affirmed the district court's refusal to allow a defendant accused of bribing college basketball coaches to admit testimony regarding the defendant's "relationships with coaches whom he did not bribe." 999 F.3d at 792. Similarly, in *Walker*, this Court affirmed the district court's refusal to allow a defendant

---

[6] Notably, Roldan had no knowledge of, or involvement in, the two prior drug seizures or Aguas's efforts to facilitate them. Roldan testified that Aguas told him generally that Aguas had previously "earned extra money" by using an informant who gave Aguas "drug information, and [Aguas] provide[d] that information to [his] bosses at the anti-narcotics unit," resulting in "a reward" whenever there was a "seizure." (A. 389). But Roldan did not testify to having any knowledge of, much less involvement in, any particular seizures that Aguas or his informant had previously facilitated. (*See* A. 389-91). And Major Torres, who led the anti-narcotics unit that conducted the prior seizures, never heard of Roldan before Roldan's arrest in this case. (A. 198).

19

accused of preparing false asylum applications to admit evidence of truthful applications he had submitted, because whether he "had prepared other, non-fraudulent applications was simply irrelevant to whether the applications charged as false statements were fraudulent." 191 F.3d at 336. And in *Chambers*, this Court affirmed the district court's refusal to admit evidence that the defendant-attorney's office manager did not discuss anything illegal with an undercover officer posing as a prospective client, because such evidence was irrelevant to charges that defendant had engaged in bribery for his other clients. 800 F. App'x at 45-46; *see also Al Kassar*, 660 F.3d at 123 (upholding district court's decision to exclude evidence of prior good acts as inadmissible under Rule 404(b)); *United States v. Williams*, 205 F.3d 23, 34 (2d Cir. 2000) (upholding district court's decision to exclude on relevance grounds evidence of defendant's prior trips to Jamaica during which he did not engage in drug activity).

Roldan argues that evidence of the prior drug seizures should have been admitted under Rule 404(b)(2) to show that Aguas's, and in turn Roldan's, "intent, motive, and plan" to conduct a lawful seizure. (Br. 39-40). But this Court rejected the same type of argument in *Dawkins*, where the defendant likewise argued that evidence that he "made no attempt whatsoever to bribe the more influential coaches" tended to "show that he lacked specific intent to commit the charged offenses." *Dawkins*, 999 F.3d at 792. This Court explained that "such 'good acts' evidence is only relevant if we assume that a defendant acted in conformity with those prior good acts—*i.e.*, if we make the exact propensity

20

inference Rule 404(b)(1) is designed to prohibit." *Id.* at 792. The same is true here.

*United States v. Aboumoussallem*, 726 F.2d 906 (2d Cir. 1984), on which Roldan relies (Br. 40-41), involved unique facts that are readily distinguishable from this case. In *Aboumoussallem*, the district court excluded evidence that the defendant's cousins and alleged co-conspirators had duped another person to transport drugs from Lebanon to the United States on an earlier occasion—in precisely the way the defendant testified they duped him several months later. 726 F.2d at 909-11. This Court found that the prior-act evidence was relevant to show that the cousins "had a plan to import narcotics from Lebanon into the United States using duped couriers," which in turn "len[t] some support to the inference that [the defendant] was duped and thereby bolster his defense of lack of knowledge." *Id.* at 912. Nonetheless, this Court affirmed the district court's decision to exclude the prior-act evidence under Rule 403, explaining that while the evidence "would probably not have consumed much time nor greatly perplexed the jury," it also "did not have much probative force to show that [the cousin] duped [the defendant]." *Id.*

Unlike in *Aboumoussallem*, where the prior act was identical in kind to the conduct the defendant testified to, the prior acts here were entirely dissimilar from the conduct described by Roldan at trial: The prior drug seizures involved Aguas's civilian informant whose information led Major Torres's anti-narcotics unit to conduct drug seizures at a seaport. By contrast, Roldan testified about a purported undercover operation to

21

which Aguas had recruited Roldan, and as part of
which Roldan and Aguas directly interacted with drug
traffickers seeking to smuggle drugs through an air-
port, without any actual participation by Major
Torres's unit or Aguas's civilian informant. Nothing
about Aguas's facilitation of the prior seizures was rel-
evant to show any common "plan" by Aguas or lend any
support to Roldan's defense. *See United States v. Afje-
hei*, 869 F.2d 670, 674 (2d Cir. 1989) ("[E]vidence of
another act should not be admitted to show knowledge
unless the other act is sufficiently similar to the con-
duct at issue to permit the jury reasonably to draw
from that act the knowledge inference advocated by
the proponent of the evidence."). Rather, the only pur-
pose of this evidence was to improperly argue to the
jury that in engaging in the charged conduct, Aguas
was acting in conformity with his prior lawful police
activities—a classic propensity argument prohibited
by Rule 404(b).

In any event, even if the evidence were relevant to
Roldan's defense (it was not), it was properly pre-
cluded under Rule 403 because any marginal proba-
tive value was substantially outweighed by the risk of
unfair prejudice and misleading the jury. (*See* Dkt. 178
at 2-4).[7] Indeed, even in *Aboumoussallem*, this Court

_____

[7]  In granting the Government's motion to pre-
clude "largely for the reasons stated in the govern-
ment's motion" (SPA 4 (citing Dkt. 171 at 36-41)), the
District Court cited only the Government's motion, not
its opposition to Roldan's motion on the same issue, in
which the Government made its Rule 403 argument

22

noted that the prior-act evidence "did not have much probative force" and affirmed the District Court's exclusion of this evidence under Rule 403. 726 F.2d at 912. Here, where the prior-act evidence is entirely dissimilar from the charged conduct, any probative value is even more marginal. By contrast, had Roldan been allowed to offer evidence of the prior drug seizures to urge the jury to infer that Aguas intended to conduct a lawful undercover operation, that would have been unfairly prejudicial to the Government's case and misleading to the jury in light of Aguas's guilty plea in this case (*see* Dkt. 161 at 24), of which the jury was unaware. *See generally* Fed. R. Evid. 104(a) ("The court must decide any preliminary question about whether . . . evidence is admissible. In so deciding, the court is not bound by evidence rules, except those on privilege.").[8]

—————

(*see* Dkt. 178 at 2-4). Even if this Court interprets this citation to suggest that the District Court did not reach the Rule 403 analysis, however, this Court "may affirm a ruling on any ground that is supported by the record." *United States v. Green*, 595 F.3d 432, 436 (2d Cir. 2010).

[8] Roldan argues that excluding evidence of the prior seizures was misleading because "the government was permitted to strongly—and incorrectly—imply that Aguas had *no* experience seizing drugs for the police department." (Br. 43 (emphasis in original)). But that is not what the Government argued to the jury. Rather, the Government properly argued that

23

### 2. The District Court Did Not Abuse Its Discretion by Excluding Evidence that Other CNP Officers Skimmed Money from Informants

The Government moved *in limine* to preclude evidence of specific instances or a general practice among CNP officers to take a cut of reward payments to civilian informants, which the Government argued was "improper propensity evidence diffused to the level of CNP officers generally." (Dkt. 171 at 37-38). In response, Roldan confirmed that he intended to offer evidence that "officers in the antinarcotics unit with which Aguas was working"—that is, Major Torres's unit—"profited financially from their sources' monetary rewards,"[9] which Roldan argued would "corroborate[ ]" his "defense that Aguas told him they could make money in this manner" and demonstrate Aguas's intent in this case. (Dkt. 181 at 16-17). Judge Kaplan precluded this evidence "largely for the reasons stated in the government's motion." (SPA 4).

The District Court's decision was plainly correct and well within its discretion. Just as a defendant may not offer evidence of his own prior acts to prove his

———————

Roldan did not intend to conduct a lawful seizure in *this* case. (A. 536-39).

[9]   Roldan did not describe this evidence, but it appears he had in mind cross-examination of Special Agent Rosales, who had reported to the Government his belief that one of Major Torres's subordinates (not Aguas) "shook down sources." (Dkt. 171 at 37).

24

conformity with those prior acts, a defendant may not offer evidence of others' acts, or a "custom and practice" within a group, to show that he acted in conformity therewith. *United States v. Angelilli*, 660 F.2d 23, 40 (2d Cir. 1981). Indeed, where the posited inference is that "individual defendants committed certain acts based on evidence that other acts were performed by other persons"—*i.e.*, that Aguas acted in conformity with the purported practice of other CNP officers of taking informant money—that inference is "even more tenuous" than a propensity inference drawn from the defendant's own prior conduct (which is already impermissible). *Id.* at 41. And of course, since the ultimate issue for the jury was not Aguas's intent but rather Roldan's, the attenuation stretched longer still.

Roldan argues that he "didn't seek to introduce general custom or practice evidence, but traditional 404(b) evidence," because proof that "Aguas had skimmed money from police rewards was prior bad act evidence . . . relevant to his intent and plan with Mr. Roldan." (Br. 43). But Roldan did not proffer or seek to admit any evidence—other than his own testimony, which was admitted (*see* A. 389-90)—that *Aguas* had personally skimmed money from informants' awards; rather, he only sought to admit evidence that "*Aguas' colleagues*" had done so (Dkt. 181 at 16 (emphasis added)). And even if Roldan had proffered or sought to admit such evidence as to Aguas, that evidence would not have been probative of Aguas's or Roldan's intent in this case because, as described above, *see* Part I.B.1.b, *supra*, Aguas's previous drug work using an informant and the charged conduct were markedly different. Indeed, the charged conduct did not involve

25

Aguas's informant (and thus any opportunity to take a portion of that informant's reward) at all: When Aguas introduced his informant to the DEA in June 2021—creating the opportunity to obtain an informant reward—that informant did not provide any information about the drug trafficking in this case (or any substantive information whatsoever). (A. 198, 204-08).

### 3. The District Court Did Not Abuse Its Discretion by Excluding Photographs of Roldan's Poor Living and Work Conditions

During the trial, the Government moved to preclude certain photographs depicting Roldan's poor living and work conditions in Colombia. (Dkt. 191 at 3-4; *see* Dkt. 191-5, 191-6, 191-7).[10] Judge Kaplan allowed three of the photographs that Roldan sought to offer, to which the Government did not object (*see* Dkt. 191 at 3), and excluded the rest under Rules 401 and 403. (SPA 63-65).[11] Judge Kaplan observed that the excluded photographs "could be described loosely as illustrating a day in the life of a lowly and poorly paid rural police officer—a person perhaps not likely to be

—————————

[10] Roldan's suggestion that the Government waited to object to his exhibits until "mid-trial, even though the government had them since a week before opening statements" (Br. 18) is incorrect. (*See* Dkt. 194, 196).

[11] In total, the District Court excluded 16 photographs—DX D1, D3-D5, E1, F2-F5, and F7-F13—over Roldan's objection. (*See* SPA 64).

26

in a position to direct airport security and other airport personnel and not likely to be party to an illegal cocaine exporting operation." (SPA 64-65). "But no one appears to dispute what defendant's ordinary daily duties were, where he was assigned to work, and the general nature of his economic and living conditions," and "[t]he circumstances of his daily life are equally consistent with his intent being to facilitate a law enforcement seizure or facilitate trafficking cocaine to the United States." (SPA 65). Judge Kaplan thus reasoned that "the photographs add not[h]ing to [the] relevant dispute in this case and thus have little or no real probative value." (SPA 65). On the other hand, there was "no denying" that the photographs were "likely to engender sympathy for a poor man performing mundane duties and living in unattractive circumstances in a remote part of a poor and troubled country." (SPA 65). "On balance," Judge Kaplan found, "the risk of unfair prejudice to the government's case substantially outweigh[ed] any probative value of those exhibits here precluded." (SPA 65).

The District Court engaged in a robust and sound Rule 403 analysis, "conscientiously balanc[ing] the proffered evidence's probative value with the risk for prejudice." *United States v. Awadallah*, 436 F.3d 125, 131 (2d Cir. 2006). Judge Kaplan was in a superior position to balance the relevant factors under Rule 403, and there is no basis to disturb his exercise of his broad discretion. *Coppola*, 671 F.3d at 244.

Roldan argues that the District Court was wrong to find *any* unfair prejudice because "[t]he government did not dispute Mr. Roldan's impoverishment or lowly

27

occupational duties, and there was nothing prejudicial to the government about these photos, except in the sense that they supported Mr. Roldan's testimony that he was innocent." (Br. 46). But the District Court correctly observed that the photographs—which appeared to show, among other things, Roldan shoveling manure, grasping barbed wire with his bare hands, and living in poor conditions (*see* Dkt. 191 at 4; Dkt. 193 at 4-5; Br. 19-20)—were "likely to engender sympathy." (SPA 65). It was well within the District Court's discretion to exclude them on that ground. *See, e.g.*, *United States v. George*, 266 F.3d 52, 63 (2d Cir. 2001) (affirming exclusion of video of defendant's wedding ceremony in passport fraud trial because "viewing his wedding to the woman to whom he wanted to return in Japan, prevented from doing so only by want of a passport, could easily generate the kind of sympathy that the district court noted would be more prejudicial than probative"), *vacated in part on other grounds on reh'g*, 386 F.3d 383 (2d Cir. 2004); *United States v. Paccione*, 949 F.2d 1183, 1201 (2d Cir. 1991) (affirming exclusion of evidence that defendant had devoted his life to caring for his son, who had cerebral palsy, because such evidence "could well cause the jury to be influenced by sympathies having no bearing on the merits of the case").

Moreover, because the District Court admitted three of Roldan's photographs—which showed Roldan in a banana field (DX F6; A. 379-80); a horse farm visited by the defense investigator (DX F1; A. 480-81); and the sewing machine Roldan purportedly use to sew his major's insignia (DX D2; A. 400-01)—the

28

precluded photographs were also "cumulative," further supporting their exclusion. (SPA 63).[12]

### 4. Any Evidentiary Errors Were Harmless

Even if any of the District Court's evidentiary rulings were erroneous (they were not), any errors, whether considered individually or collectively, were harmless. The evidence of Roldan's guilt—his plan to import a thousand kilograms of cocaine (and not to seize it as part of any secret undercover operation)—was overwhelming, and none of the excluded evidence would have swayed the jury. *See Curley*, 639 F.3d at 58 ("most critical factor" in the harmless-error analysis is "the strength of the government's case"); *United States v. Miller*, 626 F.3d 682, 690 (2d Cir. 2010) (district court's evidentiary ruling, if erroneous, was harmless, because "[t]he government's evidence of guilt was overwhelming").

*First*, Roldan's own recorded words captured his intent to carry out a drug smuggling operation. For example, Roldan affirmed to Vargas that Roldan was talking with his "friends from the tower," referring to the air traffic tower at the airport (A. 292); confirmed his understanding that Mercado—who Roldan admitted on the stand was "a real drug trafficker" (A. 442-43)—had sold a three-kilogram sample of cocaine to

_____

[12] Although the District Court's Rule 403 analysis focused on the risk of unfair prejudice (SPA 65), this Court "may affirm a ruling on any ground that is supported by the record," *Green*, 595 F.3d at 436.

29

Vargas (A. 309-11); received a report from Vargas that the three-kilogram sample had in fact arrived in New York (A. 311-13); and informed Vargas that Roldan wanted to be paid for his participation in the cocaine transaction in U.S. dollars rather than Colombian pesos (A. 313).

*Second*, Roldan and Aguas accepted a $6,000 bribe on video (A. 143-44, 266-69; GX 602C-S); paid a portion of it to Mercado (A. 144); and failed to report the $6,000 payment, as would be required if they were in fact involved in an undercover operation (A. 346-47, 417).

*Third*, before the first meeting with Vargas, Aguas warned Roldan and Mercado that they could all "die" if Vargas "ends up being a DEA agent." (A. 123). Aguas later warned Vargas that the hotel where they had previously met was "a place very frequented by the DEA." (A. 293-94). Aguas's fear of the DEA, expressed directly to Roldan, is irreconcilable with *Roldan's* supposed belief that he and Aguas were conducting a lawful undercover operation. And Aguas's extreme concern about the DEA generally is irreconcilable with Roldan's claim that *Aguas* believed they were conducting a lawful undercover operation.[13]

_____

[13] Notably, to the extent that Roldan's defense was that Aguas *lied* to Roldan about conducting an undercover operation—*i.e.*, that Aguas himself knew it was a smuggling operation but told Roldan it was an undercover operation—the excluded evidence, particularly Aguas's prior facilitation of two lawful cocaine

30

*Fourth*, after a careful and diligent search, the Colombia Attorney General investigator found no record that Roldan or Aguas had ever done any undercover work, which would have required extensive approvals and documentation. (A. 346, 348-53).

This was not a close case, as evidenced by the jury's ability to resolve it without any questions in the span of an afternoon. (A. 618-21). In light of the overwhelming evidence of Roldan's guilt, this Court "can conclude with fair assurance" that exclusion of the proffered evidence "did not substantially influence the jury." *Mercado*, 573 F.3d at 141.

Moreover, Roldan in fact introduced evidence of the very facts he sought to elicit through the excluded evidence. Roldan testified that Aguas claimed to have "earned extra money" by using an informant "who gives [Aguas] drug information, and [Aguas] provide[d] that information to [his] bosses at the anti-narcotics unit." (A. 389). Roldan further testified that Aguas explained that when his informant's information led to a seizure, the informant would receive a "payment" and "give a percentage to Aguas." (A. 390). The jury also heard evidence that "Aguas told Major Torres Valero in or about June 2021 that he had information of a plane planned to leave the Cartagena airport with narcotics on it," and "that a subsequent meeting of Aguas and his alleged source with the DEA

———————

seizures, was irrelevant to that defense. Roldan was allowed to, and did, testify about all statements that Aguas purportedly made to him about the operation.

31

was arranged." (SPA 5; *see* A. 196-98, 205-07, 554; GX 1005). Finally, the jury saw evidence of Roldan's work environment through the photographs that the District Court admitted. (DX F1, F6; A. 379-80, 480-81). The admitted evidence was amply sufficient to allow Roldan to effectively present his defense to the jury, and the excluded evidence was largely cumulative and would have added little. *See United States v. Zayac*, 765 F.3d 112, 119 (2d Cir. 2014) (exclusion of evidence harmless because defense could make argument from other evidence in the record); *United States v. Gupta*, 747 F.3d 111, 136 (2d Cir. 2014) (exclusion of evidence harmless because, among other things, admitted evidence was "clearly sufficient to enable [defendant] to present his main defense"); *United States v. Siddiqui*, 699 F.3d 690, 703 (2d Cir. 2012) (factors relevant to harmless-error analysis include "whether [the] evidence was material to the establishment of the critical fact or whether it was instead corroborative and cumulative").

## POINT II

## The District Court Properly Instructed the Jury on Intent

The District Court instructed the jury that Vargas and the other government informants in this case could not be considered co-conspirators. Roldan argues that the District Court should have gone further and explained to the jury that the *reason* informants cannot be co-conspirators is that they lack the requisite intent. (Br. 49-54). This argument is meritless. The District Court correctly charged the jury that it had to

32

find that Roldan intentionally joined the conspiracy with knowledge of its unlawful objectives and an intent to further them, and that the theory of the defense was that Roldan lacked such intent. No more was required.

## A. Relevant Facts

At the charge conference, Roldan's attorney pointed out that the District Court's draft jury instructions included "a note about . . . how you can't conspire with a government informant" and mentioned Vargas. (A. 488). Roldan's attorney requested that the instruction "cover all of the other government informants" involved in the case. (A. 488). The Government agreed, and the District Court added the relevant informants' names identified by the parties to the charge. (A. 491-93).

Roldan's counsel then requested that the District Court further "instruct the jury that the reason [government informants] can't be considered is because they lack the intent to be bona fide coconspirators." (A. 493). When the District Court asked why that instruction was necessary, Roldan's attorney stated that "[o]ur theory of the defense is that the same reason [government informants] are not bona fide conspirators is why [Roldan] is not a bona fide coconspirator." (A. 493). The District Court responded, "[t]hat may be, but I'm going to deal with your client . . . separately," noting that Roldan "is certainly capable of being one of the conspirators." (A. 493-94). At the end of the charge conference, Roldan's counsel requested, and the District Court adopted, a "theory of defense" instruction,

33

which stated that Roldan's defense was that he "did not join the conspiracy alleged in the indictment because he intended for the drugs to be seized in Colombia, not sent to the United States." (A. 506).

The District Court instructed the jury that to prove Roldan guilty, the Government had to "prove two elements beyond a reasonable doubt": first, "that the conspiracy . . . charged in Count One existed," and second, "that the defendant knowingly and intentionally joined that conspiracy." (A. 583). The District Court then gave detailed instructions as to each element.

With respect to the first element, the District Court instructed the jury:

> In deciding whether the government has proved that element, you need to consider who the two or more persons are that must reach an agreement or understanding to seek to achieve some unlawful purpose that's necessary in order for the conspiracy to have come into existence.

(A. 584). The District Court elaborated:

> The "who" is straightforward. Any two or more persons can reach an agreement or understanding that amounts to a criminal conspiracy. . . . But there is one category of persons who cannot be considered in deciding whether two or more people reached an agreement or understanding. No one who is acting at the direction of the government may be considered for that purpose, in other words, may be

34

> considered as one of the two persons who
> initially formed the conspiracy.
>
> In this case, Isidro Vargas was acting at
> the direction of the U.S. Government, so
> you may not consider him in deciding
> whether the government has proved be-
> yond a reasonable doubt that two or more
> persons entered into the necessary agree-
> ment or understanding. Nor may you con-
> sider Franco Montoya, Veijo, or Marcos—
> in other words, the undercover Colom-
> bian police officer who attended the meet-
> ing on September 2, 2021—in deciding
> whether the government has proved be-
> yond a reasonable doubt that two or more
> persons entered into the necessary agree-
> ment or understanding.

(A. 584-85). The District Court further instructed that
the Government had to prove beyond a reasonable
doubt that the purpose of the agreement was either or
both the purposes set out in the indictment—that is,
"to import cocaine into the United States," and/or "to
manufacture, distribute, or possess cocaine with the
intent to distribute it, intending, knowing, or having
reasonable cause to believe that the cocaine would be
imported into the United States." (A. 586).

With respect to the second element, the District
Court instructed the jury that the Government had to
"prove beyond a reasonable doubt that the defendant
knowingly and intentionally entered into the charged
conspiracy with a criminal intent, that is, with a pur-
pose to violate the law, and that the defendant agreed

35

to take part in the conspiracy to further promote and cooperate in at least one of its unlawful objectives." (A. 592). The District Court cautioned that "mere association by one person with a member of a conspiracy," "mere presence at the scene of a crime," or "mere knowledge of or acquiescence without participation in an unlawful plan" were not sufficient to satisfy this element. (A. 594-95). The District Court emphasized that "[w]hat is necessary" to find Roldan guilty of conspiracy "is [his] participation . . . in the conspiracy with knowledge of at least one of its illegal purposes and with an intent to aid in the accomplishment of an unlawful objective or objectives." (A. 595).

As Roldan requested, the District Court also instructed the jury that "the theory of the defense is that Mr. Roldan did not join the conspiracy alleged in the indictment because he intended for the drugs to be seized in Colombia, not sent to the United States." (A. 596).

## B.  Applicable Law

This Court "review[s] challenged jury instructions *de novo* but will reverse only if all of the instructions, taken as a whole, caused a defendant prejudice." *United States v. Applins*, 637 F.3d 59, 72 (2d Cir. 2011). In other words, "[t]o secure a reversal on a flawed jury charge, a defendant must demonstrate both error and ensuing prejudice." *United States v. Gansman*, 657 F.3d 85, 91 (2d Cir. 2011).

An "instruction is erroneous if it misleads the jury as to the correct legal standard or does not adequately inform the jury on the law." *United States v. Roy*, 783

36

F.3d 418, 420 (2d Cir. 2015). "No particular wording or phrasing is required for an instruction to be legally sufficient, so long as, taken as a whole, the instruction correctly conveys the applicable law." *Gansman*, 657 F.3d at 91. In reviewing a jury instruction, the Court "examine[s] not only the specific language that the defendant challenges but also the instructions as a whole to see if the entire charge delivered a correct interpretation of the law." *Al Kassar*, 660 F.3d at 127.

Reversal is not warranted if the alleged error in the jury instructions was harmless. Fed. R. Crim. P. 52(a); *see, e.g.*, *United States v. DeMizio*, 741 F.3d 373, 384 (2d Cir. 2014). Thus, a conviction should be affirmed despite instructional error if it "appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Neder v. United States*, 527 U.S. 1, 15 (1999).

## C. Discussion

The District Court's jury instructions were correct, and the District Court did not err by declining to instruct the jury that "the reason [government informants] can't be considered [co-conspirators] is because they lack the intent to be bona fide coconspirators." (A. 493).

The District Court's instructions correctly stated the law regarding a conspirator's intent. Conspiracy under 21 U.S.C. § 963 has two *mens rea* requirements. *First*, the defendant must "intentionally join[] in the charged conspiracy." *United States v. Umeh*, 527 F. App'x 57, 61 (2d Cir. 2013). *Second*, the defendant must know or intend the unlawful aims of the

37

conspiracy—here, to (i) import cocaine into the United States, 21 U.S.C. §§ 952(a), 960(a)(1), or (ii) manufacture, distribute, or possess cocaine with the intent to distribute it, intending, knowing, or having reasonable cause to believe that the cocaine would be imported into the United States, *id.* §§ 959(a), 960(a)(3). *Umeh*, 527 F. App'x at 61; *see also United States v. Morgan*, 385 F.3d 196, 206 (2d Cir. 2004) ("To be guilty of conspiracy, there must be some evidence from which it can reasonably be inferred that the person charged with conspiracy knew of the scheme alleged in the indictment and knowingly joined and participated in it.").

The District Court's instructions accurately (and repeatedly) conveyed both *mens rea* requirements. The District Court charged the jury that the Government had to prove beyond a reasonable doubt that Roldan "joined in and participated in [the] conspiracy *with knowledge* of its unlawful purpose or purposes *and with the intent* to further that unlawful objective or those unlawful objectives." (A. 592 (emphases added)). A few breaths later, the District Court again instructed the jury that the Government had to prove beyond a reasonable doubt that Roldan "*knowingly and intentionally* entered into the charged conspiracy *with a criminal intent*, that is, with a purpose to violate the law," and that Roldan "agreed to take part in the conspiracy *to further promote and cooperate* in at least one of its unlawful objectives." (A. 592 (emphases added)). And before concluding its substantive instructions, the District Court again reminded the jury that "[w]hat is necessary . . . is participation by a defendant in the conspiracy *with knowledge* of at least one of its illegal purposes and *with an intent* to aid in the

38

accomplishment of an unlawful objective or objectives." (A. 595 (emphases added)). The District Court also repeatedly instructed the jury that the alleged objectives of the conspiracy were "to import cocaine into the United States," and/or "to manufacture, distribute, or possess cocaine with the intent to distribute it, intending, knowing, or having reasonable cause to believe that the cocaine would be imported into the United States." (A. 586; *see also* A. 583, 587, 591). These instructions, taken as a whole, fully and accurately conveyed the *mens rea* required for Count One. *See Al Kassar*, 660 F.3d at 127 (jury instruction conveyed "both scienter requirements" by requiring the jury to find (i) the defendant "intentionally joined and participated in the conspiracy" and (ii) "the purpose of the conspiracy was to acquire and export SAMs"); *United States v. Romero-Padilla*, 583 F.3d 126, 131 (2d Cir. 2009) (jury charge addressed defendant's concern that "the jury be informed that it had to acquit defendant unless it found that he was a member of the conspiracy charged in the indictment" because "the District Court instructed the jury that it could only find him guilty if it found beyond a reasonable doubt that he was aware that he was joining a conspiracy to import narcotics into the United States").

The District Court also correctly instructed the jury that "[n]o one who is acting at the direction of the government may be considered . . . as one of the two persons who initially formed the conspiracy." (A. 584). That the District Court's did not specifically instruct the jury as to *why* a government informant cannot be a conspirator was not error. "[A] defendant is not entitled to a particular form of instruction," *United States*

39

*v. Allah*, 130 F.3d 33, 45 (2d Cir. 1997), and "a district court enjoys broad discretion in crafting its instructions, which is only circumscribed by the requirement that the charge be fair to both sides," *United States v. Ghailani*, 733 F.3d 29, 53 (2d Cir. 2013). "If the substance of a defendant's request is given by the court in its own language, the defendant has no cause to complain." *United States v. Han*, 230 F.3d 560, 565 (2d Cir. 2000). Here, the District Court not only gave an accurate instruction on the *mens rea* required to convict Roldan, but went further and delivered Roldan's requested instruction that the theory of the defense was that Roldan "did not join the conspiracy . . . because he intended for the drugs to be seized in Colombia, not sent to the United States." (A. 596). The District Court's instructions thus left no doubt that Roldan "couldn't be part of the conspiracy if he . . . intended to be uncovering drug trafficking instead of participating in it." (Br. 52). It would have been superfluous to tell the jury that an informant cannot be a conspirator because he does not intend to join the conspiracy, when the District Court already instructed the jury that it had to find that Roldan intentionally joined the conspiracy with knowledge of its unlawful objectives, and that the theory of the defense was that Roldan lacked such intent. *Cf. United States v. Kaplan*, 836 F.3d 1199, 1215 (9th Cir. 2016) ("A judge need not include proposed instructions that are not necessary to explain to the jury the legal effect of the theory of the defense.").

Roldan argues that the District Court erred by "fail[ing] to explain intent with respect to the forming of a conspiracy" because "[w]hat was disputed was

40

whether Mr. Roldan had any criminal intent at all."
(Br. 52). This argument confuses the two elements of
conspiracy. The first element—the existence of a con-
spiracy—simply requires "that two or more persons
entered into a joint enterprise with consciousness of its
general nature and extent." *United States v. Chavez*,
549 F.3d 119, 125 (2d Cir. 2008). "[W]hether Mr. Rol-
dan had any criminal intent" (Br. 52) is irrelevant to
the first element, because "proof of the existence of the
charged conspiracy is not confined to the acts of the
defendants on trial." *United States v. Araujo*, 539 F.2d
287, 289 (2d Cir. 1976). It is the second element—Rol-
dan's knowing and intentional joinder in the conspir-
acy with a criminal intent—that turns on Roldan's
*mens rea*, and the District Court accurately instructed
the jury on both aspects of the requisite *mens rea*, as
explained above.[14]

_____

[14]  Roldan suggests that "[a]t least one juror didn't
understand that intent mattered to Mr. Roldan's
guilt," citing a letter written by a juror in connection
with Roldan's sentencing. (Br. 53). Notwithstanding
the juror's statement that "I realized . . . that intent or
means didn't matter here," the juror recognized that
Roldan was "involved in a conspiracy" and "might have
been a corrupt officer," but principally questioned
whether Roldan was "actually capable of moving the
conspiracy forward in a meaningful way." (Dkt. 237 at
27). It thus appears that the juror's concern was not
about Roldan's intent in the legal sense, but rather
about Roldan's ability to accomplish the conspiracy's
aims (which, of course, is not an element of the

41

Roldan argues that the purported error "was compounded" because the Government argued in summation that Mercado "agreed to traffic drugs with Isidro Vargas, the DEA informant." (Br. 53). To start, as just discussed, there was no error to compound, and Roldan raises no independent challenge to the Government's summation. In any event, the Government did not argue that the existence of a conspiracy was established by the fact that Mercado agreed to traffic drugs with a DEA informant. Rather, the Government argued that there was "no serious dispute that there was an agreement to smuggle a thousand kilograms of cocaine out of the Cartagena airport" because, among other things, Mercado testified that "she agreed to traffic drugs with Isidro Vargas, the DEA informant, but also [Gomez, Garcia, Aguas, and Roldan], and the agreement pertained specifically to cocaine, a thousand kilograms of cocaine." (A. 516-17). In other words, the Government argued that Mercado testified that she agreed to traffic drugs with not only Vargas—whom the District Court expressly told the jury it "may not consider" in determining the existence of a conspiracy (A. 585)—but also with Gomez, Garcia, Aguas, and Roldan, all of whom (like Mercado) were true conspirators. The

_____

offense). In any event, "[t]he law is well settled that a juror cannot impeach a verdict absent extraordinary circumstances," *United States v. Davis*, 278 F. App'x 73, 74 (2d Cir. 2008) (citing *Tanner v. United States*, 483 U.S. 107, 117 (1987)), and the juror's sentencing letter is inadmissible for that purpose, Fed. R. Evid. 606(b). Roldan does not argue otherwise.

42

Government also reminded the jury that "Judge Kaplan will give you detailed instructions on the law, and what he says controls." (A. 516).

Roldan also contends that the purported error in the jury instructions should also be "considered in context" with another supposed instructional error during the defense summation, when the District Court told the jury that the Government "does not have to prove its case by any particular means, nor does the government have to place before you all of the information at its disposal, whatever that is or isn't. The question is whether the proof you have heard in this case satisfies you beyond a reasonable doubt of the defendant's guilt or not." (Br. 53 (quoting A. 561-62)). Because Roldan did not challenge this instruction below, plain-error review applies. *See United States v. Williams*, 943 F.3d 606, 609 (2d Cir. 2019). There was no error, let alone plain error, because this curative instruction was "well chosen, accurate and appropriate, given the nature of counsel's summation," *United States v. Cheung Kin Ping*, 555 F.2d 1069, 1073-74 (2d Cir. 1977)—specifically, counsel's improper argument that the DEA "literally" did not do "any investigation into Mr. Roldan before it decided to charge and extradite him" (A. 561). *See United States v. Ngono*, 801 F. App'x 19, 24 (2d Cir. 2020) ("We have held that a district court does not commit error in instructing the jury that the Government has no legal obligation to use any particular investigative technique in preparing its case." (citing *United States v. Saldarriaga*, 204 F.3d 50, 53 (2d Cir. 2000) (per curiam))); *Cheung Kin Ping*, 555 F.2d at 1073 (affirming the district court's decision to "instruct[ ] the jury that law enforcement policy was not

43

its concern, and . . . admonish[ ] the jury to focus its attention on the real issue, namely, whether the government had proved the facts alleged in the indictment beyond a reasonable doubt"). Nowhere in its curative instruction or otherwise did the District Court suggest, as Roldan claims, that "any lack of government evidence couldn't be considered." (Br. 53). To the contrary, the District Court expressly instructed the jury that reasonable doubt is "doubt that a reasonable person would have after carefully weighing all of the evidence or *lack of evidence*." (A. 582 (emphasis added)).

In any event, any purported error in the jury instructions (and there was none) was harmless. *See* Fed. R. Crim. P. 52(a); *DeMizio*, 741 F.3d at 384. As discussed above in Point I, *supra*, the evidence of Roldan's criminal intent was overwhelming. On this record, this Court can be satisfied "beyond a reasonable doubt" that the purported "error complained of did not contribute to the verdict obtained." *Neder*, 527 U.S. at 15.

## POINT III

### The District Court Did Not Procedurally Err at Sentencing

Roldan argues that the District Court procedurally erred at sentencing because it ruled (in his favor) on two U.S. Sentencing Guidelines adjustments at the end of the sentencing proceeding, after orally pronouncing his sentence. (Br. 55-57). Roldan also argues that the District Court erred by failing "to explain why it denied Mr. Roldan a minimal or minor role adjustment." (Br. 57). These arguments are meritless.

44

### A. Relevant Facts

In Presentence Report, the Probation Office calculated an advisory Guidelines range of life imprisonment, based on an offense level of 43 and a Criminal History Category of I. (PSR ¶ 89). With respect to the offense level, the Probation Office calculated a base offense level of 38 based on the drug quantity involved in the offense and applied three 2-level increases: (i) a 2-level weapons enhancement pursuant to U.S.S.G. § 2D1.1(b)(1), because Roldan possessed a firearm in connection with the offense; (ii) a 2-level abuse-of-trust adjustment pursuant to U.S.S.G. § 3B1.3, because Roldan abused his role as a CNP officer to carry out the offense; and (iii) a 2-level obstruction-of-justice adjustment pursuant to U.S.S.G. § 3C1.1, because Roldan committed perjury at trial. (PSR ¶¶ 50, 51, 53, 54). This resulted in a total offense level of 44, which was automatically reduced to the maximum offense level of 43. (PSR ¶ 58). The Probation Office recommended a sentence of 180 months' imprisonment. (PSR at 29).

In his written sentencing submission, Roldan objected to each of the three 2-level increases recommended by the Probation Office and requested three additional offense-level reductions: (i) a 4-level minimal-participant reduction, pursuant to U.S.S.G. § 3B1.2(a), which would also automatically result in a further reduction to the base offense level pursuant to U.S.S.G. § 2D1.1(a)(5); (ii) a 2-level reduction for certain zero-point offenders, pursuant to U.S.S.G. § 4C1.1; and (iii) a 2-level safety-valve reduction, pursuant to U.S.S.G. § 2D1.1(b)(18) (as well as statutory safety-valve relief, pursuant to 18 U.S.C. § 3553(f),

45

from the 10-year mandatory minimum term of imprisonment). (Dkt. 237 at 10-16). The Government argued that the Probation Office's calculation was correct, and that Roldan was ineligible for safety-valve relief. (Dkt. 243 at 4-8).

On September 26, 2024, Roldan appeared before Judge Kaplan for sentencing. (A. 624-57). After hearing argument from the parties regarding the Guidelines disputes, Judge Kaplan applied the weapons enhancement; found Roldan ineligible for safety-valve relief and declined to apply the three reductions that Roldan requested; and reserved decision on the abuse-of-trust and obstruction-of-justice adjustments. (A. 628-39). Later during the proceeding, Judge Kaplan observed that the outstanding Guidelines disputes were not "material," because the Guidelines range was so high that "you would need a nine-point reduction in the base level" (from level 44) "before you got to the point where a 180-month sentence," as recommended by the Probation Office, "would be a guideline sentence." (A. 641). Judge Kaplan stated that "as a matter of good order, I adopt the guideline range as set forth in the PSR," and that "all or substantially all of the arguments made by the defense for a different adjusted offense level would be immaterial if I imposed the recommended sentence." (A. 642).

After hearing argument from the parties and considering the factors in 18 U.S.C. § 3553(a), Judge Kaplan sentenced Roldan to 165 months' imprisonment, to be followed by five years' supervised release. (A. 651). Judge Kaplan explained that the sentence reflected "a quite substantial variance from the

46

guideline provision, which calls for a life sentence," and "a variance in excess of what probation recommended, meaning, more favorable to the defendant." (A. 652). Judge Kaplan explained that "I varied in favor of the defendant, and to this extent, because I am enormously sympathetic to quite a lot of indication that, with the exception of this conspiracy, he is a good family member, a good friend, a good man. But he was a part of this conspiracy." (A. 652).

Judge Kaplan noted that in reaching this sentence, he did "not enhance the guideline computation for perjury"—*i.e.*, obstruction of justice—even though he was "quite persuaded that [Roldan] was all-in on this conspiracy and falsely denied it." (A. 653; *see also* A. 655). Before the close of the proceeding, at the Government's request, Judge Kaplan also clarified that he did not impose the abuse-of-trust adjustment. (A. 656). The following colloquy then ensued:

> [THE GOVERNMENT]: Okay. Again, just for clarity of the record, my understanding, your Honor, is that the rejection of those two enhancements reduces the defendant's offense level to a total of 40. His criminal history category remains I, and that yields an advisory guideline of 292 to 365 months. And just to clarify, your Honor, or rather to confirm, that revised guidelines range does not in any way affect the sentence the Court intended to impose.

> THE COURT: Yes. Thank you for the clarification.

47

(A. 656). Judge Kaplan also confirmed that he "adopt[ed] the entire PSR subject to the revisions of the guidelines range and paragraph 74," relating to Roldan's immigration status in the United States. (A. 656).

## B.  Applicable Law

This Court "review[s] a sentence for procedural and substantive reasonableness under a deferential abuse-of-discretion standard." *United States v. Thavaraja*, 740 F.3d 253, 258 (2d Cir. 2014). When reviewing for procedural error, this Court "check[s] the sentence to ensure . . . that the district court followed the right steps in imposing it." *United States v. Ramos*, 979 F.3d 994, 998 (2d Cir. 2020). "A district court commits procedural error where it fails to calculate the Guidelines range (unless omission of the calculation is justified), makes a mistake in its Guidelines calculation, or treats the Guidelines as mandatory." *United States v. Cavera*, 550 F.3d 180, 190 (2d Cir. 2008) (en banc). "It also errs procedurally if it does not consider the § 3553(a) factors," "rests its sentence on a clearly erroneous finding of fact," or "fails adequately to explain its chosen sentence." *Id.*

This Court has repeatedly held that "precise calculation of the applicable Guidelines range" is unnecessary "where either of two Guidelines ranges, whether or not adjacent, is applicable, but the sentencing judge, having complied with section 3553(a), makes a decision to impose a non-Guidelines sentence, regardless of which of the two ranges applies." *United States v. Crosby*, 397 F.3d 103, 112 (2d Cir. 2005). This Court

48

explained that "[t]his leeway should be useful to sentencing judges in some cases to avoid the need to resolve all of the factual issues necessary to make precise determinations of some complicated matters." *Id.*; *see also United States v. Dhafir*, 577 F.3d 411, 415 (2d Cir. 2009) ("We reiterate here that the district court is not bound in ambiguous circumstances such as these to choose one Guidelines range in particular, and is free to take the more flexible—and often, more direct—approach of arriving at a more appropriate sentence outside the Guidelines."); *United States v. Borrego*, 388 F.3d 66, 69 (2d Cir. 2004) ("when the dispute at issue has no bearing on the determination of the sentence duration, district courts need not rule on disputes concerning offense level adjustments"). Therefore, "disputed sentencing issues need not be resolved where the sentencing court (i) could, consistent with the Guidelines, have imposed the same sentence regardless of the outcome of the dispute, and (ii) indicates that it would have done so." *Borrego*, 388 F.3d at 69; *see also United States v. Yates*, No. 22-3003-CR, 2024 WL 1338762, at *2 (2d Cir. Mar. 29, 2024). *But see United States v. Certified Env't Servs., Inc.*, 753 F.3d 72, 104 (2d Cir. 2014) ("*Dhafir, Crosby*, and *Cavera* lay out a limited exception to the general rule that a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. . . . That limited exception, however, is not a license for district courts to avoid calculating the proper guidelines range when the facts have been determined and the law is clear.").

Procedural error "is subject to harmless error analysis." *United States v. Lacey*, 699 F.3d 710, 718 (2d Cir.

49

2012). A Guidelines error is harmless if the record is clear that "the district court thought the sentence it chose was appropriate irrespective of the Guidelines range." *Molina-Martinez v. United States*, 578 U.S. 189, 200 (2016); *accord United States v. Jass*, 569 F.3d 47, 68 (2d Cir. 2009) ("Where we identify procedural error in a sentence, but the record indicates clearly that the district court would have imposed the same sentence in any event, the error may be deemed harmless, avoiding the need to vacate the sentence and to remand the case for resentencing.").

Procedural objections not raised to the district court at the time of sentencing are subject to a "rigorous plain error" analysis. *United States v. Villafuerte*, 502 F.3d 204, 208 (2d Cir. 2007). "A finding of 'plain error' requires that (1) there is an error; (2) the error is clear or obvious, rather than subject to reasonable dispute; (3) the error affected the appellant's substantial rights, which in the ordinary case means it affected the outcome of the district court proceedings; and (4) the error seriously affects the fairness, integrity or public reputation of judicial proceedings." *United States v. Alvarado*, 720 F.3d 153, 157 (2d Cir. 2013). "[R]eversal for plain error should be used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result." *Villafuerte*, 502 F.3d at 209; *see also Puckett v. United States*, 556 U.S. 129, 135 (2009) ("Meeting all four prongs is difficult, as it should be."). The burden to establish plain error is on the appellant. *United States v. Dussard*, 967 F.3d 149, 156 (2d Cir. 2020).

50

### C. Discussion

The District Court did not procedurally err in calculating Roldan's Guidelines range. The District Court resolved all of Roldan's Guidelines objections and correctly calculated his Guidelines range to be 292 to 365 months' imprisonment (A. 656)—a calculation the accuracy of which Roldan does not challenge on appeal. The District Court thus neither "fail[ed] to calculate the Guidelines range" nor "ma[de] a mistake in its Guidelines calculation." *Cavera*, 550 F.3d at 190.

Roldan nonetheless argues that the District Court procedurally erred in the *timing* of its calculation, contending that the District Court should have sustained his objections to the application of the abuse-of-trust and obstruction-of-justice adjustments earlier—before it pronounced his sentence rather than at the end of the sentencing proceeding. (Br. 56-57). This argument lacks merit.

As an initial matter, Judge Kaplan repeatedly made clear that he would impose the same sentence on Roldan regardless of whether the challenged adjustments applied. (*See* A. 641-42 (explaining that the parties' outstanding Guidelines disputes are immaterial if the District Court imposes the Probation Office's recommended sentence of 180 months); A. 653 (explaining that the obstruction-of-justice adjustment did not "affect the extent of my downward variance"); A. 656 (confirming that "revised guidelines range" of 292 to 365 months, based on an offense level without either adjustment, "does not in any way affect the sentence the Court intended to impose")). Under this Court's clear precedents, then, Judge Kaplan would not have

51

procedurally erred even had he declined to resolve the parties' complicated disputes regarding those two adjustments before sentencing Roldan to 165 months' imprisonment—a sentence that was well below the applicable Guidelines range (292 to 365 months) even if neither adjustment applied. *See Crosby*, 397 F.3d at 112; *Borrego*, 388 F.3d at 69-70 (emphasizing that "to require the court to rule on issues which would have no effect on the sentence would merely require performance of a meaningless academic exercise," and that "[t]he court is not obliged to waste its time making findings that would have no effect on the sentence or on the appeal"); *see also, e.g.*, *United States v. Hernandez*, 521 F. App'x 14, 19 (2d Cir. 2013) (finding no procedural error where "[a]fter consideration of all of the relevant facts and circumstances, the court imposed a sentence ... [that] fit squarely and intentionally within the overlap of the disputed guideline ranges"). *Ipso facto*, then, Judge Kaplan did not procedurally err by resolving those disputes at the end of the sentencing proceeding and confirming, consistent with his earlier remarks, that Roldan's sentence remained the same (A. 656).

Indeed, courts have recognized that because "sentencing is a fluid and dynamic process," "a sentence announced in open court is not imposed until there has been a formal break in the proceedings from which to logically and reasonably conclude that sentencing has finished." *United States v. Melvin*, 105 F.4th 620, 624 (4th Cir. 2024). "Lawyers often object moments after a sentence is initially announced—disputing the advisory guidelines calculation, the weight of various sentencing factors, the application of an enhancement, or

52

other issues that may arise. . . . [T]reating a sentence as tentative until sentencing has concluded 'provides the district court with an opportunity to correct any potential errors before, and perhaps in lieu of, appellate review.'" *Id.* at 625 (quoting *United States v. Luna-Acosta*, 715 F.3d 860, 866 (10th Cir. 2013)); *accord United States v. Meza*, 620 F.3d 505, 509 (5th Cir. 2010). Because Judge Kaplan was free to reconsider Roldan's sentence at any point before the sentencing proceeding formally concluded, it was not procedural error to correct or clarify his Guidelines calculation at any time during the proceeding. *See Meza*, 620 F.3d at 507, 509 (holding that the district court's "second pronouncement of [the defendant's] sentence," after correcting the Guidelines calculation, was not "an improper modification" of the sentence because there was "no formal break in the proceedings from which to logically and reasonably conclude that sentencing had finished").[15]

Even if the District Court erred by not ruling on the two adjustments earlier in the sentencing proceeding, any error was harmless because "the record indicates

---

[15] Roldan asserts that "[c]alculating the range after sentencing has concluded defeats the purpose of calculating the guideline range." (Br. 57). But Judge Kaplan *did not* wait until after sentencing has concluded to calculate Roldan's Guidelines range; rather, he corrected or clarified the Guidelines calculation after announcing Roldan's sentence but before sentencing was over. (A. 656; *see* Br. 36).

53

clearly that the district court would have imposed the same sentence in any event." *Jass*, 569 F.3d at 68. While Judge Kaplan initially adopted the Guidelines calculation in the Presentence Report, which yielded a Guidelines sentence of life imprisonment, he made clear that the parties' outstanding Guidelines disputes "would be immaterial if I imposed the [Probation Office's] recommended sentence" of 180 months' imprisonment. (A. 642; *see also* A. 643 (disagreeing with counsel's view that "if the guidelines were lower," the sentence might be lower because the District Court might "be thinking about a variance from guidelines range")). Ultimately, Judge Kaplan went even lower, imposing a 165-month sentence on Roldan (A. 651)—well below the Guidelines range regardless of whether either or both adjustments applied.

Judge Kaplan's explanation of the reasons for the sentence also makes clear that he selected Roldan's sentence based on factors independent of the Guidelines—specifically, his "enormous[ ] sympath[y] to quite a lot of indication that, with the exception of this conspiracy, [Roldan] is a good family member, a good friend, a good man." (A. 652). Judge Kaplan's explanation further underscores the harmlessness of any error in failing to resolve the parties' Guidelines disputes earlier. *See Molina-Martinez*, 578 U.S. at 200 (Guidelines error is harmless where the sentencing judge's "explanation of the reasons the selected sentence . . . make[s] it clear that the judge based the sentence he or she selected on factors independent of the Guidelines"); *see also, e.g.*, *United States v. Santiago*, 739 F. App'x 693, 695 (2d Cir. 2018) (any Guidelines error was harmless where district court "made abundantly

54

clear that it thought the sentence it chose was appropriate irrespective of the Guidelines range").

Lest there be any doubt that the Guidelines range had no impact on Roldan's sentence, Judge Kaplan expressly stated so at the end of the proceeding, when he resolved the parties' disputes regarding the two adjustments in Roldan's favor, adopted the lower Guidelines range of 292 to 365 months' imprisonment, and maintained the same 165-month sentence, explaining that "that revised guidelines range does not in any way affect the sentence the Court intended to impose." (A.656). This record leaves no doubt that any error in not adopting the lower Guidelines range earlier in the proceeding was harmless. *Cf. United States v. Darrah*, 132 F.4th 643, 652 (2d Cir. 2025) (Guidelines error was harmless where district court expressly stated that the challenged enhancement did not affect the sentence and imposed a sentence below the correct Guidelines range); *Jass*, 569 F.3d at 68 (any Guidelines error was harmless where "the district court unequivocally stated that it would impose the same . . . sentence on [defendant] however the issue of [the challenged enhancement] ultimately works out on appeal").

To be sure, as Roldan notes (Br. 57), a "district court cannot insulate its sentence from [appellate] review by commenting that the Guidelines range made no difference to its determination when the record indicates that it did." *United States v. Seabrook*, 968 F.3d 224, 233-34 (2d Cir. 2020). But this principle has no application here because "[t]he record confirms the district court's recitation that the same sentence would have been imposed regardless of the increase."

55

*Darrah*, 132 F.4th at 652. This case is unlike *Seabrook*, where "[t]he district court returned multiple times to the Guidelines range in framing its choice of the appropriate sentence," and the sentence imposed was "conspicuous for its position as the lowest sentence within what the District Court believed to be the applicable range." 968 F.3d at 234. Nor is this case like *United States v. Feldman*, 647 F.3d 450 (2d Cir. 2011), where the district court broadly stated that the sentence would have been the same "even if some of my rulings regarding the enhancements or the grouping are inaccurate . . . without stating which enhancement —or which combinations of enhancements—would not affect [the defendant's] sentence." *Id.* at 459. Rather, this case is like *Darrah*, where the district court "dealt with a single enhancement, specifically identified by the district court and imposed with the explicit and unambiguous declaration that the enhancement did not affect the ultimate sentence," 132 F.4th at 652, and *United States v. Torres*, 738 F. App'x 36 (2d Cir. 2018), where the district court clearly "formed a view of the appropriate sentence independent of the applicable sentencing range," *id.* at 37.

Finally, Roldan argues that the District Court procedurally erred because it "failed to explain why it denied Mr. Roldan a minimal or minor role adjustment" (Br. 57)—a denial that Roldan does not challenge on the merits. Roldan did not raise this argument below, so this Court reviews it for plain error. *Villafuerte*, 502 F.3d at 208. There was no error, plain or otherwise. Sentencing courts have an obligation to "make findings that are sufficiently specific to permit meaningful appellate review." *United States v. Rainford*, 110 F.4th

56

455, 476 (2d Cir. 2024). A sentencing court meets this obligation "if the court indicates, either at the sentencing hearing or in the written judgment, that it is adopting the recommendations in the PSR." *Id.* At the sentencing hearing, Judge Kaplan, with exceptions not relevant to this appeal, "adopt[ed] the entire PSR" (A. 656), which included a detailed explanation of the reasons that the mitigating-role adjustment did not apply:

> While the defendant may not have been the "mastermind" behind the conspiracy, it is the Probation Office's position that he does not meet the requirements to be considered for a minimal or minor role reduction. Roldan Cardenas agreed with his co-conspirators to participate in the conspiracy to traffic a substantial amount of cocaine evidenced by his participation in a meeting, receipt of photos of the drug lab, and the use of his position as a police officer to gain access to the airport. Based on the aforementioned, it is reasonable to believe he understood the significance of the conspiracy and is no less culpable than his co-conspirators.

(PSR at 27). "Because the PSR is sufficiently detailed to permit [this Court's] review of" the District Court's application of this adjustment—which Roldan does not ask this Court to undertake in any event—there is "no procedural error—plain or otherwise." *United States v.*

57

*Hotaling*, No. 24-434, 2025 WL 2416346, at \*3 (2d Cir. Aug. 21, 2025).[16]

_____

[16] While this Court need not look beyond the Presentence Report to reject Roldan's claim of procedural error, the District Court also engaged in an extended colloquy with Roldan's counsel about the mitigating-role adjustment at sentencing, making clear its view that Roldan played an important role in the conspiracy and was not a minimal or minor participant. (*See* A. 630 ("He was the guy who played the role of the superior officer that was essential to make the deal go, right?"); *id.* ("Isn't a reasonable inference to suppose that the reason he wanted to meet Aguas' boss is that it served as assurance that Aguas could deliver on the promise to get the drugs through the airport?"); A. 631 ("So you want a role adjustment on the theory that he was incompetent at what he was trying to do?")).

58

## CONCLUSION

**The judgment of conviction should be affirmed.**

Dated:    New York, New York
             September 11, 2025

                  Respectfully submitted,

                  JAY CLAYTON,
                  *United States Attorney for the*
                  *Southern District of New York,*
                  *Attorney for the United States*
                    *of America.*

ALEXANDER LI,
SARAH L. KUSHNER,
OLGA I. ZVEROVICH,
    *Assistant United States Attorneys,*
        *Of Counsel.*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g), the undersigned counsel hereby certifies that this brief complies with the type-volume limitation of the Federal Rules of Appellate Procedure and this Court's Local Rules. As measured by the word processing system used to prepare this brief, there are 13,859 words in this brief.

JAY CLAYTON,
*United States Attorney for the*
*Southern District of New York*

By: OLGA I. ZVEROVICH,
*Assistant United States Attorney*