# 24-2734(L)

To be argued by:
**ALLEGRA GLASHAUSSER**

**United States Court of Appeals
for the Second Circuit**

Docket Nos. 24-2734(L); 24-3299(CON)

UNITED STATES OF AMERICA,

Appellee,

-against-

MAURICIO RENE GARCIA QUIMBAYO, a/k/a TONY, a/k/a MAURICE, CLAUDIA ISABEL MERCADO SCALZO, a/k/a LA FLACA, TATIANA ANDREA VARGAS BULLA, a/k/a TATI, a/k/a TONYA, OSCAR GOMEZ ROMERO, a/k/a COMPA,

Defendants,

JEY JAMES ROLDAN CARDENAS, a/k/a MILLER DE JESUS GUTIERREZ DURAN,

Defendant-Appellant.

APPEAL FROM THE FINAL JUDGMENT OF THE
UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK

**REPLY BRIEF FOR DEFENDANT-APPELLANT
JEY JAMES ROLDAN CARDENAS**

FEDERAL DEFENDERS OF NEW YORK, INC.
APPEALS BUREAU
52 Duane Street – 10th Floor
New York, New York 10007
Tel.: (212) 417-8742
Attorney for Defendant Appellant
**JEY JAMES ROLDAN CARDENAS**

**ALLEGRA GLASHAUSSER,**
*Of counsel.*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................ii

Preliminary Statement ......................................................................................1

Argument .........................................................................................................4

Point I

The court improperly excluded evidence that supported
Mr. Roldan's defense ......................................................................................4

Point II

The court committed error in refusing to provide defense
counsel's requested, legally correct charge, which went to
the heart of the defense theory that Mr. Roldan lacked the
intent to join any conspiracy because he thought – just like
the other government informants – that he was part of a police
operation ........................................................................................................11

Point III

Mr. Roldan's sentence should be vacated because the judge
refused to calculate the sentencing guidelines before issuing
the sentence, despite counsel's clear objection and request
that the court determine the appropriate range ...............................................15

Conclusion .......................................................................................................21

# TABLE OF AUTHORITIES

## *Cases*

*Gall v. United States,*
  552 U.S. 38 (2007) ...................................................................................16

*Molina-Martinez v. United States,*
  578 U.S. 189 (2016) ....................................................................16, 17, 20

*Peugh v. United States,*
  569 U.S. 530 (2013) ...................................................................................15

*Rosales-Mireles v. United States,*
  585 U.S. 129 (2018) .............................................................................15, 16

*United States v. Aboumoussallem,*
  726 F.2d 906 (2d Cir. 1984) ........................................................................6

*United States v. Affehei,*
  869 F.2d 670 (2d Cir. 1989) ........................................................................6

*United States v. Al Kassar,*
  660 F.3d 108 (2d Cir. 2011) ..................................................................5, 12

*United States v. Bennett,*
  839 F.3d 153 (2d Cir. 2016) ......................................................................20

*United States v. Bennett,*
  No. 14 Cr. 203 (S.D.N.Y. Dec. 9, 2016) ...................................................20

*United States v. Borrego,*
  388 F.3d 66 (2d Cir. 2004) ........................................................................18

*United States v. Carlton,*
  442 F.3d 802 (2d Cir. 2006) ......................................................................12

*United States v. Chambers,*
  800 F. App'x 43 (2d Cir. 2020) ...................................................................5

*United States v. Crosby,*
  397 F.3d 103 (2d Cir. 2005) ......................................................................18

*United States v. Dawkins,*
    999 F.3d 767 (2d Cir. 2021) ....................................................................4

*United States v. Feldman,*
    647 F.3d 450 (2d Cir. 2011) ..................................................................19

*United States v. George,*
    266 F.3d 52 (2d Cir. 2001) ......................................................................8

*United States v. Hernandez,*
    521 F. App'x 14 (2d Cir. 2013) .............................................................18

*United States v. Hotaling,*
    No. 24-434, 2025 WL 2416346 (2d Cir. Aug. 21, 2025) .............................20

*United States v. LaFlam,*
    369 F.3d 153 (2d Cir. 2004) ....................................................................9

*United States v. Meza,*
    620 F.3d 505 (5th Cir. 2010) ..................................................................16

*United States v. O'Connor,*
    580 F.2d 38 (2d Cir. 1978) ......................................................................5

*United States v. Olmeda,*
    894 F.3d 89 (2d Cir. 2018) ....................................................................19

*United States v. Paccione,*
    949 F.2d 1183 (2d Cir. 1991) ..................................................................8

*United States v. Prawl,*
    168 F.3d 622 (2d Cir. 1999) ..................................................................11

*United States v. Rainford,*
    110 F.4th 455 (2d Cir. 2024) ..................................................................20

*United States v. Rosenblatt,*
    554 F.2d 36 (2d Cir. 1977) ....................................................................12

*United States v. Scarpa,*
    897 F.2d 63 (2d Cir. 1990) ......................................................................5

*United States v. Seabrook,*
    968 F.3d 224 ...................................................................................19

*United States v. Silver,*
    864 F.3d 102 (2d Cir. 2017).............................................................14

*United States v. White,*
    692 F.3d 235 (2d Cir. 2012)...............................................................9

*United States v. Williams,*
    205 F.3d 23 (2d Cir. 2000).................................................................5

*Wray v. Johnson,*
    202 F.3d 515 (2d Cir. 2000)...............................................................9

## Preliminary Statement

Jey James Roldan Cardenas files this brief in reply to the government's opposition brief of September 11, 2025. For the reasons stated below, the government's legal arguments should be rejected. At the outset, however, the defense notes a broader factual problem that infects each argument the government makes.

Mr. Roldan was a poor Columbian police officer. At his trial for conspiring to import cocaine, he testified that he thought he was aiding a law enforcement effort by helping his police partner, Jose Aguas, seize drugs for police. This was his defense: he did not intend to traffic drugs, but intended to help Aguas seize drugs. Supporting this defense, Aguas was in fact working with the DEA to lawfully seize drugs during the same time period that the government claimed he was working with Mr. Roldan to transport drugs.

The government's case at trial was complicated. It relied heavily on the testimony of a paid DEA informant, who pretended to be a drug dealer in meeting Aguas and Mr. Roldan. Three other people involved in these discussions were also government informants. Because at least four people involved in the alleged drug trafficking were only pretending to be drug trafficking and were lying during recorded meetings and calls, the testimony and exhibits were often confusing.

In his opening appellate brief, Mr. Roldan explained the trial evidence at length, detailing his two meetings and one call with the paid DEA informant as well as the

numerous other calls between Aguas and the paid DEA informant, quoting from transcripts of those meetings, which were recorded, and citing to the testimony and voluminous exhibits. App. Br. 3-29.

In contrast, the fact section in the government's brief is exceedingly short. Gov. Br. 2-10. That is because the government completely omits facts that don't fit neatly within their narrative. The result is a globally misleading presentation that the government relies on in its legal arguments throughout its brief to repeatedly and incorrectly assert that the evidence of Mr. Roldan's guilt was overwhelming. Gov. Br. 28, 30, 43. It was not. Examples of the government's omissions are below:

- The government fails to mention that the paid DEA informant found Mr. Roldan's police major costume so obviously fake that he called Mr. Roldan the "Fake Major." A. 300. Indeed, the government doesn't even hint at this fact, asserting that Mr. Roldan wore the "insignia of a major" on his "uniform[ ]," Gov. Br. 5, without mentioning that his "uniform" was so comically false that it was a subject of jokes and ridicule. *E.g.* DX C0-T at 3. Later, the government says that the paid DEA informant sent photos to Mr. Roldan, failing to note that he had Mr. Roldan's number saved in his phone as "Mayor Falso," or the Fake Major. A. 300. GX 401B & 403B. No one believed that Mr. Roldan was actually a police major with any type of power or access.

- The government writes that a cooperating government witness introduced the paid DEA informant to a "cocaine supplier" with "access to a laboratory." Gov. Br. 6. But the government fails to mention that the cooperating witness also testified that there were no "labs," saying "[t]hey don't exist." A. 189.

- The government repeatedly pretends that Aguas and Mr. Roldan did everything together, failing to mention that Mr. Roldan made only vague statements in his two meetings with the paid DEA informant, that he parroted words said by Aguas, and that it was clear to the paid DEA

2

informant and the cooperating witness that Aguas was in charge. *E.g.,* A. 81, 183, 321. For example, the government states that Mr. "Roldan and Aguas explained that they would charge $2,300 per kilogram of cocaine." Gov. Br. 6. But it was Aguas – not Mr. Roldan – who stated that price. A. 140. In contrast, Mr. Roldan didn't even know what currency the payment was meant to be made in. GX 702G-T.

- The government fails to mention that its paid DEA informant had received $3,000,000 and had also received paperwork to live in the United States despite having been deported and having a history of serious misconduct. Indeed, strangely, the government's brief never even mentions that this informant was paid at all.

- The government claims that Aguas and Mr. Roldan "agreed to exploit" his "positions and contacts as police officers," to transport cocaine through the Cartegena airport to a private place, and "secure air-traffic authorization." Gov. Br. 3. It fails to mention, however, that there was no evidence Mr. Roldan had any ability to do any of those things. Mr. Roldan was a rural horseback officer, with no connection to an international airport.

Given the government's complete failure to mention facts that don't fit its version of events or facts that support that Mr. Roldan didn't have the intent to join a conspiracy, this Court should review the government's report of the facts with skepticism.

For reasons explained below, this Court should also reject the government's legal arguments.

3

## Argument

## Point I

### The court improperly excluded evidence that supported Mr. Roldan's defense.

In Mr. Roldan's opening brief, he argued that the court improperly excluded evidence that supported the defense theory: that Mr. Roldan thought he and Aguas were working on a lawful drug seizure for the police. The court excluded evidence that Aguas had twice before helped police seize drugs during the exact same time period that the government argued Aguas was conspiring with Mr. Roldan to traffic drugs. The court also excluded evidence that Aguas previously skimmed money from drug informants, exactly what Mr. Roldan testified Aguas planned to do for Mr. Roldan. And the court excluded photos that supported Mr. Roldan's testimony. Combined, these errors deprived Mr. Roldan of his right to a fair trial.

The government's arguments in response are not persuasive. First, the cases it relies on are inapposite. The government argues that Aguas's drug seizures and that he skimmed money from drug informants was evidence of "good character," that could not be admitted. Gov. Br. 17-25. In support it cites cases relating to prior "good act[s]," while failing to address Mr. Roldan's argument that he sought to introduce the evidence to show motive, intent, knowledge and plan. Gov. Br. 17-19, citing *United States v. Dawkins*, 999 F.3d 767 (2d Cir. 2021) (sought to introduce the defendant's relationship with people "whom he did not bribe" to show his good "character");

*United States v. Williams*, 205 F.3d 23, 34 (2d Cir. 2000) ("We reject Williams's assertion that the evidence of innocent travel was necessary to rebut the government's allegation that Williams had been involved in other cocaine importations from Jamaica"); *United States v. Scarpa*, 897 F.2d 63 (2d Cir. 1990) ("A defendant may not seek to establish his innocence…through proof of the absence of criminal acts on specific occasions."); *United States v. O'Connor*, 580 F.2d 38 (2d Cir. 1978) ("counsel sought to ask a defense witness…about O'Connor's specific good acts" in not taking bribes from some people). In contrast to these cases, Mr. Roldan did not try to introduce any evidence related to his or Aguas's good character. That Aguas had helped police seize drugs was relevant to whether it was credible that Mr. Roldan believed he was helping Aguas seize drugs during the same time period. It was, thus, relevant to his intent, the key issue for his defense.

The government also cites two cases where evidence was excluded because it related to events that were remote in time from the charged crimes. Gov. Br. 19, citing *United States v. Chambers*, 800 F. App'x 43 (2d Cir. 2020) ("district court did not abuse its discretion in determining that the evidence of the meeting, which took place two years after the charged conduct, was irrelevant"); *United States v. Al Kassar*, 660 F.3d 108 (2d Cir. 2011) (upholding exclusion of evidence that "related to wholly different events that took place many years earlier"). Unlike in *Chambers* and *Al Kassar*, the excluded evidence in Mr. Roldan's case was not from two years after or many years before the charged conduct, but contemporaneous with the charged conduct.

5

Next, the government claims that on-point authority of this Court should not control. It attempts to distinguish *United States v. Aboumoussallem*, 726 F.2d 906 (2d Cir. 1984), which involved very similar facts, on the ground that the prior-act evidence in *Aboumoussallem* was "identical in kind" to the conduct described in the defendant's testimony, while, in the government's view, the prior acts in Mr. Roldan's case were "entirely dissimilar." Gov. Br. 20-21, citing *United States v. Affjehei*, 869 F.2d 670, 674 (2d Cir. 1989) (other act evidence should be "sufficiently similar to the conduct at issue to permit the jury reasonably to draw from that act the knowledge inference advocated by the proponent of the evidence"). This is simply wrong. Aguas's other drug seizures weren't "entirely dissimilar" from the work he did with Mr. Roldan. Instead, the other acts involved Aguas helping police seize drugs during the same time period that Mr. Roldan testified he believed he was helping Aguas seize drugs. The government points to minor factual distinctions between the seizures – the other acts were at a seaport, while the charged act was at an airport – and that the other seizures involved "Aguas's civilian informant" while the charged crime involved "directly interact[ing] with drug traffickers."[1] Gov. Br. 20-21, 24. But the government doesn't explain why those small factual differences are legally relevant; they are not. Notably,

---

[1] The government's accusation that Mr. Roldan "mischaracterize[d] the record" by stating that the government was splitting hairs in arguing that the prior seizures weren't similar, Gov. Res. at 15, n.4, is unfounded. The government still fails to explain why the small variations between the transactions were relevant.

6

the government cites no authority for the proposition that the other act evidence be *identical* to the charged act to be admissible under 404(b).

The government also misleadingly asserts that Mr. Roldan had "no knowledge of …the two prior drug seizures or Aguas's efforts to facilitate them." Gov. Br. 18. But Mr. Roldan testified that Aguas told him that he "work[ed] at the anti-narcotics base, [had] a source who gives [him] drug information," and that he "carr[ies] out the seizure" with his boss and the DEA agents, and "they pay a reward for that information." A. 389. This testimony indicated that Mr. Roldan was indeed aware that Aguas facilitated drug seizures.

Next, the government asserts that the evidence of Aguas's other drug seizures would have been "misleading to the jury in light of Aguas's guilty plea." Gov. Br. 22. The government doesn't explain this puzzling comment further and it should be afforded no weight. This is especially true as it was the government that made misleading arguments to the jury about Aguas that suggested he had done no drug seizure work during the relevant time period. For example, the government told the jury that officials had "scoured the relevant agencies' records for any shred of evidence that [ ] Aguas [ ] work[ed] in an undercover capacity between May and August of 2021. What did he find? Absolutely nothing." A. 514. In its response brief, the government strangely asserts, without any quotations from the record, that it didn't make this argument. Gov. Br. 22-23, n. 8. This incorrect assertion must be rejected.

7

Finally, the defense was also incorrectly prohibited from introducing pictures that – in the district court's view – showed that Mr. Roldan "perhaps [was] not likely to be in a position to direct airport security …and not likely to be party to an illegal cocaine exporting operation." SPA 64-54. In other words, the court agreed that the pictures were probative of Mr. Roldan guilt or innocence. The government, however, asserts the court was right to exclude the photos, citing two cases where video and picture evidence that were relevant only to the person's character were excluded. Gov. Br. 27, citing *United States v. George*, 266 F.3d 52, 63 (2d Cir. 2001), vacated in part on reh'g, 386 F.3d 383 (2d Cir. 2004) ("George tried to introduce the videotape apparently to demonstrate his slow and unresponsive behavior at his wedding as evidence that whatever cognitive problems he has in acquiring a passport are endemic to his personality."); *United States v. Paccione*, 949 F.2d 1183, 1201 (2d Cir. 1991) (discussing scope of character evidence about defendant's honesty and integrity). Because the evidence in *George* and *Paccione* was related to the defendant's character, rather than the guilt or innocence like here, these cases are dissimilar to Mr. Roldan's case.

\* \* \*

In sum, Mr. Roldan's defense was hampered by a lack of evidentiary richness. The defense had to rely on a stipulation by Major Victor Alfonso Torres Valero about Aguas providing him information about a plane departing from Cartegena with drugs,

rather than in-person testimony.[2] The defense was prohibited from pointing to the other drug seizures Aguas had made in the same time period, prohibited from showing that Aguas would skim money from those seizures, just as Mr. Roldan believed he would do for him, and prohibited from introducing photographs that supported Mr. Roldan's testimony. These evidentiary rulings were related to the critical dispute in this case, Mr. Roldan's intent. *See e.g., United States v. White*, 692 F.3d 235, 251–52 (2d Cir. 2012) (evidentiary error that "spoke directly to a critical element of the Government's case" was not harmless); *Wray v. Johnson*, 202 F.3d 515, 526 (2d Cir. 2000) ("In assessing the wrongly admitted testimony's importance, we consider such factors as whether the testimony bore on an issue that is plainly critical to the jury's decision") (internal quotation marks omitted). This Court has an "inclusionary approach to other act evidence under Rule 404(b), which allows such evidence to be admitted for any purpose other than to demonstrate criminal propensity." *United States v. LaFlam*, 369 F.3d 153, 156 (2d Cir. 2004). It was error for the district court to exclude this evidence.

---

[2] The government states that Mr. Roldan's "suggestion that the government caused Major Torres's unavailability at trial" is "incorrect and overlooks the facts described in" sealed correspondence. Gov. Br. 17, n. 5, citing Dkt. 178 at 1. The defense did not "overlook[ ]" the government's submission. Instead, as noted in that submission, there was no dispute that the government conveyed information to the Columbian National Police that caused Major Torres to be unavailable for trial. Dkt. 178 at 2, n. 2. The government's sealed letter provided an explanation about *why* the government conveyed that information, but didn't dispute that they had done so.

The government, however, argues that these errors were harmless, boldly stating that "[t]his was not a close case." Gov. Br. 30. This is wrong. The government can only claim this was "not a close case" by relying on a misleading, slanted version of the facts that omits cirtical events and evidence, as explained in the preliminary statement. Moreover, the government states that Mr. Roldan's "own recorded words captured his intent to carry out a drug smuggling operation," Gov. Br. 28, that he failed to report receiving money from the paid DEA informant, Gov. Br. 29, and that "Aguas's extreme concern about the DEA generally is irreconcilable with [Mr.] Roldan's claim that *Aguas* believed they were conducting a lawful undercover operation." Gov. Res. 29. But the excluded evidence would have bolstered Mr. Roldan's testimony that he didn't mean what he said to the paid DEA informant (just as the paid DEA informant didn't mean what he said to Mr. Roldan) and that he thought Aguas would skim money from the deal to pay Mr. Roldan. In other words, the excluded evidence would have undercut the government's proof on the very facts that the government points to now as proving Mr. Roldan's guilt.

This Court should reverse Mr. Roldan's conviction and order a new trial.

10

## Point II

**The court committed error in refusing to provide defense counsel's requested, legally correct charge, which went to the heart of the defense theory that Mr. Roldan lacked the intent to join any conspiracy because he thought – just like the other government informants – that he was part of a police operation.**

This Court "will vacate a conviction on account of a missing requested instruction if (1) the requested instruction was legally correct; (2) it represents a theory of defense with basis in the record that would lead to acquittal; and (3) the theory is not effectively presented elsewhere in the charge." *United States v. Prawl*, 168 F.3d 622, 626 (2d Cir. 1999). Here, Mr. Roldan requested a legally correct instruction that people working for the government cannot form a conspiracy because they lack the necessary criminal intent. That requested instruction supported a theory of defense with a basis in the record that would lead to acquittal and the theory was not effectively presented elsewhere in the charge.

In response, the government doesn't dispute, and thus implicitly concedes, that the instruction requested by Mr. Roldan was legally correct and that it supported a theory of defense that would lead to acquittal. Instead, its argument in response relies entirely on its assertion that the instruction would have been "superfluous" because, although intent was not discussed with respect to the forming of the conspiracy, it was discussed with respect to Mr. Roldan joining the conspiracy. Gov. Br. 39. The Court should reject this argument.

11

First, the government simply ignores the district court's failure to understand that the defense's requested charge was legally correct. The court stated that it was "not sure [the reason why government informants couldn't be conspirators was] because they don't share the intent." A. 490. Later, the court only reluctantly conceded that counsel "may be" correct that a lack of shared intent was why informants couldn't be conspirators. A. 493-94. But counsel was indisputably correct. App. Br. 51-52, citing *United States v. Rosenblatt*, 554 F.2d 36, 38 (2d Cir. 1977); *Al Kassar*, 660 F.3d at 128; *United States v. Carlton*, 442 F.3d 802, 811 (2d Cir. 2006) ("The agreement to conspire requires that at least two culpable co-conspirators agree, and 'a person who enters into such an agreement while acting as an agent of the government, either directly or as a confidential informant, lacks the criminal intent necessary to render him a bona fide co-conspirator.'").

Second, the government also seemingly misunderstands the requested instruction, asserting that "criminal intent" is "irrelevant" as to whether a conspiracy existed. Gov. Br. 40. The government doesn't further explain this argument, which makes no sense. A conspiracy requires a meeting of the minds and that the conspirators share a criminal intent. With respect to this first element of conspiracy, however, the court did not mention intent, except with respect to the specific object of the conspiracy. A. 583-590. The court said that the jury needed

> to consider who the two or more persons are that must reach an agreement or understanding to seek to achieve some unlawful purpose that's necessary in order for the conspiracy to have come into existence.

12

> You must consider what sort of conduct may constitute an agreement or understanding. And then you must consider what the purpose of any such agreement or understanding must have been. A. 584.

It continued, saying

> [a]ny two or more persons can reach an agreement or understanding that amounts to a criminal conspiracy. One of those persons may be the defendant, but it doesn't have to be the defendant in order for an agreement or understanding to come into existence. It can be two or more other people. But there is one category of persons who cannot be considered in deciding whether two or more people reached an agreement or understanding. No one who is acting at the direction of the government may be considered for that purpose, in other words, may be considered as one of the two persons who initially formed the conspiracy. A. 584

The charge simply didn't explain that the people who "reach an agreement or understanding" had to <u>intend</u> to enter into the illegal agreement or understanding. It failed to convey why government informants couldn't be a part of the conspiracy. As the charge read, it appeared that there was just a strict rule that government informants couldn't be part of a conspiracy. Without the instruction that intent was required and someone working for the police wouldn't have that intent, the charge didn't make clear to the jury that, if the jury believed that Mr. Roldan thought he was seizing drugs, that he too couldn't be considered part of the conspiracy just like the government informants. This was a critical concept kept from the jury.

Third, the government argues that it is sufficient that the court said that to prove the "second element" of the conspiracy, that Mr. Roldan had to "intentionally enter[ ] into the charged conspiracy with a criminal intent…" Gov. Br. 37, citing A. 592. But this charge about the second element doesn't address Mr. Roldan's argument

13

that the court failed to explain that intent mattered with respect to the first element as well.

Finally, the government asserts that it didn't mislead the jury by arguing in summation that "Scalzo" "agreed to traffic drugs with Isidro Vargas, the DEA informant" because there was "no serious dispute that there was an agreement." A. 516-17. The government now asserts that this wasn't misleading because they said that Scalzo "agreed to traffic drugs with Isidro Vargas, the DEA informant," "but also Oscar Romero, Mauricio Quimbayo, Jose Aguas Oviedo, and James Roldan." A. 517. The government calls Romero and Quimbayo "true conspirators." Gov. Br. 41. This argument is a red herring: Romero and Quimbayo were bit players at trial and the government didn't argue that the conspiracy was formed initially between Scalzo and Romero or Quimbayo. The problem with the government's summation argument is that – as a legal matter – no one could enter a criminal conspiracy with the paid DEA informant, yet the government told the jury that Scalzo in fact did enter a conspiracy with the paid DEA informant. That was misleading and compounded the jury instruction error.

The government bears the burden of proving harmlessness. *United States v. Silver*, 864 F.3d 102, 119 (2d Cir. 2017). They have not done so.

14

## Point III

**Mr. Roldan's sentence should be vacated because the judge refused to calculate the sentencing guidelines before issuing the sentence, despite counsel's clear objection and request that the court determine the appropriate range.**

At Mr. Roldan's sentencing, the court refused to rule on two of the defense guideline objections, saying that the rulings weren't "material" because probation had recommended a sentence lower than the guideline range would have been if the court granted the objections. A. 636, 642. Counsel specifically objected to this approach, explaining that probation's sentencing recommendation could change if the guidelines range changed, and correctly stating that the guidelines were an "anchor" that the court needed to calculate before the sentence was imposed. A. 642-43. Rather than relying on the guidelines as the starting point and anchor, however, the court relied on the probation recommendation as the starting point and anchor. A. 641. Despite counsel's specific objection, the court refused to rule on the defense guideline objections until *after* Mr. Roldan's sentence was pronounced, and only at the government's prompting. The court's failure to calculate the guideline range was procedural error. *Rosales-Mireles v. United States*, 585 U.S. 129, 134 (2018) (cleaned up) ("the failure to calculate the correct Guidelines range constitutes procedural error") (citing *Peugh v. United States*, 569 U.S. 530, 537 (2013)). As Mr. Roldan argued in his opening brief, his sentence should, therefore, be vacated. App. Br. 55-58.

15

The Supreme Court has made the importance of calculating the guideline range correctly abundantly clear. It has explained that the guidelines are the "starting point and the initial benchmark" for sentencing, *Gall v. United States*, 552 U.S. 38, 49 (2007), that they provide a "framework" and an "anchor" for sentencing. *Molina-Martinez v. United States*, 578 U.S. 189, 198–99 (2016), and that the district court bears the "the ultimate responsibility to ensure that the Guidelines range it considers is correct." *Rosales-Mireles*, 585 U.S. at 134. Despite this, the government now argues that the district court's failure to calculate Mr. Roldan's guideline range before sentencing was harmless. Gov. Br. 50-55. This argument should be rejected.

In the government's response brief, it states that any error was harmless because the court "repeatedly made clear that [it] would impose the same sentence on [Mr.] Roldan regardless of whether the challenged adjustments applied." Gov. Br. 50.[3] In support, the government misleadingly cites *Molina-Martinez*, asserting that the Supreme Court held in that case that a guidelines error "is harmless where the sentencing judge's explanation of the reasons the selected sentence makes it clear that the judge based the sentence…on factors independent of the guidelines. Gov. Br. 53

---

[3] The government also asserts that the court was "free to reconsider" the sentence "at any point before the sentencing proceeding formally concluded," citing two out-of-circuit cases in which a court modified its sentence during a sentencing proceeding. Gov. Br. 51-52, citing *United States v. Melvin*, 105 F.4th 620, 623 (4th Cir. 2024) (court changed sentence after defendant's "outburst"); *United States v. Meza*, 620 F.3d 505 (5th Cir. 2010) (when informed of guideline error during the sentencing proceeding, court reformulated the sentence by changing the division of time imposed on the new offense and on the revocation of supervised release, but keeping the length of the total sentence the same). In *Melvin* and *Meza*, by contrast, there was no dispute that the court calculated the guidelines before imposing sentence; these cases are simply not like Mr. Roldan's case.

(cleaned up). But *Molina-Martinez* doesn't say that. First, the portion of *Molina-Martinez* cited by the government relates to the requirements of plain error, not harmless error. *Molina-Martinez*, 578 U.S. at 200 (explaining that in "most cases, [a guidelines error] will suffice for relief if the other requirements of Rule 52(b) [subsection defining "plain error"] are met"). In Mr. Roldan's case, the procedural error was fully preserved by counsel's clear objection. The standard for plain error is, thus, irrelevant.

Second, in discussing situations where an error might not be plain, the Supreme Court described a sentencing court that had given a "detailed explanation of the reasons the selected sentence is appropriate" making "it clear that the judge based the sentence…on factors independent of the Guidelines." *Id.* That too did not happen in Mr. Roldan's case. The sentencing court here simply didn't give a "detailed explanation of the reasons" for the sentence. Rather, the court's stated reasons for the sentence were brief: the court said that it was "enormously sympathetic" to Mr. Roldan, and that Mr. Roldan was a "good family member, a good friend, a good man," but the "jury convicted him" and the court has "huge respect for juries…" A. 652-53. The court also mentioned that it did not "believe[ ] the story that Mr. Roldan told on the stand." A. 652-53. The court provided no further substantive explanation for its sentence: it didn't mention deterrence, just punishment, the nature and circumstances of the offense, or other § 3553 factors. This was far from a "detailed explanation" of Mr. Roldan's sentence.

The government also cites Second Circuit cases that well-predate *Molina-Martinez* for the proposition that the court was permitted not to resolve "complicated disputes" about the guidelines because the court sentenced Mr. Roldan below the guideline range. Gov. Br. 50-51, citing *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005); *United States v. Borrego*, 388 F.3d 66, 69 (2d Cir. 2004); and *United States v. Hernandez*, 521 F. App'x 14, 19 (2d Cir. 2013). These pre-*Molina-Martinez* cases don't support the government's position either. In *Crosby*, for example, the court noted that some "leeway" is "useful" to avoid "precise determinations of some complicated matters" like "monetary loss." *Crosby*, 397 F.3d at 112. But Mr. Roldan's case didn't involve any complicated or "precise" calculations. *Borrego* is so old that it is from a time when the guidelines were mandatory, and appears to be directly contradicted by *Molina-Martinez*. *Borrego*, 388 F.3d at 69. And, in *Hernandez*, the court ruled on the disputed guideline provision. 521 F. App'x at 19 (explaining that the court ruled that the safety-value didn't apply). Thus, *Hernandez* sheds no light on the question in Mr. Roldan's case.

Additionally, this Court has vacated sentences and remanded for guideline errors even in situations where the district court made unequivocal comments that the sentence would be the same under the defense calculation of the guidelines. It is black letter law that a sentencing court's legal duty to correctly calculate and take account of the guidelines means that a "district court cannot insulate its sentence from [appellate] review by commenting that the Guidelines range made no difference to its

18

determination when the record indicates that it did." *United States v. Seabrook*, 968 F.3d 224, 233-34 (2d Cir. 2020); *see also United States v. Feldman*, 647 F.3d 450, 460 (2d Cir. 2011) (opining that "incantation" that sentencing court would "impose the same sentence regardless of any errors calculating the applicable Guidelines range" shouldn't "exempt[ ]" sentence from procedural review); *United States v. Olmeda*, 894 F.3d 89, 94 (2d Cir. 2018) ("[W]e will not 'lightly assume that' proper attention to the Guidelines 'would not affect the sentence,'" especially "where, in the absence of an error, the defendant's Guidelines range would have been substantially lower.") (internal citations omitted). A "district court generally should not try to answer the hypothetical question of whether or not it definitely would impose the same sentence on remand if this Court found particular enhancements erroneous." *Feldman*, 647 F.3d at 460. And this Court will remand for resentencing even where the lower court makes such a statement.

In *United States v. Seabrook*, 968 F.3d at 232-35, for example, this Court remanded for resentencing even though the district judge said it "would have imposed the same sentence under either guideline" argued by the parties, since the judge had "'returned multiple times' to the Guidelines range in framing its choice of the appropriate sentence," and the judge's guidelines miscalculation meant that the imposed sentence constituted a "significant" upward variance from the correct guidelines.

19

Similarly, in *United States v. Bennett*, 839 F.3d 153, 163 (2d Cir. 2016), where the court said it was "not moved by" the guidelines, this Court nonetheless remanded for resentencing after determining the judge had incorrectly calculated those guidelines. And, in fact, on remand, for a variety of reasons, the district court did impose a lower sentence. *See United States v. Darrell Bennett*, No. 14 Cr. 203 (RJS), ECF Dkt. 43, Transcript of Sentencing at 51-52 (S.D.N.Y. Dec. 9, 2016) (reducing original sentence by 18 months).

"[I]n the ordinary case a defendant will satisfy his burden to show prejudice by pointing to the application of an incorrect, higher Guidelines range and the sentence he received thereunder. Absent unusual circumstances, he will not be required to show more." *Molina-Martinez*, 578 U.S. at 201. There are no unusual circumstances here. Instead, this Court should vacate Mr. Roldan's sentence and remand for a resentencing.

Finally, with respect to Mr. Roldan's argument that the court also erred in failing to provide any explanation why a mitigating-role adjustment shouldn't apply, the government asserts that the court didn't need to explain its ruling because the court adopted the PSR. Gov. Br. 56, citing *United States v. Rainford*, 110 F.4th 455 (2d Cir. 2024) and *United States v. Hotaling*, No. 24-434, 2025 WL 2416346 (2d Cir. Aug. 21, 2025) (a summary order that provides scant factual information). *Rainford* is not like Mr. Roldan's case: none of the defendants in *Rainford* argued that the sentencing court hadn't provided an adequate explanation at sentencing. 110 F.4th at 475.

Moreover, in Mr. Roldan's case, the objection was not made only to probation. Here, defense counsel requested the role adjustment at sentencing, explaining that Mr. Roldan was the "least culpable," was in a "uniform he sewed himself," and "stumbl[ed]" through the situation. A. 629-31. The PSR, which predated counsel's comments, didn't address any of these arguments and shouldn't be relied on as the court's explanation for rejecting counsel's argument. Instead, the court's failure to explain its ruling was also error.

## Conclusion

For the reasons set forth above and in appellant's main brief, the Court should vacate Mr. Roldan's conviction or vacate his sentence.

Dated:     New York, New York
           October 2, 2025

                                   Respectfully submitted,

                                   FEDERAL DEFENDERS OF NEW YORK
                                   APPEALS BUREAU

                                   *Allegra Glashausser*
                                   _____
                                   **ALLEGRA GLASHAUSSER**
                                   Assistant Federal Defender
                                   52 Duane Street – 10th Floor
                                   New York, New York 10007
                                   Tel.: (212) 417-8739

21

## CERTIFICATE OF SERVICE

I certify that a copy of this Appendix been served by the Court's Appellate Case Management System **(ACMS)** on the United States Attorney/S.D.N.Y.; Attention: **ALEXANDER NUO LI, OLGA I. ZVEROVICH, SARAH L. KUSHNER, ESQS.,** Assistant United States Attorneys, 26 Federal Plaza, 37th Floor, New York, NY 10278.

Dated:     New York, New York
           October 2, 2025

*Allegra Glashausser*

**ALLEGRA GLASHAUSSER**
Assistant Federal Defender

## CERTIFICATE OF COMPLIANCE WITH RULE 32 (a)

1.  This Brief complies with the type-volume limitations of Fed. R. App. P. 32(a) (7) (B) because:

    this Brief contains 5,392 words, excluding the parts of the Brief exempted by Fed. R. P. 32(a) (7) (B) (iii); and

2.  This Brief complies with the typeface requirements of Fed. R. App. P. 32(a) (5) and type style requirements of Fed. R. App. P. 32(a) (6) because:

    This Brief has been prepared in a monospaced typeface using Microsoft Word with 14 characters per inch in Garamond type style.


Dated:      New York, New York
            October 2, 2025

                                    *Allegra Glashausser*
                                    **ALLEGRA GLASHAUSSER**
                                    Assistant Federal Defender